THE HONORABLE RONALD B. LEIGHTON

1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TROY X. KELLEY,

Defendant.

Case No.  3:15-cr-05198-RBL

DEFENDANT'S OMNIBUS
OPPOSITION TO GOVERNMENT'S
MOTION IN LIMINE REGARDING
SAVITT EXPERT TESTIMONY AND
CLASS ACTION LAWSUITS

**NOTED FOR:**
**FRIDAY, MARCH 4, 2016**

**ORAL ARGUMENT REQUESTED**

**REDACTED**

9

10

11

12

13

14

15

16

17

## I.    INTRODUCTION

18

The government has filed motions in limine seeking to exclude two significant

19

categories of evidence favorable to Mr. Kelley's defense: (1) *any* evidence—except the

20

complaints—related to the multiple class action suits brought to recover "improper"

21

reconveyance fees, all of which were dismissed; and (2) expert testimony from James Savitt

22

concerning the class action lawsuits, and his interpretation of the vague contracts that the

23

government alleges required Mr. Kelley to pay refunds.  Motion in Limine to Exclude

24

Evidence Relating to Class Action Lawsuits (Dkt. No. 158, "Class Action MIL"); Motion to

25

Exclude Testimony of Expert James Savitt (Dkt. No. 159, "Savitt MIL").  The government's

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   attempt to exclude this evidence should be rejected.  Evidence from the class action suits is not

2   just relevant, it is critical to Mr. Kelley's defense to show that (1) reconveyance fees paid to

3   Mr. Kelley's company were earned by him; (2) the reconveyance fees were not owned by the

4   title companies or the borrowers; and (3) Mr. Kelley's knowledge or belief that such funds

5   were not stolen property was reasonable in light of the class action proceedings and the fact

6   they were dismissed.  Mr. Kelley has a Sixth Amendment right to present this important

7   evidence to rebut the government's mens rea and other evidence.  *Taylor v. Illinois,* 484 U.S.

8   400, 415 (1988).

9        Based on this brief, Mr. Kelley not only responds to the government's in limine

10   motions but also separately moves for leave to file a severance motion based on the

11   government's new theories of criminal liability espoused in the in limine motions.

12   Importantly, these new theories are divorced from those stated in the Superseding Indictment,

13   and contradicted by those explained by the government's agents at the evidentiary hearing.  As

14   shown below, the government's new fraud theories are nothing more than a house of cards that

15   will fall before this case gets to the jury for decision.  When the government's case does fail, as

16   it inevitably will, the Court will be left with three false declaration counts and seven tax counts

17   that should never have been joined for trial and which cannot proceed to decision because of

18   the prejudice caused by presentation of the government's alleged fraud case.  *United States v.*

19   *Ragghianti*, 527 F.2d 586, 587 (9th Cir. 1975) (citing Wright, Federal Practice and Procedure,

20   Criminal, § 222 (1969)) (trial court should consider prejudice under Rule 14 from introduction

21   of evidence on dismissed count); s*ee United States v. Lazarenko*, 564 F.3d 1026, 1043 (9th Cir.

22   2009) ("'Retroactive misjoinder' arises where joinder of multiple counts was proper initially,

23   but later developments—such as a district court's dismissal of some counts for lack of

24   evidence or an appellate court's reversal of less than all convictions—render the initial joinder

25   improper.") (quoting *United States v. Vebeliunas*, 76 F.3d 1283, 1293–94 (2d Cir. 1996));

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 2

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   *United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) (remanding for new trial on remaining

2   counts because "in retrospect, the jury should never have heard evidence on the vacated

3   count").

## II.   DISCUSSION

**A.     The Government Has Materially—and Fatally—Changed its Theory of the Case.**

**1.     The Government's Stolen Property and Money Laundering Charges Require it to Prove that Someone Besides Mr. Kelley Owned the Allegedly Stolen Funds.**

8   To prove Mr. Kelley possessed and concealed stolen money in violation of 18 U.S.C. §

9   2315, the government has to prove that Mr. Kelley took money "from one having the attributes

10  of an owner." *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978); *see also id.* (holding

11  that the National Stolen Property Act does not extend to "embrace every fraudulent scheme

12  which, however remotely, diminishes another's wealth").[1]  Similarly, to prove Mr. Kelley

13  laundered money taken by fraud, the government will need to prove that he deprived someone

14  of their property rights in that money.  *Hammerschmidt v. United States*, 265 U.S. 182, 188

15  (1924) ("[The] words 'to defraud' . . . refer . . . to wronging one in his property rights by

16  dishonest methods or schemes."); *see also Cleveland v. United States*, 531 U.S. 12, 15 (2000)

17  ("It does not suffice, we clarify, that the object of the fraud may become property in the

18  recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in

19  the hands of the victim.").[2]

20

---

21  [1] *See also Dowling v. United States,* 473 U.S. 207 (1985) (holding that the sale of bootleg records did not violate
    the National Stolen Property Act because "the property rights of a copyright holder have a character distinct from

22  the possessory interest of the owner of simple 'goods, wares, [or] merchandise,' for the copyright holder's
    dominion is subjected to precisely defined limits") (quoting 18 U.S.C. § 2314); *United States v. Long Cove*

23  *Seafood, Inc.*, 582 F.2d 159 (2d Cir. 1978) (dismissing § 2314 charges where the government could not prove
    ownership of the allegedly stolen goods because the National Stolen Property Act covers only "felonious

24  (taking[s]) with intent to deprive the owner of the rights and benefits of ownership") (quoting *United States v.
    Turley,* 352 U.S. 407, 417 (1957)).

25  [2] *See also McNally v. United States*, 483 U.S. 350, 359 (1987) ("[T]he mail fraud statute . . . had its origin in the
    desire to protect individual property rights, and any benefit which the Government derives from the statute must
    be limited to the Government's interests as property holder."); *U.S. v. Adler*, 186 F.3d 574 (4th Cir. 1999)

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 3

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

2.     **The Government's Theory Has Long Been that Mr. Kelley Stole the Money from Borrowers by Failing to Pay Refund**s.

The government has never been altogether clear on whose money it believes Mr. Kelley stole.[3]  The Superseding Indictment tries to avoid the (dispositive) question altogether, saying that the money was "taken by fraud from [the title companies] *and* borrowers," as though an individual borrower and an unrelated corporation could simultaneously own the same dollar bill.  Superseding Indictment ¶ 105 (emphasis added).  A deeper reading of the indictment reveals some conflict in the government's theory,[4]  but generally speaking, the government's theory appears to be that the reconveyance fees borrowers paid to PCD were owned by the borrowers and that Mr. Kelley stole those fees only when he declined to refund them to the borrowers—in violation of his representations to the title companies, including, most importantly, the terms of his contracts with the title companies.  *See, e.g.,* SI ¶ 11 ("Contrary to his representations, TROY X. KELLEY did not refund unused portions of reconveyance fees to borrowers, but instead fraudulently retained, stole, and converted them to his own use. . . . Count 1 of the Superseding Indictment [therefore] charges TROY X. KELLEY with Possession and Concealment of Stolen Property, namely, . . . unused reconveyance-processing fees that should have been refunded to borrowers."); ¶ 20 ("TROY X. KELLEY devised a scheme and artifice to defraud Fidelity and borrowers . . . to take and convert to his own use and benefit reconveyance-processing fees that TROY X. KELLEY knew should have been refunded to borrowers."); ¶ 36 (Mr. Kelley "intended to take . . . reconveyance-processing fees

---

(holding that federal fraud statutes "are limited to 'protecting property rights,'" and therefore did not apply where the alleged victim "did not have a property right in the particular" funds) (quoting *McNally,* 483 U.S. at 357).

[3] The evidence at trial will show that, at the closing of each residential transaction, any fee paid to Mr. Kelley was earned by his company and was not owned by either the title companies or the escrow customers.  Not only will Mr. Kelley's experts testify to this fact, but it was admitted by Old Republic Title in connection with its settlement with Mr. Kelley, which is alleged in the Superseding Indictment at paragraphs 83 and 141, and therefore corroborates Mr. Kelley's belief that the property was not stolen.  As explained below, the pleadings filed by the title companies in the class action litigation also concede that the reconveyance fees were earned at closing.

[4] In particular, while repeatedly insisting that the reconveyance fee paid to Mr. Kelley was the property of the borrowers, the government nonetheless continues to assert, without a clear basis, that Mr. Kelley stole money from the borrowers *and the title companies*.  *See, e.g.,* SI ¶¶ 20, 32, 52.

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 4

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    that . . . should have been refunded to borrowers.").  Put another way, the government's theory

2    in the indictment seems to be that the contracts with and representations to the title companies

3    provide the source of Mr. Kelley's alleged obligation to return the funds, but it was the

4    borrowers whose money was "stolen" when Mr. Kelley allegedly breached those contracts.

5         In an effort to obtain some clarity on the government's theory, Mr. Kelley's attorney

6    tried asking Michael Brown, the lead FBI agent in this case, who owned the money.  Though

7    Agent Brown's testimony was far from direct, his testimony generally appeared to confirm that

8    the government's theory was that the money belonged to the borrowers and that Mr. Kelley

9    "stole" it because he was contractually obligated to, but did not, refund it to the borrowers:

10        Q.    Now, in order to steal property, you have to steal it from somebody,
11              correct?

12        A.    Yes.

13        Q.    And what is the government's – What has your investigation shown
14              about who Mr. Kelley allegedly stole this property from?

15        A.    I believe it is a legal question, as far as who specifically he stole it from.
16              The money, I can – I can speak to the money, based on his
              representations, was supposed to be returned to borrowers.

17                                        …

18        Q.    So who did he steal it from?

19        A.    I believe ultimately that is a legal question, as far as who he stole it
20              from.  He was not – That was not his money, and he was supposed to
              return – based on his representations, he was supposed to return that
21              back to the borrower.

22   Declaration of Angelo J. Calfo ("Calfo Decl."), Ex. 1 at 124:5–14, 124:20–125:1.

23        Q.    Any obligation to refund home buyers' reconveyance fees would have to
24              arise by contract; is that right?

25        A.    That is my understanding.

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 5

1     Q.     And the government's theory in this case is that Mr. Kelley did not abide by your interpretation of certain contracts; is that true?

2     A.     Yes.

3     Q.     And you believe that that constituted theft of stolen property; is that right?

4

5     A.     That is correct.

                             . . .

6     Q.     But it is your position that by retaining what you have described as excess funds, pursuant to this agreement, such as it is, that Mr. Kelley stole the money from the home buyers?

7

8     A.     Yes.

                             . . .

9     Q.     Your theory here, as I understand it, is that Mr. Kelley stole money by retaining the excess funds under these contracts, right?

10

11     A.     Yes.

                             . . .

12

13     Q.     Didn't the borrowers own the money?

14     A.     Yes, that was their money at the time, transferred over to the title company.

15     Q.     Once it got to PCD, was it still their money?

16

17     A.     I believe, because it was due back to them; minus the fees, that is their money.

18     Q.     So they should have a right to that money back, shouldn't they?

19     A.     I believe they are due the money.

20     Q.     But Old Republic Title says it is not clear that they have a right, and their own lawyer says it is not clear they have a right. So why is it – What is your basis for saying they do have a right?

21

22     A.     I am looking at the arrangements that they had, what services were due to be provided.  So in those cases Mr. Kelley made statements to the title companies about the use of the money, and failed to return the money as per that agreement. So the borrower may or may not have been aware of that – of that piece of things, and been aware that they were due that particular refund.

23

24

25

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1
2

    Q.     Okay. I am not sure I understood that. Is it your testimony today that the
               borrowers – the money was stolen from the borrowers?

3

    A.     The money is due to the borrowers, yes.

4

    Q.     Was it stolen from them?

5

    A.     I think it was stolen from them and from the title company.

6

Calfo Decl., Ex. 2 at 7:1–10, 23:4–8, 30:18–21, 32:25–34:1. Gary Beisheim, the FBI's

7

accountant, echoed Agent Brown's understanding of the government's theory of the case:

8
9

    Q.     And your conclusion that the funds were stolen is based on your review
               of contracts; is that right?

10

    A.     That's correct.  Contracts and backed up by the checks. That's the basis
               of my conclusion.

11
12
13

    Q.     And your basic – It sounds like your view is the failure of Mr. Kelley to
               refund customers' excess fees under the contracts with the title
               companies constituted theft?

14

    A.     That's correct.

15

Calfo Decl., Ex. 3 at 3:15–23.  Following the evidentiary hearing and the parties' briefing on a

16

motion to sever, the Court explained the government's theory this way: "The government

17

alleges [Mr. Kelley] stole excess reconveyance fees from his clients' borrowers."  Order on

18

Motion to Sever (Dkt. No. 105), p. 8.  In reliance on the theory sketched in the indictment and

19

the testimony of the government's witnesses, Mr. Kelley prepared for trial.

20
21

       **3.**     **The Government Changed its Theory Last Week, and Now Claims that the
                Money Was Stolen from the Title Companies.**

22

       As Mr. Kelley pointed out in his Motion in Limine to Exclude Evidence of Alleged

23

Representations Made to Borrowers and Title Companies (Dkt. No. 155), this theory of fraud

24

was legally unsound because "under clear Ninth Circuit precedent, alleged misrepresentations

25

are only actionable as fraud when they are made to the person or entity from whom money or

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 7

property is sought, i.e., the victim of the alleged fraud. *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989)." Dkt. No. 155, p. 2.[5] But sound or not, it was the government's theory. That changed last Monday night at around 11:50 P.M. when the government filed two motions in limine that abruptly changed its theory of the case. In the government's class action motion in limine, it announced that Mr. Kelley is no longer charged with stealing from borrowers by failing to pay refunds due under a contract, but "he is charged with lying to escrow companies to obtain money (i.e. obtaining money from the escrow companies by fraud and deceit)." Class Action MIL, p. 1. Mr. Kelley is now charged with "fraud to obtain money from the escrow companies," which, the government asserts, "is entirely separate and independent of the escrow companies' interactions with their borrowers." Class Action MIL, p. 6; *see also* p. 12. In a subsequent motion in limine, filed at 11:56 P.M., the government doubled down on its new theory, claiming:

> Kelley is being prosecuted for fraud that he committed by making misrepresentations to escrow companies to get money in those companies' control. He is not being prosecuted for breach of contract, either with escrow companies, or with their borrowers. The jury instructions in this case will require the jury to determine whether Kelley engaged in a scheme to obtain money held by escrow companies by deceiving those companies, and only evidence relevant to that issue (and to the elements of that crime) is properly admissible.

Savitt MIL, pp. 1–2. Or, as the government put it a few pages later, "[t]he jury in this case will be required to determine whether Kelley made fraudulent misrepresentations and used deceit to obtain property from Fidelity and Old Republic. . . . The jury will <u>not</u> be required to determine whether Kelley breached his contract with Fidelity and Old Republic." Savitt MIL, p. 10 (emphasis in original).

---

[5] The government's borrower/owner theory was plagued by additional comprehensive defects, which Mr. Kelley was prepared to address via a Rule 29 motion.

DEFENDANT'S OMNIBUS OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE REGARDING SAVITT EXPERT TESTIMONY AND CLASS ACTION LAWSUITS - 8

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

The government's new theory significantly shifts the focus of this case. Because, as the government must be aware, property can only be "stolen" from an owner and a person can only be "defrauded" of property she owns, the government's new theory must be that the title companies owned the money that borrowers deposited with them to pay to PCD. *See, e.g.*, *United States v. Turley*, 352 U.S. 407, 417 (1957) ("'Stolen' as used in 18 U.S.C. § 2312[, a statute analogous to § 2315,] includes all felonious takings . . . *with intent to deprive the owner of the rights and benefits of ownership.*") (emphasis added)[6]; *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) ("[The] words 'to defraud' . . . refer . . . to *wronging one in his property rights* by dishonest methods or schemes.") (emphasis added). Indeed, the government now appears to contend that whether the borrowers had any interest in the money is *irrelevant*. Savitt MIL, p. 10. (The government has admitted that Mr. Kelley *only* had an obligation to repay borrowers *if* he was required to do so by the PCD/title company contracts. Calfo Decl., Ex. 2 at 6:16–7:10. So if, as the government now claims, it is irrelevant whether Mr. Kelley breached that contractual obligation, then it is *ipso facto* irrelevant whether the borrowers had any right to a refund.)

### 4. The Government's New Theory Is Untenable because the Title Companies Do Not Have Any Property Rights in the Reconveyance Fees Paid by Borrowers.

The government's new theory fails as both a legal and a factual matter. The theory fails because escrow agents (including title companies) do not own any protectable property right in money entrusted to them by borrowers. "The hallmark of a protected property interest is the right to exclude others." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999); *see also Int'l News Serv. v. Associated Press*, 248 U.S.

---

[6] The Ninth Circuit applied *Turley's* definition of "stolen" to the National Stolen Property Act in *Carman*. *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978); *see also United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978) ("The meaning of the word "stolen" as used in [18 U.S.C. § 2314] is relatively well-established. The leading case is *United States v. Turley*, 352 U.S. 407 (1957) . . . We regard *Turley* as controlling here because the word 'stolen' is used in the same way in both the NSPA and the [National Motor Vehicle Theft Act].").

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 9

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

215, 250 (1918) (Brandeis, J., concurring) ("An essential element of individual property is the legal right to exclude others from enjoying it.").  Thus, the Supreme Court held in *Dowling* that the National Stolen Property Act—18 U.S.C. §§ 2311 and 2314–2315—did not cover copyrights because "the copyright holder's dominion is subjected to precisely defined limits." *Dowling v. United States*, 473 U.S. 207, 217 (1985).  This logic applies with even greater force to escrow agents.

It is beyond dispute that an escrow agent *does not* have the exclusive right to use and control escrow funds at will.  To the contrary, "the escrow holder has *no personal interest in the escrow deposit* other than carrying out his or her obligations under the escrow agreement." 28 Am. Jur. 2d Escrow § 22 (emphasis added).[7]  In Washington as elsewhere, "[t]he escrow agent's duties and limitations are defined . . . by his instructions. . . .  'As a general rule, the escrow holder must act strictly in accordance with the provisions of the escrow agreement; he must comply strictly with the instructions of the parties.'"  *Nat'l Bank of Washington v. Equity Inv'rs*, 81 Wash. 2d 886, 910 (1973) (quoting 30A C.J.S. Escrows § 8 (1965)); *see also* 28 Am. Jur. 2d Escrow § 22 ("[W]hen a person acts as the depositary of an escrow, he or she is absolutely bound by the terms and conditions of the deposit and charged with the strict execution of the duties thereby voluntarily assumed.").  That is, an escrow agent is an agent, bound to do with the money only what his principals instruct.  Thus, an escrow agent who fails to disburse the funds precisely as a depositor instructs "can be held liable to his principals for damage proximately caused from his breach of the escrow instructions."  *Styrk v. Cornerstone Investments, Inc.*, 810 P.2d 1366, 1371 (Wash. Ct. App. 1991).

---

[7] So who owns the money in the title company's control?  Under Washington law, ownership of escrowed funds is deemed to remain with the depositor until the escrow conditions are completed, at which time ownership transfers to the payee.  *In re Brown*, 28 F. App'x 725, 727 (9th Cir. 2002) (citing *Lechner v. Halling*, 216 P.2d 179, 183–84 (Wash. 1950), *Angell v. Ingram*, 213 P.2d 944, 945 (Wash. 1950), and *In re Presidential Corp.*, 180 B.R. 233, 238 (B.A.P. 9th Cir. 1995)); *see also In re Presidential*, 180 B.R. at 238, *abrogated on other grounds by In re Mortgage Store, Inc.*, 773 F.3d 990 (9th Cir. 2014)) ("Prior to the conditions being met for the funds to be transferred from the buyer to the seller, the escrow agent holds the funds as the agent of the buyer.").

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 10

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1    This point was forcefully and repeatedly made by the title companies themselves after

2    they were sued by borrowers in a spate of class action suits.  For example, in its Motion for

3    Judgment on the Pleadings in *Cornelius v. Fidelity*, Fidelity argued, "Plaintiffs [escrow

4    customers] *specifically authorized* and directed the Escrow Agents to collect reconveyance

5    fees in addition to general escrow fees and to pay the reconveyance fees to the third-party

6    entity Post Closing Department [by signing HUD-1 statements]. . . .   Neither Escrow Agent

7    could ignore the requirements to collect separate reconveyance fees and disburse them to the

8    third party Post Closing Department."  Calfo Decl., Ex. 4 at pp. 5–6.  Old Republic made the

9    same point in its motion for summary judgment in the *McFerrin* case, pointing out that "the

10   parties' escrow instructions (i.e., their contracts) plainly disclosed the existence and amount of

11   the reconveyance fee and expressly authorized Old Republic to collect it."  Calfo Decl., Ex. 5

12   at p. 2.[8]  A review of escrow instructions from both Fidelity and Old Republic confirms that

13   the borrowers expressly instructed the escrow companies to distribute funds—including the

14   reconveyance fees—in accordance with the HUD-1 settlement statements.  Calfo Decl., Ex. 6.

15   In short, as a legal matter, the title companies did not have any property rights in the escrowed

16   funds because the borrowers had the exclusive rights to control the disbursement of the funds.

17   The government's new theory is therefore legally untenable.

18        The theory is also factually untenable because both Fidelity and Old Republic—the

19   purported victims—have disclaimed any right to the money.  *See* Calfo Decl., Ex. 7 (Old

20

21   [8] So did First American in its own motions to dismiss.  Calfo Decl., Ex. 10 at p. 21 ("[T]he reconveyance tracking
fee and payoff amounts were listed as separate items on Plaintiffs' final HUD-1 Settlement Statements and thus
22   the charges were incorporated into the parties' Escrow Instructions . . . .  Thus, FATIC's reconveyance charges
did not breach the Escrow Instructions.  To the contrary, they were expressly authorized via the HUD-1s."); Calfo
23   Decl., Ex. 11 at pp. 11–12 ("Not only was the 'Reconveyance Tracking Fee' fully disclosed and clearly labeled,
but Plaintiffs agreed to pay it when they signed their Escrow Instructions.  First American cannot breach that
24   contract by collecting the very charges Plaintiffs told it to collect.").  So did Land Title.  Calfo Decl., Ex. 12 at p.
9 ("[A]ny perceived contractual obligation LTC had to not charge certain fees . . . was immediately nullified when
25   Plaintiff, after full disclosure, repeatedly affixed his signature to documents outlining the fees, such as the escrow
instructions, the specific escrow instructions from the lender, and the HUD-1 settlement statement.  In short, the
payment of the fees became the contractual obligation LTC was obliged to follow.") (citations omitted).

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 11

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1     Republic's answers to requests for admission in *Old Republic v. Kelley*, disclaiming ownership

2     of the funds); Calfo Decl., Ex. 8 ¶¶ 5, 21 (declaration of Fidelity Vice President Edwin C.

3     Johnson filed in *Cornelius v. Fidelity* class action suit; describing reconveyance fee as "a fee

4     charged by the vendor [PCD] to the customer" and noting that Fidelity "did not receive or

5     retain any portion, split, or percentage of the reconveyance fees charged by PCD"); Calfo

6     Decl., Ex. 9 ¶ 18 (declaration of Old Republic Vice President Patricia LeVeck filed in

7     *McFerrin v. Old Republic* class action suit; "Old Republic collected fees for reconveyance

8     services . . . .  The entire amounts collected from Plaintiffs at closing were remitted to the

9     third-party vendors under contract with Old Republic to perform post-closing reconveyance

10    services."); *see also Cornelius v. Fid. Nat. Title Co. of Washington*, No. C08-754MJP, 2010

11    WL 1406333, at *2 (W.D. Wash. Apr. 1, 2010) ("[E]ach HUD–1 disclosed an escrow closing

12    fee and a separate reconveyance fee *payable to PCD*.") (emphasis added); *id.* at *4 ("[Fidelity]

13    collected and disbursed (in its entirety) the fee charged by PCD for its reconveyance

14    tracking.").

15         Because escrow companies, as a matter of law, do not maintain property rights in

16    escrowed money, the government can elicit no set of facts that could lead a reasonable juror to

17    find Mr. Kelley guilty of Counts 1 and 6–10.  And even if the law changed between now and

18    trial, the government's theory would still be doomed as a factual matter because both Old

19    Republic and Fidelity have denied any ownership of the money allegedly stolen from them.

20    Consequently, this Court should not let these counts go to trial.  Or, at a minimum, the Court

21    should sever the government's fatally defective counts from the remaining counts to avoid the

22    inevitable prejudice to Mr. Kelley with respect to the remaining counts that results from the

23    joinder of these defective charges.

24

25

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 12

**B.      The Class Action Lawsuits Are Relevant to the Government's Charges and to Mr. Kelley's Defenses, and the Government's Attempt to Exclude them Should be Rejected.**

The government's attempt to exclude almost all—but not all—evidence related to the class action suits starts with a mischaracterization of its own charges against Mr. Kelley.  As the government acknowledges, Mr. Kelley is charged with possession and concealment of stolen property, in violation of 18 U.S.C. § 2315.  Class Action MIL, p. 7.  Curiously, however, the government suggests that to prove that charge, it need not prove the elements enumerated in § 2315, but can instead prove the elements of two different statutes under which it has not charged Mr. Kelley (including a Washington state statute).  Class Action MIL, p. 7.[9] In any event, courts have held that the standard for determining whether property is "stolen" under federal law is governed by a federal standard, which requires the government to show an intent by the defendant to deprive the owner the benefits of ownership (*see, e.g.*, *Turley*, 352 U.S. at 417[10]) and that "to defraud" someone is to deprive them of their property rights (*see, e.g.*, *Hammerschmidt*, 265 U.S. at 188).  The government gives no explanation and cites no authority for its planned switcheroo to incorporate state theft or other charges into the Superseding Indictment.  But in any event, looking at the statutes under which Mr. Kelley has actually been charged, the government cannot seriously dispute that the course and pleadings of the class action suits are highly relevant to the elements of its charges and Mr. Kelley's potential defenses thereto.

---

[9] The government cannot charge Mr. Kelley directly for wire fraud because the statute of limitations on that charge ran long before the government brought its indictment.  It has no jurisdiction to charge state law theft.

[10] As the Supreme Court noted in *Turley*, "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning.  But 'stolen' (or 'stealing') has no accepted common-law meaning." *Turley*, 352 U.S. at 411.  Thus, the Court concluded that, "[f]reed from a common-law meaning, [federal courts] should give 'stolen' the meaning consistent with the context in which it appears." *Id.* at 412–13.  The *Turley* Court therefore looked at the Congressional record to determine what Congress likely meant when they used the term "stolen." *Id.* at 415.  It concluded that the proper standard was to determine whether the defendant intended to deprive the owner of property of the rights and benefits of ownership. *Id.* at 417.

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700      FAX, (206) 623-8717

1

2

**1.      Allowing the Government to Introduce the *McFerrin* and *Cornelius* Complaints While Prohibiting Mr. Kelley from Showing How Those Claims Fared Would Be Grossly Prejudicial.**

To start with, the unreasonableness of the government's proposed blanket prohibition is perhaps best shown by considering the only two things the government does not want to keep out: the class action complaints filed against Fidelity and Old Republic.  Class Action MIL, p. 14.  That is, the government wants to be able to show the jury complaints alleging that Fidelity and Old Republic's customers were wrongfully charged for reconveyance fees for which no work was performed, while excluding *any and all* evidence demonstrating how thoroughly the claims were rejected (both by courts and the government's alleged victims).  Such a one-sided presentation would obviously prejudice Mr. Kelley.  The jury would get the class action lawyers' allegations of wrongdoing (implicitly attributable to PCD), without any explanation for why those allegations proved severely lacking.  They would naturally speculate and assume the worst.  If the government wants to introduce the complaints, Mr. Kelley has no objection, but basic notions of fairness require allowing Mr. Kelley to tell the whole story by introducing subsequent pleadings and rulings.

**2.      The Class Action Suits Are Highly Relevant to Mr. Kelley's Knowledge and Intent in Possessing Money Earned as Reconveyance Fees.**

The Superseding Indictment alleges that Mr. Kelley was aware of the class action lawsuits.  SI ¶ 56.  It also alleges that his knowledge of those lawsuits explains his intent in allegedly hiding the funds by conducting financial transactions with the allegedly stolen money after those lawsuits were filed.  SI ¶¶ 62, 71.  Just as the class action lawsuits and the contents of the complaints are relevant to the government's case theory as to Mr. Kelley's mens rea, so, too, are they relevant to the defense's position that the lawsuits and subsequent proceedings show Mr. Kelley's lack of knowledge and intent to deal in stolen property.

Mr. Kelley can only be convicted under 18 U.S.C. § 2315 if the government can prove beyond a reasonable doubt that Mr. Kelley <u>knew</u> the money he possessed and allegedly

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

concealed was stolen and that he intended to deprive the owner of the rights and benefits of ownership.  18 U.S.C. § 2315; *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978). Similarly, he can only be convicted of money laundering with a specified unlawful activity of wire fraud if the government can prove beyond a reasonable doubt that he <u>intended to defraud</u> a person to whom he made material misrepresentations.  18 U.S.C. § 1343; Class Action MIL, p. 7.  As detailed above, both 2315 and wire fraud require that someone besides Mr. Kelley *owns* the property in Mr. Kelley's possession.  Thus, any evidence which tends to cast doubt on the notion that someone besides Mr. Kelley had a property right in reconveyance fees paid to him tends to show that it was objectively reasonable for Mr. Kelley to believe he was not depriving anyone else of their property rights.

As a general matter, the fact that borrowers lost suit after suit after suit challenging the charging of reconveyance fees gave Mr. Kelley good reason to believe that no one besides him had a right to the money in his account.  More specifically, to take examples from the government's motion, the court's ruling in *Cornelius* that borrowers were not entitled to a refund because they had agreed to pay the reconveyance fee after full disclosure and that escrow companies could not be held responsible because the money was paid to PCD and not to them could certainly suggest to a reasonable person that neither the borrower nor the title company had any right to that money.  Class Action MIL, p. 8.

Similarly, statements from Fidelity (one of the government's victims) that "PCD received the entire amount of the fee and rendered services for them" and thus, according to Fidelity, had "earned" the fee under the governing law, are relevant because they show Mr. Kelley could reasonably believe he had a right to keep that earned money.  Class Action MIL, p. 10.  "[A] person who deals with another person's goods with the sincere and genuine belief that he has the owner's consent does not do so knowing the goods to have been 'stolen.'  They may in fact have been stolen, but if he believes the owner has consented to his dealings with

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 15

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   them he lacks the knowledge explicitly required by these sections." *United States v. Bennett*,

2   665 F.2d 16, 22 (2d Cir. 1981) (footnote omitted).  Thus, if Fidelity said in the class action

3   case that Mr. Kelley had earned the money, Mr. Kelley cannot have knowingly stolen it.

4          To take the government's final example, statements from the title companies that no

5   refunds were due to borrowers certainly shed light on whether Mr. Kelley could reasonably

6   believe that no one else—either the title companies or the borrowers—owned the reconveyance

7   fees he had been paid.  Class Action MIL, pp. 10–11.  If the courts say it's not the borrowers'

8   and it's not the title companies', and the title companies say the same thing,  then surely Mr.

9   Kelley could reasonably believe the money paid to PCD for reconveyance processing wasn't

10  the title companies' and it wasn't the borrowers'.

11         Further, the reconveyance class actions show that *every* major title company, whether

12  they used a third party like PCD or whether they handled reconveyances in-house, was

13  charging a reconveyance fee comparable to what PCD charged, and that *none of them* were

14  paying refunds where the settlement statement listed the expense as a fee rather than a deposit

15  (as it did in all cases involving Mr. Kelley, Old Republic, and Fidelity).  This is relevant to

16  show that Mr. Kelley reasonably believed he was following the universal industry practice in

17  keeping the entire reconveyance fee once it was paid at closing as a fee in exchange for a

18  service, rather than knowingly stealing the money.  The government contends that each case

19  had a unique context which makes generalizing problematic (pp. 12–13), but this is exactly the

20  point: even across these (slightly) different contexts, each industry player hewed to the same

21  industry practices as Mr. Kelley, and this speaks to whether Mr. Kelley knew he was violating

22  the law.

23         In short, evidence of the class action decisions and pleadings is relevant to Mr. Kelley's

24  state of mind, and the government's request for a blanket prohibition on all such evidence is

25  meritless.

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 16

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

### 3.     The Title Companies' Statements Concerning Ownership of the Reconveyance Fees Are Relevant.

Also relevant to the government's stolen property counts is the fact that throughout the class action proceedings, both of the title companies from whom Mr. Kelley allegedly stole property disclaimed any interest in the allegedly stolen property.  For example, Curt Johnson, Fidelity's vice president, submitted a sworn declaration in *Cornelius v. Fidelity* in which he explained why Fidelity had no interest in the reconveyance fees paid to PCD.  He described them as "a fee charged by the vendor [PCD] to the customer."  Calfo Decl., Ex. 8at ¶ 5.  He insisted that Fidelity "did not receive or retain any portion, split, or percentage of the reconveyance fees charged by PCD."  *Id.* at ¶ 21.  In fact, Fidelity's lack of rights in the reconveyance fees was one its key themes in Fidelity's motion for summary judgment, as it made clear in its very first paragraph: "The undisputed facts . . . show: (1) FNTCW disclosed the fees up front; (2) Plaintiffs and their lenders instructed FNTCW to disburse the fees to PCD; (3) PCD is a vendor not affiliated with FNTCW; and (4) PCD received the entire amount of the fees and rendered services for them."  Calfo Decl., Ex. 13 at p. 1.  Judge Pechman concurred, finding that "each HUD–1 disclosed an escrow closing fee and a separate reconveyance fee *payable to PCD*," and that "[Fidelity] collected and disbursed (in its entirety) the fee charged by PCD for its reconveyance tracking."  *Cornelius v. Fid. Nat. Title Co. of Washington*, No. C08-754MJP, 2010 WL 1406333, at *2, *4 (W.D. Wash. Apr. 1, 2010) (emphasis added).  And yet the government insists the class action pleadings are *per se* irrelevant to whether Fidelity was defrauded of its property.

Old Republic echoed Fidelity in its own pleadings.  Old Republic's Vice President Patricia LeVeck echoed Mr. Johnson in her own declaration from the *McFerrin v. Old Republic* suit.  Ms. LeVeck said, "Old Republic collected fees for reconveyance services . . . The entire amounts collected from Plaintiffs at closing were remitted to the third-party vendors under contract with Old Republic to perform post-closing reconveyance services."  Calfo

DEFENDANT'S OMNIBUS OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE REGARDING SAVITT EXPERT TESTIMONY AND CLASS ACTION LAWSUITS - 17

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1  Decl., Ex. 9 at ¶ 18.  In dismissing plaintiffs' claims, Judge Settle similarly characterized the

2  fee not as property of Old Republic's, but a "fee *to the Post Closing Department*."  *McFerrin v.*

3  *Old Republic Title, Ltd.,* No. C08-5309BHS, 2009 WL 2045212, at *5 (W.D. Wash. July 9,

4  2009).  But here again, the government claims that *nothing* in either *Cornelius* or *McFerrin*—

5  except, of course, the complaints—is relevant to whether Mr. Kelley took property from

6  Fidelity or Old Republic.

7         Because the government's new theory requires it to prove beyond a reasonable doubt

8  that the title companies owned the money Mr. Kelley allegedly stole, statements by the title

9  companies and the courts indicating that the money did not belong to the title companies are

10  not only relevant to the government's charges, they are fatal.

11         **4.     Whether or Not the Government Still Intends to Argue that Borrowers'**
           **Supposed Right to a Refund Is Relevant, the Class Action Suits Are**
12         **Relevant to that Question.**

13         The government's attempt to exclude evidence from the class action suits is based

14  largely on the narrowness of its new stolen property theory.  *See, e.g.*, Class Action MIL, p. 9

15  ("Nothing about the issues decided by the courts in each of the class actions . . . makes it more

16  or less likely that Kelley made . . . misrepresentations . . . , and used deception, in his dealings

17  with the escrow companies."); p. 12 ("The statements and positions make it neither more nor

18  less likely that Kelley made material misrepresentations to the escrow companies, and that he

19  used deception, to obtain money from them.").  But whether or not the government tries to

20  change its theory yet again, the class action pleadings and decisions are relevant because they

21  contain statement after statement after statement to the effect that when—as happened here—a

22  borrower agrees to pay a reconveyance fee that is fully disclosed on her HUD-1, and the payee

23  does some work for that fee—the borrower no longer maintains any ownership rights to the

24  fee.  *See, e.g.*, Calfo Decl., Ex. 1 at 154:15–159:15, 160:6–162:7 (testimony from FBI Agent

25  Michael Brown discussing title company positions in class action suits), Calfo Decl., Ex. 2 at

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 18

4:18–6:15 (same).  Showing that the borrowers have no ownership or other right in the reconveyance fees is relevant to Mr. Kelley's knowledge and belief as to the nature and effect of the transactions.  If Mr. Kelley believed that the borrowers did not own the money, it is highly probative of whether he believed the property was stolen.

5. **For All of These Reasons, Mr. Savitt's Testimony About the Class Action Suits Is Also Relevant.**

The government also seeks to exclude testimony from Mr. Kelley's expert witness, James Savitt, discussing "the positions taken by the title companies in these class action lawsuits." Class Action MIL, p. 10, Ex. 6 at 2.[11]  For the reasons outlined above, these topics are relevant to the government's allegations and Mr. Kelley's defenses.  Moreover, they are proper subjects for expert testimony because they will aid the jury in understanding the positions taken by the parties and their relevance to this case.  The entirety of Mr. Savitt's proposed testimony regarding the class action suits is therefore admissible.

Federal Rule of Evidence 702 provides that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," then it is an appropriate for an expert to testify as to that knowledge.  Fed. R. Evid. 702.

---

[11] In addition to discussing the positions taken by the class action litigants, Mr. Savitt intends to discuss a number of other class-action-related topics, as outlined in Mr. Kelley's expert disclosures:

> He will discuss the manner in which class action plaintiffs are paid, and how damages recovered in a class action case are distributed to those allegedly harmed financially.  Mr. Savitt will also discuss recent case law under which courts considered the issue of whether a class action defendant's payment of an individual class plaintiff s claim should result in the dismissal of the class action claim, and the recent U.S. Supreme Court ruling on this issue.  Against the background of this testimony, Mr. Savitt will testify regarding the course of proceedings in class action litigation filed in the Western District of Washington brought by escrow customers against title companies seeking a return of reconveyance fees paid at closings.

Class Action MIL, Ex. 6 at 2.  The government does not specifically challenge any of these topics, and with good reason:  courts consistently hold that experts may testify about complex litigation procedures "in terms that a layperson can understand."  *See, e.g., Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 946–47 (N.D. Cal. 2015) (internal quotation marks omitted); *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 256 (W.D.N.Y. 2000).  Similarly, courts permit experts to educate juries on industry customs.  *Hangarter*, 373 F.3d at 1016; *First Nat'l State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981).

DEFENDANT'S OMNIBUS OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE REGARDING SAVITT EXPERT TESTIMONY AND CLASS ACTION LAWSUITS - 19

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow*

2   *Pharms., Inc.,* 509 U.S. 579, 589 (1993).  The admissibility inquiry is flexible, and "[s]haky

3   but admissible evidence is to be attacked by cross examination, contrary evidence, and

4   attention to the burden of proof, *not exclusion*."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.

5   2010) (emphasis supplied).  Rather than exclusion, courts should permit the expert to testify,

6   "and the jury decides how much weight to give that testimony."  *Id.*

7        Rule 702 requires a flexible, fact-specific inquiry that embodies the twin concerns of

8   reliability and helpfulness.  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999);

9   *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1184 (9th Cir. 2002).  In conducting this inquiry,

10  courts consider whether expert testimony addresses an issue beyond the common knowledge of

11  the average layman.  *Daubert,* 509 U.S. at 591. To be admissible, "expert testimony must . . .

12  address an issue beyond the common knowledge of the average layman."  *United States v.*

13  *Vallejo,* 237 F.3d 1008, 1019 (9th Cir. 2001), *amended by* 246 F.3d 1150 (9th Cir. 2001); *see*

14  *also United States v. Hanna,* 293 F.3d 1080, 1086 (9th Cir. 2002).

15       Under Rule 702, the "rejection of expert testimony is the exception rather than the

16  rule."  Advisory Committee Notes to the 2000 Amendment to Fed. R. Evid. 702.  Thus in cases

17  where an expert intends to testify regarding a legal matter, the proper course is for the judge to

18  permit the testimony, so long as it is helpful to the jury and supported by facts, and to instruct

19  the jury that the testimony is not binding.  *See Fiataruolo v. United States*, 8 F.3d 930, 942 (2d

20  Cir. 1993); *Karnes v. Emerson Elec. Co.*, 817 F.2d 1452, 1459 (10th Cir. 1987)

21       As the government notes, the various class action cases were "mired in intricacies of

22  contractual and regulatory law," "alleged myriad legal theories," generated a large volume of

23  pleadings, were "extremely complicated," and involved "complex legal issues."  Class Action

24  MIL, pp. 1–2, 4, 5, 12.  That is precisely why Mr. Savitt's testimony regarding the legal

25  positions taken by the class action plaintiffs is required here.  It is critical to aiding the jury in

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 20

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    understanding what it means when, for example, Fidelity says that PCD earned the

2    reconveyance fees under RESPA.  Where an expert can help a jury understand difficult legal

3    concepts without opining on the ultimate legal issue, that testimony is appropriate.[12]  *See*

4    *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quoting

5    *Specht v. Jensen,* 853 F.2d 805, 809 (10th Cir.1988) ("[A] witness may properly be called upon

6    to aid the jury in understanding the facts in evidence even though reference to those facts is

7    couched in legal terms.").  Mr. Savitt, as a conceded expert in civil and class action litigation,

8    can immeasurably aid in the jury's understanding of the relevant class action pleadings, and the

9    government's attempt to keep him from doing so is meritless.

10   **C.    Testimony Related to the Interpretation of PCD's Contracts with the Title**
           **Companies Is Relevant to Determining What the Parties Agreed On and Mr.**
11         **Kelley's Knowledge and Belief.**

12        The government also seeks to exclude expert testimony of Mr. Savitt concerning the

13   interpretation of Mr. Kelley's contracts with his supposed victims, Old Republic and Fidelity,

14   on the theory that such testimony is irrelevant.  Savitt MIL, pp. 1–2, 7–11.  The government's

15   position beggars belief.

16        **1.    The Terms of the Contracts between Mr. Kelley and His Alleged Victims**
                 **Are Relevant.**
17

18        As the government now tells it, the only relevant issue is whether Mr. Kelley made

19   false representations to title companies to induce them to disburse funds to him.  Savitt MIL, p.

20   7.  By any measure, the most important representations PCD made to the title companies were

21   those included in the actual contracts between the parties.[13]  The contracts governed the

22

23   _____

     [12] The government does not claim that Mr. Savitt's testimony regarding the positions of the class action litigants
     goes to the ultimate issue of this suit—in fact, just the opposite.  Class Action MIL, p. 10 ("[N]one of the title
24   companies' supposed positions is actually probative of whether [Mr.] Kelley committed fraud and theft.").  For
     substantially the reasons explained below with respect to Mr. Savitt's other proposed testimony, even if it did go
     to the ultimate issue here, it would appropriate.  *Infra*, § II.D.

25   [13] The contracts of course only governed the parties' relationships to the extent they were agreed on by the parties.
     As explained in Mr. Kelley's Motion in Limine to Exclude References to Unsigned Draft as "Contract," the
     government has failed to provide an actual contract between PCD and Fidelity.  Dkt. No. 134.  But because the

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 21

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1  parties' relationships.  The contracts contain the only enforceable promises between Mr. Kelley

2  and the title companies.  The contracts say how much money the title companies agreed Mr.

3  Kelley could take and what work Mr. Kelley was expected and required to do for that money.

4  What the contracts say and mean goes directly to Mr. Kelley's knowledge and belief as to

5  whether the funds were stolen, or belonged to either the title companies or the borrowers.

6       Understanding the meanings of the representations made by the parties and the legal

7  issues is therefore patently relevant.  Take this quote, for example:

8       The jury in this case will be required to determine whether Kelley made
     fraudulent misrepresentations and used deceit to obtain property from Fidelity
9       and Old Republic.  The evidence will establish that Kelley did so by making
     fraudulent misrepresentations, before and after entering into agreements with
10       Fidelity and Old Republic, that suggested that he was retaining only $15 or $20
     per transaction, and was refunding unused funds to customers.  And it will
11       establish that Kelley did so by creating, and providing to Old Republic, falsified
     documents that suggested the same thing.  The jury will not be required to
12       determine whether Kelley breached his contract with Fidelity and Old Republic.
     As a result, Mr. Savitt's proposed testimony concerning the supposed proper
13       interpretation of the contracts is irrelevant.

14

15  Savitt MIL, p. 10.  The government seems to be saying that everything that happened before

16  the contract is relevant, and everything that happened after the contract is relevant, but what

17  the actual contracts mean—i.e., Mr. Savitt's proposed testimony—is irrelevant.  The

18  government's position in this regard is unreasonable.

19       Or take this quote: "Whether the escrow customers had a contractual right to recover

20  from Kelley is simply irrelevant to the facts of consequence."  Savitt MIL, p. 8.  First, as

21  explained at length above, this new position is wholly inconsistent with the government's

22  position at literally every prior point in these proceedings.  But more to the point for present

23  purposes, the misrepresentation the government alleges Mr. Kelley made is that he would

24

25  government has heretofore referred to and treated an unsigned draft as a contract, Mr. Savitt will, if necessary,
testify to the meaning of the draft contract.

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 22

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

refund reconveyance fees to borrowers.  Whether Mr. Kelley's contracts with title companies incorporated such a requirement is unquestionably relevant to what the parties intended would happen with the reconveyances fees.  The government's blithe dismissal of the supposed refund requirement that has always been the linchpin of its case is both concerning in terms of fair process and meritless on the issue of the admissibility of Mr. Savitt's testimony.

It seems that the government has now decided that this case is not, in fact, a breach of contract case converted into a federal criminal case (Savitt MIL, pp. 1–2), and apparently thinks that means this case should be governed by the exact opposite of contract law.  So while in contract law parol evidence is generally not admissible "to add to, subtract from, modify, or contradict the terms of" an agreement, the government here seeks to keep out evidence of the *agreement* to add to, subtract from, or contradict the terms of its *parol evidence*.  *DePhillips v. Zolt Const. Co.*, 959 P.2d 1104, 1108 (1998); *see also Emrich v. Connell*, 716 P.2d 863, 866–67 (1986) (applying *DePhillips* rule to partially integrated contracts (like the PCD/title company contracts)).  Needless to say, it has cited no cases to support its endeavors.

The government knows the representations included in the contracts are of paramount relevance.  ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████  That is why the government discusses the Fidelity contract draft and the Old Republic contract in its indictment as the source of Mr. Kelley's supposed obligation to provide refunds.  SI ¶¶ 16, 35.  That is why the government's block quote from the two documents are followed in each case by a variation of "in reliance upon TROY X. KELLEY'S representations and promises . . . Fidelity began using Post Closing Department to perform reconveyance-tracking work, and caused borrowers to authorize disbursement of funds from Fidelity to Post Closing Department."  SI ¶ 17; *see also* ¶ 37.  That is why the government

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 23

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   elicited substantial testimony from its witness, FBI Agent Michael Brown, about his

2   understanding of what Mr. Kelley was promising to do under the Old Republic contract and

3   Fidelity draft contract. *See, e.g.,* Calfo Decl., Ex. 1 at 41:4–47:6, 48:24–49:5, 60:2–63:24.

4   That is why the government includes the Old Republic contract and the Fidelity draft on its

5   own exhibit list. For the government now to claim it is *irrelevant* for someone to testify about

6   what that contract actually means is not just wrong, it shows a lack of appreciation for Mr.

7   Kelley's right to defend himself.

8         **2.**    **The Government Is Not Entitled to Exclude Evidence Relevant to Mr.**
**Kelley's Defenses Just Because the Government Does Not Know Why it Is**

9                  **Relevant to Mr. Kelley's Defenses.**

10         The topics of Mr. Savitt's proposed testimony that the government challenges in its

11   Savitt Motion all go to the interpretation of the title company/PCD contracts. Mr. Kelley's

12   counsel has not explained to the government exactly how Mr. Kelley intends to use each piece

13   of Mr. Savitt's testimony, but Mr. Kelley is not required to. If the government does not

14   understand why, for example, the indemnities offered by Mr. Kelley, the third-party

15   beneficiary status *vel non* of the borrowers, or the RSI contract are relevant to interpreting Mr.

16   Kelley's contract with the title companies, it is not incumbent upon Mr. Kelley to enlighten

17   them at this point. If, when Mr. Kelley is putting on his case, the government objects to a

18   particular opinion or piece of evidence as irrelevant, the government can raise its objection

19   then.

20   **D.**    **Mr. Savitt's Proposed Testimony Is Not an Inadmissible Legal Opinion because it**
**Serves to Educate the Jury On Complex Issues and Does Not Instruct the Jury as**

21        **to the Applicable Law.**

22         The government additionally challenges some of Mr. Savitt's proposed testimony on

23   the ground that Mr. Savitt will only be testifying as to legal conclusions. Savitt MIL, pp. 2,

24   10–11. The key to the government's argument is its claim that "[i]t is well established that the

25   interpretation of a contract presents a question of law." Savitt MIL, p. 10 (citing *Stanford*

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 24

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

*Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 624 (9th Cir. 1996) and *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999)).  The government's faith, however, is mislaid because it relies entirely on cases interpreting insurance policies.  *See Stanford Ranch*, 89 F.3d at 624 ("The interpretation of an insurance policy is a question of law."); *McHugh Ass'n*, 164 F.3d at 454 ("[I]nterpretation of the insurance policy is a question of law. . . . [Expert] testimony cannot be used to provide legal meaning or interpret *the policies as written*.") (emphasis added).

With respect to other contracts, both the Ninth Circuit and Washington Supreme Court have made it clear that "[t]he interpretation of a contract is a mixed question of law and fact." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000); *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 875 n.9 (Wash. 2008).  Where—unlike here—"the facts are undisputed . . . courts may decide the issue as a matter of law."  *Mut. of Enumclaw*, 191 P.3d at 875 n.9 (2008).  But "[t]he meaning of contract provisions is a mixed question of law and fact because [factfinders] ascertain the intent of the contracting parties 'by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'"  *Id.* (quoting *Berg v. Hudesman,* 801 P.2d 222, 228 (Wash. 1990)).

"Experts may testify on questions of fact as well as mixed questions of fact and law. This sort of testimony is not objectionable merely 'because it embraces an ultimate issue to be decided by the trier of fact.'" *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) (quoting Fed. R. Evid. 704); *see also Askanse v. Fatjo*, 130 F.3d 657, 672 (5th Cir. 1997). What an expert may not do is: (1) tell the jury what result to reach if the expert is in no better position than the jury to draw legal conclusions from the evidence presented at trial (i.e., opine

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 25

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1   on an ultimate issue of law) or (2) instruct the jury as to the applicable law.  *Hangarter*, 373

2   F.3d at 1016; *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822, at *12

3   (W.D. Wash. Aug. 5, 2013).

4           Moreover, even if Mr. Savitt's proposed testimony does, in part, encompass a legal

5   opinion, trial courts have discretion to admit testimony encompassing a legal opinion so long

6   as the expert (1) supports his conclusion by facts and (2) gives the jury "helpful information

7   beyond a simple statement on how its verdict should read."  *Fiataruolo*, 8 F.3d at 942.  This is

8   particularly the case "in a more complicated case or a case dealing with a concept less familiar

9   to ordinary jurors" because "expert testimony on an ultimate issue may be useful for guiding

10  the trier of fact through a complicate morass of obscure terms and concepts."  *Microsoft*, 2013

11  WL 4008822, at *12.

12          Courts thus permit experts to express opinions incorporating legal issues where the

13  subject matter "is not within the common knowledge of a lay person."  *Dixon v. City of Forks*,

14  No. C08-5189FDB, 2009 WL 1459442, at *2 (W.D. Wash. May 26, 2009); *see also*

15  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981), *aff'd in part, rev'd in*

16  *part on other grounds*, 459 U.S. 375 (1983) (interpretation of boilerplate language in a

17  prospectus, which was relevant to proof of scienter in a 10(b)-5 case); *United States v. Milton*,

18  555 F.2d 1198, 1205 (5th Cir. 1977) (finding testimony permissible even where the testimony

19  gave legal conclusions on at-issue elements because "[t]he jurors had to understand the

20  gambler's lyric before they could sing the fateful quintain"); *Cary Oil Co. v. MG Refining &*

21  *Mktg., Inc.*, No. 99 Civ. 1725(VM), 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003)

22  (permitting an expert to testify whether defendants exceeded the control a parent ordinarily

23  exercises over its subsidiary where veil-piercing was at issue).

24          With these guidelines in mind, Mr. Savitt's testimony should not be excluded.  The

25  government identifies two opinions that it believes are improper.  First, it argues that testimony

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 26

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

that escrow customers had no contractual right to receive refunds from PCD "constitutes a legal conclusion" and thus is "improper expert testimony." Savitt MIL, p. 7. This argument misstates the effect of the law. Offering an expert legal opinion on the validity or meaning of a contract is not *per se* impermissible—instead, such testimony *could* be impermissible if the jury were charged with finding whether there was a valid contract. And even in that case, a court still could allow the testimony if it were helpful to the jury in understanding a complex set of facts and if the expert supported his own opinion by facts.

But as the government is at pains to point out, Mr. Kelley is not on trial for a breach of contract either with Old Republic or third-party borrowers. Savitt MIL, pp. 1–2. Whether the contract provided any rights to third-party beneficiaries is not an ultimate issue for the jury. Likewise, the government cannot argue that Mr. Savitt's intended testimony is impermissible because it would "invade the province of the Court to instruct the jury concerning the principles governing the interpretation of contracts" because here the Court simply will not be charged with instructing the jury on the elements of a breach of contract. Savitt MIL, p. 11. Instead, Mr. Savitt's intended testimony concerns the interpretation of incredibly vague contract documents, with any number of key terms left out, formed and performed against the backdrop of complicated industry practice, arguably for the benefit of a third party who has their own, materially different contract covering the same services—all "background information crucial if the laymen jury is to understand fully the complex issues in this matter." *Cary Oil*, 2003 WL 1878246, at *5.[14] On this—and the other topics of his proposed testimony

---

[14] The government argues that testimony concerning the prior litigation in *Old Republic v. Kelley* should be excluded as hearsay. Savitt MIL, p. 9. However, Mr. Kelley is not seeking—as the government would have the Court believe—simply "to have an expert reprise positions and statements that Kelley, and his lawyers, made in a prior civil litigation." *Id.* Instead, Mr. Kelley seeks to have Mr. Savitt use his specialized, expert knowledge to translate relevant, complex facts into lay language that can be understood by (and thus will be useful to) the jury. This is no different than the many cases where courts have permitted lawyers to provide expert testimony that assisted juries in understanding the legal frameworks underlying issues in a case. *E.g., Microsoft*, 2013 WL 4008822, at *9, *23–24 (background facts about a related litigation and effects of an anti-injunction suit on a relocation decision); *Icon-IP Pty*, 87 F. Supp. 3d at 946–47 (patent litigation procedure); *Bausch & Lomb*, 79 F. Supp. 2d at 256 (same).

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 27

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

that the government does not challenge—Mr. Savitt will use his expert, specialized knowledge to educate the jury on how to evaluate the impact of contracts that were produced by the government during discovery and that are plainly relevant to the government's theory that the money paid by escrow customers was stolen and whether Mr. Kelley could reasonably have believed it was stolen.

## III.    CONCLUSION

For the foregoing reasons, Mr. Kelley respectfully requests that this Court deny the government's motions in limine to exclude evidence from the class action suits and to exclude portions of the expert testimony of James Savitt.

DATED this 29th day of February, 2016.

CALFO HARRIGAN LEYH & EAKES LLP


By     s/Angelo J. Calfo
     Angelo J. Calfo, WSBA #27079
     999 Third Avenue, Suite 4400
     Seattle, WA  98104
     Telephone:  (206) 623-1700
     Email:  angeloc@calfoharrigan.com

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 28

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on February 29, 2016, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   following:

5          Andrew C. Friedman                    andrew.friedman@usdoj.gov

6          Arlen R. Storm                        arlen.storm@usdoj.gov

7          Katheryn Kim Frierson                 katheryn.k.frierson@usdoj.gov

8          Richard E. Cohen                      richard.e.cohen@usdoj.gov

9

10                                               *s/Susie Clifford*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEFENDANT'S OMNIBUS OPPOSITION TO
GOVERNMENT'S MOTION IN LIMINE
REGARDING SAVITT EXPERT TESTIMONY
AND CLASS ACTION LAWSUITS - 29

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717