The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>           v.<br><br>TROY X. KELLEY,<br><br>                      Defendant. | NO. CR 15-5198RBL<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SEVER COUNTS 1 TO 10<br><br>(Dkt. No. 199) |

Comes now the United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Andrew C. Friedman, Katheryn Kim Frierson, and Arlen R. Storm, Assistant United States Attorneys for said District, and submits this opposition to Defendant Troy X. Kelley's Motion to Sever Counts 1 to 10 (Dkt. No. 199).

**INTRODUCTION**

For the third time, Kelley has filed a motion asking that the Court sever counts in the case. Kelly now asserts the government recently has espoused "new theories of criminal liability" regarding his scheme to defraud that are "divorced from those stated in the Superseding Indictment" and that, in Kelley's view, are doomed to fail as a matter of law and to be dismissed at the close of the government's case, leaving only the false statement and tax counts for the jury's consideration. Dkt. No. 182 at 2; Dkt No 199 at 2. Kelley thus argues the "Court should not let [Count 1 and Counts 6 to 10] go to trial," or at a minimum they should be severed. Dkt. No. 182 at 12. He also asks that the false statement counts (Counts 2 to 5) be severed because they "relate solely to Mr. Kelley's alleged fraud against the title companies." Dkt. No. 199 at 2.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Kelley's argument proceeds from multiple false premises: (1) the government's theory of liability has not deviated from that espoused in the Superseding Indictment (although the government has indicated it will be asking the jury to consider a more narrow version of that theory); and (2) there is no legal or factual problem with the scheme to defraud/theft by deception identified in the Superseding Indictment. Kelley's claims to the contrary are based on a fundamental misunderstanding of the governing legal principles, and his motion should be denied.

## I.  FACTUAL BACKGROUND

Kelley is charged in a Superseding Indictment (Dkt. No. 38) with a variety of crimes stemming from his efforts to retain millions of dollars he obtained by fraud during the years 2006 to 2008. Among other charges, Kelley is charged with Possession and Concealment of Stolen Property (Count 1), in violation of 18 U.S.C. §2315, based on his possession of at least $1.4 million Kelley initially obtained by fraud from trustees holding those funds (a scheme amounting to mail and/or wire fraud), which he later converted to his own use. Kelley is also charged with five counts of Money Laundering (Counts 6-10), in violation of 18 U.S.C. §1956(a)(1)(B)(i), based on his participation in a series of financial transfers designed to conceal the fact that the transferred funds were proceeds of his mail and/or wire fraud scheme.

During the period at issue, Kelly operated Post Closing Department ("PCD"), which provided reconveyance tracking services to two escrow companies: Fidelity National Title of Washington ("Fidelity") and Old Republic Title ("Old Republic"). Fidelity and Old Republic collected reconveyance fees—typically $100 to $150—from borrowers at the time of closing of real estate transactions. Superseding Indictment ¶¶ 7-8. These fees were collected to compensate for tracking the reconveyance of the property (PCD charged $15 to $20 for this service), and to pay any third-party fees associated with the reconveyance, e.g., trustee fees and recording fees. In essence, then, the borrowers' reconveyance fees had two components: the fee for PCD's tracking service and an advance to cover third-party costs associated with effecting the reconveyance. If any portion of the reconveyance fee remained after these expenses were

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

paid, PCD was, pursuant to its contracts with Fidelity and Old Republic, supposed to refund the unused portion to the borrower.[1]  *Id.* ¶¶ 13, 15-16, 32-35.

During the period at issue major lenders were processing reconveyances without charging ancillary fees (or else the fee was included in the borrower's loan payoff), meaning that often the only expense to be paid from a borrower's reconveyance fee was the small cost associated with PCD's reconveyance tracking service. *Id*. ¶¶ 9, 29, 45.  However, rather than refund the unused portion of the reconveyance fees to the borrowers, Kelley devised a scheme whereby he would keep those monies for himself.  The scheme proceeded in two stages.  First, Kelley defrauded Fidelity and Old Republic into delivering the borrowers' full reconveyance fees to PCD.  This is the "scheme and artifice to defraud" the escrow companies identified in the Superseding Indictment.  *Id*. ¶¶ 20, 32.  Kelly falsely represented that PCD would take custody of the entire reconveyance fee; would charge a flat fee for tracking the reconveyance ($15 as to Fidelity, $20 as to Old Republic); would use the remainder to pay any applicable third-party fees; and would refund any unused funds to the borrowers.  Kelly made repeated representations to this effect before entering into his contracts with Fidelity and Old Republic, in the contracts themselves, and then while supposedly performing under the contracts.  In reliance on these false representations—and in particular that unused funds would be refunded to borrowers—Fidelity and Old Republic delivered to PCD millions of dollars in reconveyance fees that had been entrusted to them by the borrowers.  *Id*. ¶¶ 15-17, 22-27, 29-37, 45-46.  This is the property Count 1 identifies as having been "stolen" and "taken by fraud" from these escrow companies. *Id*. ¶¶ 20, 32, 105. The government expects to prove at trial that, between January 2006 and June 2008, PCD retained at least $2,938,708.44 in unrefunded reconveyance fees.[2]

---

[1] Kelley says the evidence at trial will show that "at the closing of each residential transaction any fee paid to Mr. Kelley was earned by his company and was not owned by either the title companies or the escrow customers." Dkt. No. 182 at 4 n.3.  The government disputes this and, in any event, this disputed factual issue is not grounds for a severance.

[2] This figure differs by about $25,000.00 from the approximate figure set forth in Paragraph 68 of the Superseding Indictment. The difference results from additional analysis, and the adoption of more conservative assumptions, by FBI Forensic Accountant Jared Young, who will be testifying at trial.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The second phase of the scheme involved Kelley converting the unreconveyed funds to his own use. Second, having failed to refund money to borrowers, in 2008, after class action lawsuits had been filed, Kelley transferred the money and concealed it accounts belonging to entities other than PCD. Id. ¶ 105. This is how the money ultimately was stolen by Kelley. ¶¶ 31, 47, 68. Between January 2006 and June 2008, the bank account associated with PCD's Fidelity business had grown from $745,121 to $2,361,181, while the account associated with Old Republic grew to $888,949. Id. ¶¶ 31, 47, 68. In June 2008, Kelley transferred the $2,361,181 from the Fidelity-linked account, the $888,949 from the Old Republic-linked account, and $532,096 from another account to a newly-opened bank account in Washington. Id. ¶ 63. Through a series of interstate wire transfers, on June 26, 2008, $3,634,673.51 of this money wound up in a Vanguard account in Pennsylvania held in the name of Berkeley United, LLC ("Berkeley United"), a company controlled by Kelley. Id. ¶¶ 64-67. The evidence as trial will establish that at least $1,442,302.73 in that Vanguard account was directly traceable to Kelley's scheme to defraud Fidelity and Old Republic and to his ultimate theft of unrefunded reconveyance fees. Kelley's possession and concealment of this stolen property is the basis for Count 1 of the Superseding indictment.

In May 2011, Kelley paid Old Republic $1,050,000 from Berkeley United's Vanguard account to settle a lawsuit brought to recover unrefunded reconveyance fees. Id. ¶ 83. This left about $2,581,653 in the Vanguard account. Id. Beginning in 2011 and continuing through 2015, Kelley made annual withdrawals from these funds in the amount of $245,000. However, he routed those withdrawals though Blackstone International, Inc., an S Corporation that he owned, to conceal the fact that these funds derived from his scheme to defraud Fidelity and Old Republic (a scheme that involved wires and the mails and thus constituted mail and/or wire fraud). Id. ¶ 2, 100-02. Kelley further concealed the fact that the funds derived from his prior scheme to defraud, by claiming substantial deductions on his tax returns for Blackstone for expenses that either were wholly fraudulent, or were in fact personal expenses. Id. ¶ 142. By drawing the money through Blackstone, and making it appear that Blackstone was a legitimate business with current income and corresponding expenses, Kelley concealed the true source of the money. Id. The five $245,000 transfers to Blackstone are the basis of the five money laundering charges in Counts 6 to 10 of the Superseding Indictment. Id. ¶¶ 126-35.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## II. ARGUMENT

### A. The Government's Theory of Criminal Liability has not Deviated from the Allegations of the Superseding Indictment.

Kelley is correct when he says the Superseding Indictment alleges that he stole money when he chose not to pay refunds to borrowers as required under his contracts with Fidelity and Old Republic, although he is not correct in saying those allegations entail the conclusion that those funds were "owned by the borrowers" at the time of the theft. Dkt. No. 182 at 4-7 (emphasis omitted).[3] In fact, the Superseding Indictment does not allege whose property Kelley ultimately stole and converted (Superseding Indictment ¶ 105), because to convict Kelley of Possession and Concealment of Stolen Property as charged in Count 1 the government is not required to prove who actually owned the unfunded portion of the borrowers' reconveyance fees. All the government has to prove was that someone *other than Kelley* owned them. *United States v. Crawford*, 239 F.3d 1086, 1092-93 (9th Cir. 2001). While a strong argument can be made that it was the borrowers whose property was ultimately converted by Kelley—it was they who were denied the refunds they were owed—ultimately this is not a question the jury has to answer.

Kelley is also wrong is saying the government has "abruptly changed its theory of the case" when, in moving in limine to exclude evidence of the class action litigation involving the title companies, the government indicated that Kelley is "'charged with lying to escrow companies to obtain money (i.e. obtaining money from the escrow companies by fraud and deceit).'" Dkt. No. 182 at 8 (citation omitted). That is the very scheme to defraud outlined in the Superseding Indictment. And, this scheme to defraud the escrow companies is indeed "'separate and independent of the escrow companies interactions with their borrowers,'" *Id*. (citation omitted). What Kelley does not seem to grasp is that his scheme to defraud the escrow companies is separate, as a temporal and legal matter, from his ultimate conversion (i.e., theft) of the property he received as a result of his fraudulent scheme.

---

[3] In making this assertion, Kelley relies heavily on testimony elicited during cross-examination of the case agent during the probable cause hearing. Dkt. No. 182 at 5-7. But the case agent is obviously not competent to testify about who owned the unused portion of the reconveyance fees. To the extent this issue it relevant in the present context (it is not), it is a question of law for the Court that would have to be answered based on the allegations in the indictment.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Consistent with these allegations, Count 1 alleges Kelley "did possess and conceal stolen property, knowing the same to have been stolen, unlawfully converted, and taken, namely, money of a value of $5,000 or more, which money had crossed a State boundary after being stolen, unlawfully converted, and taken, to wit, funds that were taken by fraud from [Fidelity] and borrowers between January 2006 and March 2008, taken by fraud from [Old Republic] and borrowers between June 2006 and June 2008, and stolen by [Kelley] between January 2006 and June 2008, and that subsequently were transferred to an account in the name of Blackstone International, Inc., at Nevada State Bank, in the State of Nevada, and further transferred to the account in the name of Berkeley United, LLC, at Vanguard, in the State of Pennsylvania." Superseding Indictment ¶ 105. Since pleading in the conjunctive allows proof in the disjunctive, *see United States v. Booth*, 309 F.3d 566, 572 (9th Cir. 2002), the indictment alleges two theories of theft that can support this count: (1) Kelley's possession of funds that were initially "taken by fraud" from Fidelity and Old Republic;[4] and (2) Kelley's possession of funds that were ultimately "stolen" when Kelley converted the unused reconveyance fees to his own use. These two theories arise because the "takings by fraud" from the escrow companies occurred before Kelley stole the unused reconveyance fees, and were a necessary precondition for those thefts.

Because these alternatives are just different means of committing the underling theft giving rise to the possession and/or concealment of stolen property charge, the government would be within its rights to have both theories submitted to the jury—the jury could convict based on his obtaining the full reconveyance fee from the title companies by fraud and/or based on his ultimate conversion of the unused portion of the fee—and, provided there is sufficient

---

[4] Kelley faults the government for alleging in the Superseding Indictment that property was taken by fraud from the escrow companies and the borrowers (Superseding Indictment ¶¶20, 32, 105), stating it is fatuitous to suggest "an individual borrower and an unrelated corporation could simultaneously own the same dollar bill." Dkt. No. 182 at 4. Leaving aside that the indictment was just pleading in the conjunctive to allow maximum flexibility at trial, Kelly is just wrong in saying the same dollar bill cannot be "owed" by two people. Kelley is employing a very cramped definition of "owner"—namely the person with legal title to the property—and one that does not apply in the criminal theft context. Nevertheless, because Kelley made no misrepresentations to the borrowers, the government agrees that the borrowers cannot be the targets of Kelley's theft by deception or his mail and/or wire fraud scheme, and that the scheme to defraud must be limited to Fidelity and Old Republic. The targets of the scheme to defraud were pleaded in the conjunctive, and there is no problem with the government narrowing the scheme alleged in the indictment. *See United States v. Wilbur*, 674 F.3d 1160, 1178 (9th Cir. 2012).

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

evidence to support them, juror unanimity on a particular alternative would not be required. *See Schad v. Arizona*, 501 U.S. 624, 631-45 (1991) (plurality); id. at 650-51 (Scalia, J., concurring). However, to simplify the jury's deliberations, the government has indicated it will not seek to prove Count 1 by relying on the conversion-based theft theory. Instead, the government will ask that the jury be instructed that, to convict on Count 1, the jury must find Kelley obtained property (the full reconveyance fee) by deceiving the escrow companies, either by committing mail or wire fraud or theft by deception under state law. Dkt. No. 158 at 7. This is not a "new theory" of the case (Dkt. No. 182 at 9), nor is it a "disavow[al] [of] any claim that Mr. Kelley stole money from Old Republic or Fidelity's escrow customers." Dkt. No. 199 at 1. It is an (unnecessary) election among the theft theories outlined in the Superseding Indictment, one that merely narrows the indictment's allegations and which is perfectly permissible.

**B.      There is no Legal or Factual Defect in the Possession and Concealment of Stolen Property Count or the Money Laundering Counts, so there is no Reason to Sever these Counts or the Related False Statement Counts.**

   *1.      Property can be Stolen or Taken by Fraud from Someone Other than the Property's Legal Owner.*

Kelley insists that "property can only be 'stolen' from an owner and a person can only be 'defrauded' of property she owns." Dkt. No. 182 at 9. Because the escrow companies did not own the property entrusted to them by the borrowers, Kelley reasons the government's decision to focus on his scheme to defraud the escrow companies means that, as a matter of law, the government will be unable to show any theft from the escrow companies occurred. Dkt. No. 182 at 10-12. But any first year law student can see the flaw in this argument. It is just not true that only a taking from the property's owner can constitute theft. *See*, *e.g.*, *United States v. Mafnas*, 701 F.2d 83, 85 (9th Cir. 1983) (upholding bank robbery conviction where money was stolen from a third-party armored car service to whom the bank entrusted the funds). To the contrary, it is settled that anyone with a superior possessory claim to the property can be the victim of a theft, even if he is not the legal owner. *See Fowler v. United States*, 273 F. 15, 17 (9th Cir. 1921). Indeed, even one who steals from a thief is guilty of theft. *See State v. Schoonover*, 211 P. 756, 758 (Wash. 1922). Kelly's argument is at odds with this fundamental legal principle.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Kelley's position seems to be that if money is entrusted to a third-party, and that money is then taken unlawfully (by fraud or otherwise), that third-party cannot be deemed the "owner" or victim from whom the property was stolen. But, if this were so, then banks could never be the victims of a scheme to defraud, since the money taken is owned not by the banks, but by the depositors. Needless to say, this is not the law. *See, e.g. United States v. Molinaro*, 11 F.3d 853, 857 (9th Cir. 1993); *United States v. Morgan*, 805 F.2d 1372, 1376-77 (9th Cir. 1986). Kelley's position would also preclude a wire or mail fraud prosecution of a fraud scheme that focused on investment or pension funds rather than individuals, since the property obtained by fraud would not belong to funds who were victims of the fraud and to whom misrepresentations were made. This too is obviously not the law. *See e.g., United States v. Shipsey*, 363 F.3d 962, 971-72 (9th Cir. 2004). The situation here is no different. The borrowers entrusted money to the escrow companies, and the Superseding Indictment alleges Kelley acquired a portion of that money (the full reconveyance fee) by defrauding the escrow companies. That is a valid fraud theory.

Kelley is simply wrong when he says the escrow companies did not have "any protectable property right in money entrusted to them by borrowers." Dkt. No. 182 at 9. Kelley reasons that "because the borrowers had the exclusive rights to control the disbursement of funds," "the title companies did not have any property rights in the escrowed funds." Dkt. 182 at 11. Kelley cites no authority for this proposition, perhaps because it is a non sequitur. The escrow companies' duty to comply with the borrowers escrow instructions says nothing about whether the companies had any recognizable property interest in the escrowed funds, and certainly not as against persons not parties to the escrow (e.g., PCD). And indeed they did. While the borrowers undeniably remained the legal owners of the escrowed funds while they remained in the escrow companies' custody (Dkt. No. 10 & n.7), as against the rest of the world the escrow companies had a right—indeed a duty—to exclude anyone else from accessing those funds. An escrow agent "occupies a fiduciary relationship to all parties to the escrow," *National Bank of Washington v. Equity Investors*, 506 P.2d 20, 35 (Wash. 1973), and one of the agent's fiduciary duties is "to conserve the money placed in escrow." 28 Am. Jur. 2d *Escrow* §23. As Kelley points out, "[t]he hallmark or a protected property interest is the right to exclude others," *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

666, 673 (1999), and the escrow companies had such a right while entrusted funds were in their possession, even if they were not the legal owners of those monies.

It is of course true (Dkt. No. 182 at 11) that the escrow companies eventually paid the reconveyance fees to PCD pursuant to the borrowers' escrow instructions (hence, the escrow companies had no liability to the borrowers for the unrefunded reconveyance fees), but this fact is of no moment. Those escrow instructions were the direct result of Kelley's scheme to defraud: he repeatedly lied to Fidelity and Old Republic and said he would pay refunds to the borrowers, and in reliance on those misrepresentations the title companies contracted with PCD to provide reconveyance tracking services, hence the payments under the resulting escrow instructions. Nor does it matter that the escrow companies "have disclaimed any right to the monies." Dkt. No. 182 at 11. The declaimers Kelley is referencing involve the right to any portion of the money *after it was paid out of escrow*. The escrow companies never said that they had absolutely no interest in the money they held *while escrow was pending*, and they certainly never "denied any ownership of the money allegedly stolen from them." Dkt. No. 182 at 12. And any such denials would be irrelevant in any event, as it will be up to the jury to decide if, under the governing legal standards, the escrow companies were defrauded into paying PCD money that had been entrusted to them. When the elements of the possession and concealment of stolen property and money laundering counts are considered, it is readily apparent that the evidence, if accepted by the jury, would suffice to support Kelley's conviction on these counts.

    2.    *Possession and Concealment of Stolen Property.*

To convict Kelley of possession and concealment of stolen property as alleged in Count 1 the government must prove Kelley possessed and/or concealed "money of the value of $5,000 or more . . . which ha[s] crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken."[5] 18 U.S.C. §2315. For purposes of §2315, "the term 'stolen' include[s] 'all felonious takings . . .

---

[5] Because Kelley is charged with possession and concealment of stolen money (Superseding Indictment ¶105), his citation to *Dowling v. United States*, 473 U.S. 207 (1985)—which held possession of copyright infringing property did not fall within the National Stolen Property Act—is inapt. Kelley is charged with possessing and concealing stolen "money," which is expressly included within the ambit of §2315.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

regardless of whether or not the theft constitutes common-law larceny.'" *United States v. Schultz*, 333 F.3d 393, 409 (2d Cir. 2003) (quoting *United States v. Turley*, 352 U.S. 407, 417 (1957)). The terms "taken" and "stolen" in §2315 include property taken by fraud. *See United States v. Miller*, 725 F.2d 462, 468 (8th Cir. 1984); *United States v. McClintic*, 570 F.2d 685, 688-89 (8th Cir. 1978). And, the theft itself need not violate federal law; any unauthorized taking will suffice. *See, e.g.*, *Rugendorf v. United States*, 376 U.S. 528, 536-37 (1964); *United States v. Miller*, 688 F.2d 652, 655-56, 663 (9th Cir. 1982). There therefore, no requirement that the antecedent theft amount to mail or wire fraud.

Cases discussing theft and theft by fraud sometimes describe the crime as a taking which "deprive[s] the owner of the rights and benefits of ownership," *United States v. Turley*, 352 U.S. 407, 417 (1957) (cited in Dkt. No. 182 at 9), or "wronging one in his property rights by dishonest methods or schemes." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (cited in Dkt., No. 182 at 3, 9). But it must be remembered that in the theft context "owner" and "property rights" have a more expansive meaning than their normal use: they encompass any taking from someone with a greater claim to the property than the thief, regardless of whether the victim is the legal owner of the property (e.g., theft from a bailee) or has a property right in that item (e.g., theft from a thief). For crimes encompassed by the National Stolen Property Act, what the government has to prove is that property was stolen, converted, or taken by fraud "from one having *the attributes* of an owner," *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978) (emphasis added), not that the victim was the property's legal owner. Because the National Stolen Property Act reaches "'all felonious takings,'" *id*. (citation omitted), it necessarily includes property stolen from those who possessed it but were not the legal owners, as this was (and is) a well-recognized felonious taking. *See United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978) ("stealing is still essentially an offense against another person's proprietary or *possessory interests in property*," but "[t]his does not mean that the victim must be shown to have had good title.") (emphasis added) (cited in Dkt. No. 182 at 3 n.1). This is doubly true if such conduct amounts to theft under state law, since "ownership" in this context is a question of state law. *See United States v. Lequire*, 672 F.3d 724, 728 (9th Cir. 2012).

All that said, the government is not actually required to prove who owned the stolen property, only that Kelley did not: "[t]he days of homesteading are over, and the jury may

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

presume that property has a rightful owner, even if the identity of the rightful owner is not immediately known to one who comes upon the property." *Crawford*, 239 F.3d at 1092-93. Thus, if the government proves Kelley did not own the money at issue when he obtained it from Fidelity and Old Republic through fraud—which he clearly did not, as Kelley had no claim to money held by escrow companies before it was remitted to PCD, which was the direct result of his fraudulent scheme—that will suffice to show he possessed and/or concealed stolen property. And, indeed, it is clear that Kelley's conduct amounts to theft by deception under Washington law, as well as federal mail and/or wire fraud. Either species of theft, if found by the jury, will be sufficient to sustain a conviction for possession and/or concealment of stolen property.

    a.    *The Allegations of the Superseding Indictment, if Proven, Show Kelley Committed Theft by Deception.*

Washington defines "theft" as, inter alia, "[b]y color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services," Wash. Rev. Code § 9A.56.020(1)(b), and if the value of the property stolen is more than $5,000 the crime is Theft in the First Degree.[6] Wash. Rev. Code § 9A.56.030(1)(a). "'By color or aid of deception' means that the deception operated to bring about the obtaining of the property or services," but "it is not necessary that deception be the sole means of obtaining the property or services." Wash. Rev. Code § 9A.56.010(5). The victim thus must rely on some misrepresentation, but the misrepresentation need not be the sole reason the victim delivered the property. *See State v. Mehrabian*, 308 P.3d 660, 672-72 (Wash. Ct. App. 2013); *see also State v. Zorich,* 431 P.2d 584, 587 (Wash. 1967). A "deception" occurs when, among other things, the actor knowingly "[c]reates or confirms another's false impression which the actor knows to be false," or "[p]romises performance which the actor does not intend to perform or knows will not be performed." Wash. Rev. Code §§9A.56.010(5)(a), (e). "Obtain control over" means, "in addition to its common meaning," "to bring about a transfer or purported transfer to the obtainer or another of a legally recognized interest in the property."

---

[6] Where, as here, there is an ongoing scheme that results in multiple individual thefts that would constitute third-degree theft due to their value if considered separately (less than $750), "the transactions may be aggregated" for purposes of determining the degree of theft involved. Wash. Rev. Code §9A.56.010(21)(c).

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Wash. Rev. Code §9A.56.010(10)(a). And "property" simply "means anything of value, whether tangible or intangible, real or personal." Wash. Rev. Code §9A.04.110(22).

Under these definitions, theft by deception occurs whenever a person, through deceit, obtains anything of value from another. "[T]he substance, or 'gist,' of the crime is the victim's loss of property by deceptive methods," and whether or not the victim sustained "an actual pecuniary loss is irrelevant." *State v. George*, 164 P.3d 506, 509 (Wash. 2007). Notably, the theft must simply involve "the property . . . of another;" there is no requirement that the victim be the legal owner of the property (another reason why no pecuniary loss need be shown). "'[T]o constitute the property of another, the item must be one in which another person has an interest, and the defendant may not lawfully exert control over the item absent the permission of that other person,'" but "this does not mean . . . that title must strictly be in the other person." *State v. Joy*, 851 P.2d 654, 658 (1993). Rather, the term "'[p]roperty of another' implicates the [statutory] definition of 'owner,'" *State v. Longshore*, 5 P.3d 1256, 1259 (Wash. 2000), and it is "the definition of 'owner' which[] establishes the level of interest necessary to claim a right to property." *State v. Pike*, 826 P.2d 152, 154 (Wash. 1992). For purposes of Washington's theft statutes, an "owner" is "a person, other than the actor, *who has possession of* or any other interest in the property or services involved." Wash. Rev. Code §9A.56.010(11) (emphasis added). Thus, mere possession of property suffices to render someone an "owner," even if title to that property is vested in another. *See Pike*, 826 P.2d at 155.

The Superseding Indictment alleges that Kelley made serial misrepresentations to the escrow companies and that, in reliance on these misrepresentations, Fidelity and Old Republic agreed to, and did, delivery to PCD millions of dollars entrusted to them by borrowers. These allegations, if proven, will show Kelley committed first-degree theft by obtaining property (money) that was in Fidelity's and Old Republic's possession through deception, *see generally State v. Reeder*, __ P.3d __, 2015 WL 9192556, at *1, *11-12 (Wash. Dec. 17, 2015); *State v. Smith*, 798 P.2d 1146, 1157, 1150 (Wash. 1990), and it is immaterial if the title companies were not the legal owners of the money that, due to Kelley's deception, was paid to PCD. *See State v. Wheeler*, 172 P. 225, 226 (Wash. 1918) (upholding conviction where the defendant obtained money "from the agent of the owner by color or aid of fraudulent or false representations"). Nor does it matter that these payments were made to Kelley pursuant to his contracts with the escrow

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

companies and the borrowers' escrow instructions: the contracts and escrow constructions resulted from Kelley's fraudulent representations, and any defense averring a "good faith claim of title is inapplicable as a matter of law where the charge is theft by deception." *State v. Casey*, 915 P.2d 587, 589 (Wash. Ct. App. 1996); *see also State v. Mercy*, 348 P.2d 978, 980 (Wash. 1960). And, since the Superseding Indictment alleges that money obtained from the title companies by deception was moved across state lines and held in a bank account controlled by Kelley, these allegations are sufficient, if proven, to sustain a conviction for possession and concealment of stolen property as charged in Count 1.

b. *The Allegations of the Superseding Indictment, if Proven, Show Kelley Committed Mail and/or Wire Fraud.*

The elements of mail and wire fraud are similar, the principal difference being the jurisdictional "hook" involving a mailing or wire to further the scheme. *See United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003). In addition to the jurisdictional element, to prove wire or mail fraud the government must prove "the existence of a scheme to defraud" and "a specific intent to defraud" on behalf of the defendant. *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). The mail and wire fraud statutes sweep broadly and "reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987). And, as is relevant in this case, the fraudulent scheme must be aimed at obtaining "money or property." 18 U.S.C. §§1341, 1343; *see also McNally v. United States*, 483 U.S. 350, 359-60 (1987). There is no requirement that the scheme be successful, or that the victim sustain any financial loss. *See Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Dischner*, 974 F.2d 1502, 1521 (9th Cir. 1992).

Proof of wire or mail fraud also requires an intent "to obtain money or property from the one who is deceived." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989). In other words, the scheme must be designed to obtain money or property from the person(s) to whom material misrepresentations are made. *See United States v. Ali*, 620 F.3d 1062, 1070-71 (9th Cir. 2010). The government must also show the fraud targeted "property in the hands of the victim," *Cleveland v. United States*, 521 U.S. 12, 15 (2000), which simply means the object of the fraud must qualify as "property" within the meaning of the mail and wire fraud statutes. *See id.* at 20-21 (state's interest in issuing regulatory licenses is not "property" for this purpose); *see also*

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Pasquantino v. United States*, 544 U.S. 349, 355 (2005) (entitlement to collect money is "property"); *Carpenter*, 484 U.S. at 26 (confidential business information is "property"). This requirement is obviously met here, since the object of Kelley's fraud was money entrusted to Fidelity and Old Republic, and money is expressly included within the purview of the mail and wire fraud statutes. And while the escrow companies were not the legal owners of that money, there is no requirement that the scheme target the victim's own property, i.e., that the victim be the property's legal owner. The mail and wire fraud statutes cover all fraudulent schemes "for obtaining money or property," 18 U.S.C. §§1341, 1343, and thus include any scheme to obtain money or property from another by fraud, not just schemes to obtain money or property from its legal owner. Again, were the law otherwise fraudulent schemes targeting investment or pension funds would be immune from prosecution for wire and mail fraud, which is plainly not the law. The allegations against Kelley—that he repeatedly lied to the escrow companies in a scheme to obtain millions of dollars entrusted to them by borrowers—is conduct that comfortably fits within the ambit of the mail and wire fraud statutes. For this reason, too, Kelley's possession and concealment of money so derived can sustain a conviction under Count 1, and thus there is no reason to sever this count.

      2.     *False Statements and Money Laundering.*

Counts 2 to 5 charge Kelley with making false statements in judicial proceedings about various aspects of his scheme to defraud Fidelity and Old Republic. Superseding Indictment ¶¶ 106-25. Counts 6 to 10 charge Kelley with money laundering based on financial transactions that allegedly involved "the proceeds of specified unlawful activity" which were "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. §1956(a)(1)(B)(i). The specific unlawful activity at issue in these counts is mail or wire fraud. Superseding Indictment ¶¶ 126-35. Because there is no legal or factual problem with the mail and/or wire fraud theory outlined in the Superseding Indictment, there is also no reason to sever the money laundering or false statement counts.

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### III. CONCLUSION

For the forgoing reasons, Kelley's Motion to Sever Counts 1 to 10 should be denied.

DATED: this 4th day of March, 2016.

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney

s/ Andrew C. Friedman
ANDREW C. FRIEDMAN
Assistant United States Attorney

s/ Katheryn Kim Frierson
KATHERYN KIM FRIERSON
Assistant United States Attorney

s/ Arlen R. Storm
ARLEN R. STORM
Assistant United States Attorney

700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone:     (206) 553-2277
Fax:           (206) 553-0755
E-mail:        Andrew.Friedman@usdoj.gov
               Katheryn.K.Frierson@usdoj.gov
               Arlen.Storm@usdoj.gov

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | |

I hereby certify that on March 4, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s).

*s/Jenny Fingles*
JENNY FINGLES
United States Attorney's Office
700 Stewart, Suite 5220
Seattle, Washington 98101-1271
Phone:  206-553-7970
Fax:       206-553-0755
E-mail: jenny.fingles@usdoj.gov

UNITED STATES' RESPONSE TO MOTION TO SEVER COUNTS 1 TO 10\
KELLEY (No. CR 15-5198RBL) — 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970