Judge Ronald B. Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>TROY X. KELLEY,<br><br>          Defendant. | NO.  CR15-5198RBL<br><br>GOVERNMENT'S TRIAL BRIEF |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Andrew C. Friedman, Katheryn K. Frierson, and Arlen R. Storm, Assistant United States Attorneys for said District, hereby submits this trial memorandum.

## I.    FACTS

### A.    Overview

During the years leading up to 2008, Kelley represented to escrow companies that his company, Post Closing Department, would take custody of fees paid by borrowers, that it would track reconveyances for the escrow companies for a flat fee of $15 or 20 per reconveyance, that it would pay any necessary trustee fees, and that it would refund any unused moneys to borrowers.  In fact, major lenders processed the vast majority of reconveyances that Post Closing Department tracked.  As a result, Post Closing

1  Department generally did not need to pay any trustee fees to effect the vast majority of

2  reconveyances.  Instead of returning unused reconveyance fees to borrowers, however,

3  Kelley and Post Closing Department kept the money, all the while continuing falsely to

4  represent that Post Closing Department was charging a flat fee of only $15 or $20 per

5  reconveyance for its work.

6       Because Kelley was not refunding to borrowers unused fees that he should have

7  refunded, by May 2008, Kelley had accumulated in excess of $3.7 million, at least $1.4

8  million of which Kelley had fraudulently failed to refund.

9       After class actions lawsuits were filed against Kelley's two largest customers,

10  Fidelity National Title and Old Republic Title, Kelley moved quickly to close his

11  business, terminate his employees, claim that his business had lost all of its records in a

12  fire, and conceal the funds by moving them to an account opened in the name of a shell

13  company, which, in turn, was primarily owned by a sham trust in Belize.  He not only

14  concealed the funds from the class-action litigants, but when Old Republic Title sued

15  him, he sought to conceal the funds from that escrow company as well.

16       After resolving the lawsuit filed by Old Republic Title, Kelley transferred the

17  funds from the sham trust and used them for his own benefit.  Because Kelley had not

18  previously declared these funds on his tax returns, Kelley sought to make it appear that

19  Kelley was earning current income through the operation of a legitimate business by

20  making $245,000 transfers from the pool of accumulated reconveyance fees to an account

21  he held in the name of a business entity he controlled.  Unwilling to pay all taxes on these

22  transfers, however, he falsely and fraudulently declared tens of thousands of dollars of his

23  family's living expenses as business expenses.

24

25

26

27

28

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 2

### B.     Troy Kelley Defrauds Fidelity National Title

#### 1.     The Lynnwood Office

During 2002, through United National LLC d/b/a Post Closing Department (hereinafter "Post Closing Department"),[1] Troy Kelley began offering a reconveyance tracking service to real estate escrow companies.  Thereafter, Kelley solicited the business of the Fidelity National Title office in Lynnwood (hereinafter "Fidelity of Lynnwood").

During a meeting with Fidelity of Lynnwood Manager J.Y., in approximately October 2003, Kelley offered to track the office's reconveyances for $15 per reconveyance tracked.  He also offered to accept from Fidelity the trustee fees associated with reconveyances and to refund them to borrowers if they went unused.

Shortly thereafter, J.Y. signed an agreement which was submitted to her by Kelley.  It specifically provided:  "At the completion of the post-closing documentation if extra funds are left over, PCD shall forward the funds to the Customer, with the sample letter attached."[2]

---

[1]  In order to do so, on August 2, 2002, Kelley formed United National, LLC, a limited liability company incorporated in Washington State.  Kelley operated United National as a partnership.  Blackstone International and Attorney Trustee Services were identified as United National's general and limited partners, respectively.

In turn, Blackstone International and Attorney Trustee Services were S Corporations, which were completely controlled by Kelley and his wife.  From the beginning, Troy Kelley identified himself as Blackstone International's President.  He also subsequently identified himself as Attorney Trustee Service's President.

The impact of the United National partnership arrangement was that United National's income flowed through to partners Blackstone International and Attorney Trustee Services.  It then flowed through to Troy Kelley and his wife, respectively.

[2]  The written agreement, signed by Fidelity's Operations Manager, J.Y., provided, in relevant part:

Fees are as follows:  $15.00 post closing tracking fee per item.

***

Payment Terms:

Client shall collect post closing fees and make checks payable to PCD . . . .  Expenses such as trustee fees and recording fees that are associated with a file will be advanced and charged to that file.  *At the completion of the post closing documentation if extra funds are left over, PCD shall* forward *the funds to the Customer, with the sample letter attached.*  (emphasis added)

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    Pursuant to the agreement, Fidelity attached to each file that it delivered to Post

2   Closing Department for tracking a check made payable to Post Closing Department for

3   $100.  That amount included Post Closing Department's $15 tracking fee and an $85

4   trustee fee.

5    Where Post Closing Department was not required to pay trustee fees, Kelley, in

6   fact, refunded the unused trustee fees to borrowers.  With the refund checks, Kelley

7   included letters, in which he acknowledged his obligation to refund the unused fees.  In

8   addition, Kelley submitted to Fidelity of Lynnwood spreadsheets which revealed that he

9   was refunding unused trustee fees to borrowers.

10    During approximately March 2005, however, Post Closing Department stopped

11   issuing nearly all refunds of unused trustee fees to borrowers.  Instead, Kelley—who, at

12   that time, personally took responsibility for authorizing refunds—began authorizing the

13   issuance of refund checks only to those borrowers who were savvy enough to know that

14   they were entitled to refunds and demanded them.  In order to conceal the fact that he had

15   stopped issuing refunds, moreover, when Post Closing Department opened a website,

16   Kelley directed Post Closing Department Operations Manager J.J. to remove from the

17   reconveyance spreadsheets that it posted online all information relating to how Post

18   Closing Department disbursed trustee fees.

19    Kelley did not inform J.Y. that he had stopped making refunds in March 2005.  To

20   the contrary, on February 16, 2006, more than a year after he had stopped refunding

21   unused trustee fees, Kelley sent J.Y. an email in which he suggested that Fidelity increase

22   the total fees it collected from each borrower and passed on to Post Closing Department.

23   He assured J.Y., however, that pursuant to his proposal, Post Closing Department would

24   continue to charge only $15 per reconveyance tracked.

25    When J.Y. changed jobs during the early summer of 2006, Kelley sought to

26   conceal his conduct from T.H., who took over as Manager of Fidelity of Lynwood.

27   While T.H. did not have a particular interest in the tracking of reconveyances, Kelley

28   nevertheless repeatedly sought to assure T.H. that he charged only a flat fee of $15 per

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 4

reconveyance tracked.[3]  He continued doing so right up until March 2008, when Fidelity of Lynnwood notified Post Closing Department that it had decided to begin tracking reconveyances in-house.[4]  At that time, Kelley sought to retain Fidelity of Lynnwood's business by notifying it that even if Fidelity of Lynnwood retained and disbursed the trustee fees, Kelley still would charge only $15 per reconveyance tracked.  Fidelity declined the offer, however.

### 2.    *The Tacoma Office*

During the spring of 2006, Kelley also started tracking reconveyances for the Tacoma Office of Fidelity (hereinafter, "Fidelity of Tacoma").  In soliciting that business, Kelley specifically informed Fidelity of Tacoma Manager M.M. that he would track its reconveyances for a flat fee of $15 per reconveyance and would refund unused trustee fees to borrowers.  Kelley did not tell M.M., however, that he had not regularly refunded unused trustee fees to Fidelity of Lynnwood's borrowers for over a year.  In fact, from the beginning, Kelley did not intend to issue, and did not issue, refunds of unused trustee fees to Fidelity of Tacoma borrowers.

### C.    Troy Kelley Defrauds Old Republic Title

On April 10, 2006, Kelley met with Old Republic Vice President C.L., in order to discuss Post Closing Department tracking Old Republic's reconveyances.  During this meeting, C.L. specifically expressed his concern that Post Closing Department return unused trustee fees to borrowers.

The following day, Kelley sent C.L. an email with a copy of the same refund letter he had issued to Fidelity borrowers prior to March 2005.[5]  In the email, Kelly

---

[3] On May 9, 2007, for example, Kelley caused the Post Closing Department Operations Manager, J.J., to send an email to T.H., stating, in relevant part, that "PCD collects $15 per file."  On July 31, 2007, moreover, Kelley personally sent an email to T.H. stating, in relevant part, "I want to confirm our fees are $15 per deed of trust tracked and we hold what you direct us to in order that the trustee gets paid and records the reconveyance."

[4] Fidelity planned to charge $140 as a "tracking fee" and planned to retain the entire amount.  As long as they did not make any misrepresentations regarding the use of the funds, they were entitled to do so.

[5] That letter stated, in relevant part:

represented that he had created the letter for a client who "wanted to hit the issue of the refund and integrity extra hard in the letter."

On April 13, 2006, moreover, Kelley followed up with his prior conversation with C.L. by sending him an email stating that Kelley had priced the "tracking *and refund* service at $20" (emphasis added). Kelley attached to this email a proposed agreement, which provided in relevant part:

> *$20.00 post closing tracking fee per item*, *fee includes management of* funds due trustees & *client refunds* (emphasis added).

Upon including additional language regarding Kelley's obligation to report his use of the fees advanced by Post Closing Department,[6] C.L. signed the agreement.

Pursuant to this agreement, Old Republic attached to each file that it delivered to Post Closing Department for tracking a check made payable to Post Closing Department. The checks typically were made out in an amount which would cover Post Closing Department's $20 tracking fee in addition to relevant trustee fees.

Despite its relevance, at no time during his negotiations with C.L. did Kelley tell C.L. that he had stopped refunding unused trustee fees during March 2005. And, despite

---

To ensure that the reconveyance is done properly, ----- collects a Post Closing fee for each reconveyance. *A portion of this fee is charged to track county records for your reconveyance and the balance is charged so that ------ or another trustee can process your reconveyance if additional [funds] are needed.* In your case, the county records show the reconveyance document has been recorded, so we can close our file and we are refunding you the excess processing fee. (emphasis added)

[6] To the proposed agreement, the following term requiring Kelley to account for the borrower's funds was added:

Additional Terms and Conditions:

PCD shall provide client with monthly progress reports of reconveyance activity on each of client's files being tracked as well as an *accounting on all funds received from client that have been disbursed and/or refunded to principals* (emphasis added).

his representations to C.L. that he would refund unused trustee fees, from the beginning, Kelley did not refund unused trustee fees to Old Republic borrowers.

When Kelley felt that Old Republic employees were asking too many questions regarding how he was using the fees he collected, Kelley sought to conceal the fact that he was not issuing refunds of unused trustee fees.  First, he directed Post Closing Department Operations Manager J.J. to randomly issue a batch of refund checks to miscellaneous borrowers.  In addition, he directed J.J. to create a spreadsheet—for the purpose of providing it to Old Republic—which would reflect the issuance of that random batch of refund checks.  Kelley further directed J.J. to "zero out" a portion of the spreadsheet.  That is, where refunds had not been issued, Kelley directed J.J. to depict falsely the issuance of checks to trustees so that it appeared as though he had used up all of the borrowers' trustee fees.[7]

### D.    Troy Kelley Employs Individuals to Track Reconveyances

Kelley hired D.L., A.M., and J.J., to track Fidelity and Old Republic Reconveyances.  While each of these employees, at one time or another, worked from an office in Everett that Kelley leased from Stewart Title, by May 2008, D.L. and J.J. worked from home, and only A.M. worked from the Stewart Title office.

In tracking reconveyances, these employees initially entered relevant data relating to each file, including the borrower's name and the Deed of Trust number, on a line of a spreadsheet they maintained.  They then logged onto relevant county websites, and, where reconveyances had been completed, they entered into the spreadsheet the number

---

[7] On March 26, 2007, when J.S., an Old Republic employee, emailed Post Closing Department asking, among other things, "[d]o you have a fee schedule . . . ?", Kelley caused J.J. to respond, "[t]he fee is $20 flat for each item (each DOT to be tracked)."  Additionally, Kelley again directed J.J to randomly issue a second batch of refund checks to miscellaneous Old Republic borrowers.

Just as he had done with Fidelity, moreover, on July 26, 2007, Kelley sent Old Republic an email in which he encouraged P.L. of Old Republic to increase the amount it collected per reconveyance tracked to $150.  While Kelley assured P.L. that Post Closing Department would continue to charge only $20 per reconveyance tracked, in fact, because Post Closing Department was neither using the funds to pay trustees and filing fees nor refunding the unused fees, the proposed increase would result in Post Closing Department retaining $150 for each reconveyance it tracked, not $20.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 7

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  assigned to the reconveyance.  Most reconveyances closed in one to two months, and
2  80% to 90% closed within the calendar year that the underlying real estate transactions
3  were initiated.

4       Occasionally, Post Closing Department employees were required to call or write a
5  letter to a bank in order to encourage it to process a reconveyance.  The employees did
6  not document in the spreadsheets they maintained the individual tasks they performed in
7  tracking reconveyances, however.  Because Kelley understood that Post Closing
8  Department received only a $15- or $20-fee per reconveyance tracked, moreover, he
9  never asked them to do so.

10      **E.      Troy Kelley Files False Income Tax Returns between 2006 and**
11      **2008**

12      Recognizing that either Old Republic or borrowers might successfully challenge
13  his fraudulent retention of unused trustee fees, Kelley sought to evade paying all taxes on
14  them in the year in which he fraudulently retained them.  In sum, Kelley deposited the
15  fees he received from Fidelity and Old Republic into Columbia Bank accounts
16  (hereinafter the "Fidelity Columbia Bank account" and Old Republic Columbia account,"
17  respectively).  Those fees constituted income, at the latest, at the time that reconveyances
18  were completed, and Kelley fraudulently retained the unused fees.  Instead of declaring
19  the full amount of trustee fees which accrued each year after reconveyances closed,
20  however, Kelley declared a fraction of that figure; that is, he declared only (1) the
21  tracking fee income that Post Closing Department received during the year, and (2) the
22  unrefunded fees that he had moved from Post Closing Department accounts at Columbia
23  Bank to his personal Bank of America account during a given year.[8]

24
25
26      [8] Each month, Kelley transferred the total of the $15- and $20-tracking fees that he received during the
27  prior month from the Columbia Bank Fidelity and Old Republic accounts to the Post Closing Department general
   operating account at Columbia Bank.  He then used the tracking fees to operate Post Closing Department.  In
28  addition, each year Kelley moved some funds from the Columbia Bank Fidelity and Old Republic accounts to his
   personal Bank of America account.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**F.      Class-Action Lawsuits Are Filed**

On May 14, 2008, class-action lawsuits were filed in the United States District Court for the Western District of Washington against Fidelity National Title and Old Republic Title.  The class actions, *Cornelius v. Fidelity National Title Insurance*, C08-0754MJP (W.D. Wash.), and *McFerrin v. Old Republic Title*, C08-5309BHS (W.D. Wash.), alleged, among other things, that Fidelity National Title and Old Republic Title collected trustee fees from borrowers and, even though they went unused, did not refund them.  Upon learning of the class-action lawsuits, Kelley (1) fraudulently sought to influence a class-action plaintiff who Kelley understood might implicate him; (2) closed the Post Closing Department office in Oregon and started it up again under a new name, Attorney Trustee Services, and (3) quickly shut down Post Closing Department in Washington and hid the unused trustee fees that Kelley had not refunded.

**G.      Troy Kelley Fraudulently Attempts to Influence Class-Action Plaintiff F.C.**

On May 15, 2008, the day following the filing of class-action lawsuits, Fidelity of Tacoma Manager M.M. sent an email to Kelley, notifying him both that the lawsuits had been filed and that they implicated Post Closing Department.  Recognizing his culpability, Kelley set out to obstruct the litigation.

Pursuant to Kelley's inquiry, Post Closing Department Operations Manager J.J. informed Kelley that Post Closing Department tracked the real estate transactions engaged in by F.C., the lead plaintiff in *Cornelius v. Fidelity National Title*.  In response, Kelley told J.J. that he planned to mail a refund check to F.C.

---

In the United National, Post Closing Department Form 1065 Tax Returns that Kelley filed for each of the tax years 2006, 2007, and 2008, he reported as gross receipts the total of the tracking fees that Kelley transferred to the general operating account during the year.

In the Form 1120S Tax Returns that Kelley filed for Blackstone International during each of the tax years 2006, 2007, and 2008, in calculating Blackstone's income, Kelley reported (1) the tracking fees income which flowed from Post Closing Department to Blackstone International  and (2) the total amount that he had moved to his personal Bank of America account during the relevant year.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

The following day, May 16, 2008, at 9:17 a.m., Kelley used an ATM at a Bank of America branch near his home to withdraw $300 in cash from his personal bank account. After withdrawing the cash, Kelley immediately headed to a nearby Washington Mutual Bank branch.

There, at 9:27 a.m., Kelley used the cash to purchase a $250 cashier's check made payable to F.C.[9]  To avoid fees associated with the purchase of the cashier's check, Kelley—who was then a member of the Washington State Legislature—provided Washington Mutual Bank with the account number for his Washington Mutual Bank campaign finance account, opened in the name of Friends of Troy Kelley.[10]

That same day, Kelley mailed the cashier's check to F.C.  With it, he included a letter in which he acknowledged that Post Closing Department was entitled only to a flat reconveyance-tracking fee of $15 per reconveyance and, therefore, was returning the unused trustee fees.[11]  He made clear, moreover, that even though Post Closing Department may have contacted the lender in order to prompt it to issue the reconveyance, there was no additional fee for that action.[12]

---

[9]  Because Kelley paid for the $250 cashier's check using money withdrawn from his personal Bank of America account, he later issued a check on the Columbia Bank Fidelity account, and made it payable to himself in the amount of $250.  On the memo line, Kelley wrote the word "reimbursement."

[10]  Before leaving the bank, Kelley deposited $155 in cash into his campaign finance account.

[11]  Kelley also included with the cashier's check a copy of an identical letter that Post Closing Department allegedly had sent to F.C. on January 7, 2008.  In order to provide F.C. with a plausible explanation for not having previously received it, Kelley fraudulently placed a slightly-incorrect address in that letter's heading.

[12]  The letter provided in relevant part:

Dear [F.C.]:

A review of our records shows that you did not cash our check of January 7, 2008.  The letter mailed to you was not returned by the post office, and you have not contacted Fidelity National Title or The Post Closing Department since the time your escrow closed.  That check is now stale dated and you should not cash it.

We are enclosing an official bank check to zero out your account balance, and mailing it to you with proof of mailing.

1

**H.     Troy Kelley Begins Operating Post Closing Department's**
**Oregon Business Under a New Name**

2

3         By at least early June 2008, Kelley began carrying out a plan to operate

4   Post Closing Department's tracking business in Oregon under a new name, that is, in the

5   name of United National's limited partner, Attorney Trustee Services.  Pursuant to that

6   plan, on June 11, 2008, Kelley opened a bank account at Columbia Bank in the name of

7   Attorney Trustee Services.[13]  Two days later, Kelley started distributing to himself the

8   funds Post Closing previously had received from its tracking business in Oregon, which

9   Kelley had deposited into Post Closing Department's general operating account at

10  Columbia Bank.[14]

11      **I.     Troy Kelley Shuts Down Post Closing Department's Tracking**
**Business in Washington and Hides Accumulated Unused Trustee**
**Fees**

12

13

14         By early June, 2008, Kelley possessed a total of $3,782,226 in accumulated trustee

15  fees in the following accounts: (1) $2,361,181 in the Columbia Bank Fidelity,

16  (2) $888,949 in the Columbia Bank Old Republic account, and (3) $532,096 in a

17  Columbia Bank account into which he had deposited fees received from another client,

18  Stewart Title.  At around the same time Kelley started operating in Oregon under a new

19

20         The enclosed official bank check is for $250.  Fidelity National Title collected
21   $140 on the payoff of each deed of trust.  *$15 was charged to track each*
     *reconveyance.  There was a balance on each deed of trust of $125 when the*
     *beneficiary secured the reconveyance.  This recording of the reconveyance may*
22   *have been after being contacted by the Post Closing Department to confirm that*
     *the document was being processed.  Thus, you are being refunded $125 for each*
23   *deed of trust that was paid off in escrow for a total of $250.*

24         (emphasis added)

25      [13]  He did so by issuing checks payable to himself on June 13, 2008, June 16, 2008, and July 3, 2008, in the
     amounts of $70,053.04, $30,000.17, and $12,850.00, respectively, which he deposited into his personal Bank of
26   America account.

27      [14] On July 3, 2008, using the entity name Attorney Trustee Services, Kelley entered into a new agreement
     with Fidelity National Title of Oregon to track its reconveyances, and on August 11, 2008, he filed a Certificate of
28   Withdrawal/Cancellation with the Washington State Secretary of State, thereby immediately canceling the
     registration of United National LLC.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 11

name, he also started carrying out a plan to shut down Post Closing Department's tracking business in Washington State and to hide these accumulated unused trustee fees.

In order to achieve these objectives, Kelley created a shell company, that is, Berkeley United LLC,[15] and a sham trust in Belize, that is, Wellington Trust.  The Berkeley United Operating Agreement provided that it was to operate as a partnership and that United National's General Partner, Blackstone International, was to control Berkeley United as its Managing Member.[16]  The provisions of the Wellington trust provided that, not only was Blackstone International the settlor and a beneficiary of the trust, it also controlled the trustees. [17]

Rather than hiding the accumulated unused trustee fees simply by moving them to an account opened in the name of Berkeley United or contributing them to Wellington Trust, however, Kelley first moved the funds through a series of hard-to-follow transfers. Thus, on June 12, 2008, he transferred the funds from Columbia Bank to an account which Kelley had recently opened in the name of United National at Wells Fargo Bank. On June 13, 2008, Kelley again moved the funds, by wiring them to an account which Kelley had recently opened in the name of United National at U.S. Bank.  On June 18, 2008, Kelley moved the funds out of state by wiring them to an account which Kelley had recently opened in the name of Blackstone International at Nevada State Bank in Nevada.

---

[15]  On June 27, 2008, Kelley signed an Operating Agreement for a partnership referred to as Berkeley United, and on June 30, 2008, Kelley signed paperwork establishing Wellington Trust.

[16]  As the Managing Member, Blackstone International was entitled to make "all decisions respecting any matter affecting or arising out of the conduct of the business of the Company."

[17]  The trust provided that, as the Settlor, Blackstone International was entitled to "appoint or remove any person" to the positon of "Protector."  The trust further repeatedly provided that the Protector's consent was required in order for the Trustee to act and that the Protector could remove Trustees and appoint new Trustees.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 12

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

**J.      Stewart Title Is Destroyed by Fire**

During the evening of June 25, 2008, a fire was reported at the Stewart Title building in Everett.  While Stewart Title ultimately burned to the ground, Post Closing Department's office, which was connected to the Stewart Title building, survived the fire.

**K.      After the Fire at Stewart Title, Kelley Finishes Hiding the Unused Trustee Fees, and Shuts Down Post Closing Department in Washington**

On June 27, 2008, Kelley completed the task of hiding the title companies' funds by transferring $3,634,673 from the Blackstone account at Nevada State Bank to an account which Kelley had recently opened in the name of Berkeley United at Vanguard. On that same day, June 27, 2008, Kelley left a voicemail for Old Republic Vice President C.L., in which, for the first time, Kelley informed C.L. that there would be an interruption in the tracking services that Post Closing Department offered to Old Republic.

Among other things, in his voicemail, Kelley informed C.L. that there had been a fire at Stewart Title, "so at least temporarily," Post Closing Department would have to suspend its tracking of Old Republic's reonveyances.[18]  Four days later, on July 1, 2008, Kelley cancelled all ten trade names that United National had used, including Post Closing Department.[19]

Thereafter, on July 28, 2008, Kelley sought to further obfuscate his possession and control of the funds by signing the First Amendment to the Berkeley United Partnership Operating Agreement.  While Blackstone remained the Managing Member and retained a 1% interest (it previously held a 100% interest) in the Berkeley United partnership, through this amendment, Kelley admitted Wellington Trust as a "Non-Managing

---

[18]  While, at that time, Post Closing Department also was tracking reconveyances for Fidelity of Tacoma, Kelley did not notify it of the difficulties the fire created for Post Closing Department.  Rather, after the fire at Stewart Title, Post Closing Department simply stopped picking up their files.

[19]  On that same date, moreover, Kelley drafted memoranda noting that (1) going forward Attorney Trustee Services would take in all new document-tracking business, and (2) Blackstone International would be "responsible for the continued tracking of documents that its subsidiary, United National, contracted out to complete."

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 13

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Member" of Berkeley United and assigned it a 99% interest the Berkeley United

2  partnership.  As a result of these machinations, on paper, Wellington Trust of Belize

3  appeared to control 99% of the $3.6 million in accumulated trustee fees that Kelley

4  concealed in the Vanguard Berkeley United account.  In fact, however, as only the

5  privately held Berkeley United Operating Agreement and trust documents would reveal,

6  Kelley completely controlled both Berkeley United and Wellington Trust.[20]

       **L.**      **Troy Kelley Begins Moving Some Funds From the Vanguard**
7
                   **Berkeley United Account, to His Personal Bank of America**
8
                   **Account**
9

10  On December 22, 2008, Kelley, identifying himself as the "President" of Berkeley

11  United and the business of the company as "mortgage payoff," opened an account in the

12  name of Berkeley United at Wells Fargo Bank.  Thereafter, Kelley regularly transferred

13  interest earned on the funds he was concealing in the Vanguard Berkeley United account,

14  to the newly opened Wells Fargo Bank Berkeley United account and, from that account,

15  to his personal Bank of America account.

       **M.**     **In an Effort to Locate the Trustee Fees It Had Delivered to Troy**
16
                   **Kelley, Class-Action Defendant Fidelity National Title Issue**
17
                   **Subpoenas**
18

19  On February 14, 2009, Kelley's attorney, A.H., responded to an inquiry by

20  class-action defendant Fidelity's counsel, E.C.  Therein, A.H. admitted that Kelley had

21  sent a refund check to F.C., stating, "my client issued a refund to Cornelius on January 8,

22  2008, and, when that check was not cashed, issued a cashier's check to clear those funds

23  on PCD's account on May 15, 2008."

24  Beginning on April 22, 2009, E.C. started an effort to locate the trustee fees that

25  Kelley had concealed.  On that date, E.C. issued a subpoena to US Bank, the first bank

26  into which Kelley had moved the funds.  Five months and three additional subpoenas

27

28      [20] On September 23, 2008, Kelley also submitted to Vanguard an International Wire Option Form,
providing him with the option of wiring funds from the Vanguard Berkeley United account to the account opened in
the name of Wellington Trust at Atlantic International Bank in Belize.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 14

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   later, E.C. located the funds at Vanguard.  Accordingly, on September 8, 2009, E.C.

2   issued a subpoena to Vanguard, demanding that it produce records.

**N.   After Old Republic Title Sues Troy Kelley, He Seeks to Conceal from Old Republic the Unused Trustee Fees in the Berkeley United Vanguard Account**

*1.   The Class Action Lawsuit Filed Against Old Republic Title Is Dismissed; Old Republic Title Sues Kelley*

8   On October 29, 2009, pursuant to an agreement by the parties, Judge Settle

9   dismissed the class-action lawsuit filed against Old Republic.[21]  Thereafter, Old Republic

10  filed a lawsuit naming Kelley in King County Superior Court.  On January 7, 2010, that

11  lawsuit was removed to the United States District Court for the Western District of

12  Washington, *Old Republic Title, Ltd.  v. Troy Kelley, et al.,* No. C10-0038JLR (W.D.

13  Wash.) (hereinafter "*Old Republic v. Kelley*").  Among other things, Old Republic

14  alleged in the lawsuit that by failing to refund unused trustee fees, Kelley breached the

15  contract he had entered into with Old Republic.  Additionally, it alleged that Kelley had

16  improperly wound up Post Closing Department by absconding with the trustee fees

17  without paying creditors.

*2.   Old Republic Serves Troy Kelley with Written Interrogatories*

19  As part of the civil discovery in *Old Republic v. Kelley*, Old Republic's counsel,

20  S.S., served Kelley with written interrogatories.  In his responses to the interrogatories,

21  which he submitted on February 22, 2010, Kelley sought to conceal from Old Republic,

22  his association both with Berkeley United and the Vanguard Berkeley United account, in

23  which Kelley then held the unused trustee fees he had received from Old Republic.[22]

_____

[21]  On April 1, 2010, Judge Pechman granted Fidelity's motion to dismiss the class-action lawsuit against Fidelity.

[22]  For example, Interrogatory 16 required Kelley to disclose all entities in which he was an officer.  On February 22, 2010, Kelley responded to this interrogatory, stating:

Mr. Kelley has formed the following entities, . . . :

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 15

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

### 3.    Old Republic Deposes Troy Kelley

On August 2, 2010, Old Republic's counsel, S.S., deposed Kelley.  During the deposition, Kelley admitted that the "industry standard" was to refund trustee fees if they were not needed to pay trustees.  He asserted, however, that J.Y. of Fidelity and C.L. of Old Republic had made verbal side agreements with him in which they authorized him to charge a borrower each time Post Closing Department made a phone call or wrote a letter on behalf of a borrower.

Kelley, who was under oath, testified that the spreadsheets his staff maintained had specific columns in which staff members documented these letters they sent and phone calls they made.  Kelley claimed that he could not produce a spreadsheet, however, because the Post Closing Department spreadsheets either were destroyed during the fire at Stewart Title or were destroyed when his laptop crashed.[23]

Kelley claimed that when he wound up Post Closing Department, he reviewed the columns in spreadsheets that listed the specific fees he was entitled to take, and, pursuant to that review, he determined that he had earned the entire amount contained in the

---

Blackstone International Inc. 2000 – present.  (President)
United National LLC, 2002-2008, cancelled.  (President)
United National 14 LLC, 2004-2008, cancelled.  (President)
Attorney Trustee Services Inc, 2003-present.  (President)
Kelley Education Foundation, 2007-present, very small, give money for education or internships (Chairman)
Friends of Troy Kelley, political association for campaign, 2006-present (Candidate)

Interrogatory 18, moreover, required Kelley to disclose all bank accounts into which he had "*deposited any money originally received* from Old Republic."  (emphasis added)  On February 22, 2010, Kelley responded to this interrogatory, stating "[t]he only account used for the *deposit of checks from ORT* was #[*****]1629 at Columbia Bank.  The account was in the name of United National, LLC; dba Post Closing Department."

With respect to Interrogatory 16, while he did not list himself as an officer of Berkeley United, only three months earlier, Kelley had opened a Wells Fargo Bank account in which he identified himself as the "President" of Berkeley United.  With respect to Interrogatory 18, instead of answering the questions asked—where had he deposited any money originally received from Old Republic—Kelley answered a question not asked—where had he deposited checks received from Old Republic.  Both answers appear to be an attempt by Kelley to obfuscate both his association with Berkeley United and the fact that Berkeley United then held Old Republic's funds.

[23] When shown a spreadsheet that did not contain such columns, however, Kelley asserted that the columns must have been folded so that they did not appear on the spreadsheet.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 16

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   Columbia Bank Stewart, Fidelity and Old Republic accounts.  He, therefore, retained and

2   intended to keep all of the $3.7 million that he transferred out of state.

3       Despite his lawyer's earlier acknowledgement that he had sent it, moreover,

4   Kelley claimed that he had not sent a refund check and letter to class-action plaintiff F.C.,

5   the lead plaintiff in the Fidelity class-action lawsuit, and that he did not know who did.[24]

6           4.      *Troy Kelley Moves for Summary Judgment and Opposes Old*
                    *Republic's Cross-Motion for Summary Judgment*
7

8       On March 28, 2011, Old Republic filed an Opposition to Kelley's Summary

9   Judgment Motion and Old Republic Title's Cross-Motion for Summary Judgment.[25]

10  Dkt. 120.  Among other things, Old Republic argued therein that the filing of the

11  class-action lawsuits provided Kelley with a motive to quickly shut down Post Closing

12  Department and improperly wind it up.  Refuting Kelley's earlier claim during the

13  deposition that he had not even been aware of the class-action lawsuits when he shut

14  down the business, among other facts, Old Republic cited the fact that two days after the

15  lawsuits were filed, Kelley sent a refund check to F.C., the lead plaintiff in the Fidelity

16  class-action lawsuit.

17      Thereafter, on April 8, 2011, Kelley filed his Reply to Old Republic's Response

18  Dkt. 129.  To that Reply, Kelley attached a Declaration.  Dkt. 130.  In it, he asserted

19  under oath, "As I testified in my deposition, I didn't send this letter, and I don't know

20  who did."  During May 2011, while the parties' motions and cross-motions were pending,

21  Kelley and Old Republic resolved the lawsuit.

22

23

24      [24] During the August 2, 2010, deposition counsel for Old Republic made it known that counsel was aware
    of the Vanguard Berkeley United account by directly inquiring into Kelley's motive for transferring Old Republic's
25  funds to the account.  Thereafter, Kelley filed a supplemental response to the interrogatories he previously had
    submitted.  In it, Kelley admitted both that he was the President of Berkeley United and that he had deposited Old
26  Republic's funds into the Vanguard Berkeley United account.

27      [25] On March 9, 2011, Kelley filed a Motion for Summary Judgment.  Dkt. 108.  In this motion, Kelley did
    not address the claim that he was liable for Improperly Winding Up United National.  Rather, Kelley argued only
28  that, if Old Republic's other claims failed, the claim of Improperly Winding Up also should fail.

GOVERNMENT'S TRIAL BRIEF/                                    UNITED STATES ATTORNEY
*U.S. v. Troy Kelley* (CR15-5198RBL) - 17                    1201 PACIFIC AVENUE, SUITE 700
                                                             TACOMA, WASHINGTON 98402
                                                             (253) 428-3800

1    **O.    After All Litigation Is Resolved, Troy Kelley Moves All Funds**
2           **Remaining in the  Vanguard Berkeley United Account to**
           **Accounts Opened in the Name of Blackstone International**
3
4          After resolving the last of the pending litigation during May 2011, Kelley no

5    longer had a need to conceal the trustee fees he had transferred to the Berkeley United

6    account, which by that time totaled approximately $2,581,653. [26]   Accordingly,

7    beginning in June 2011, Kelley—who had not previously paid taxes on the funds—began

8    making annual $245,000 transfers from the pool of accumulated unused trustee fees he

9    held in the Vanguard Berkeley United Account into an account he held in the name of

10   Blackstone International.[27]   In the federal income tax returns he filed on behalf of

11   Blackstone International, Kelley then represented to the IRS that Blackstone International

12   was engaged in the business of "document tracking" and earned $245,000 per year.[28]

13   _____

14        [26]  During February 2010, Kelley informed M.L., the CPA he hired to file tax forms for Berkeley United
     and Wellington Trust, that he was continuing to hold the funds in the Vanguard Berkeley United account "because
15   of the potential litigation."

16        [27] Specifically, between 2011, and 2015, Kelley made the following transfers:

17        (1)   transfer of $245,000 June 3, 2011, from Vanguard Berkeley United Account, No. 8746, to Wells Fargo
              Berkeley United Account, No. 7983; movement of $245,000 from Wells Fargo Berkeley United
18            account by the issuance of check No. 5527 and deposited into Columbia Bank Blackstone International
              account, No. 8470, on June 7, 2011 (deposit charged as Money Laundering in Count 6 of the
19            Indictment);

20        (2)   movement of $245,000 by issuance of check No. 1007 on Vanguard Berkeley United account and
              deposited into Columbia Bank Blackstone International account, No. 8470, on January 6, 2012
21            (deposit charged as Money Laundering in Count 7 of the Indictment);

22        (3)   movement of $245,000 by issuance of check No. 1001 on Vanguard Blackstone International account,
              and deposited into Columbia Bank Blackstone International account, No. 8470, on January 3, 2013
23            (deposit charged as Money Laundering in Count 8 of the Indictment);

24        (4)   movement of $245,000 by issuance of check No. 1004 on Vanguard Blackstone International account,
              and deposited into Columbia Bank Blackstone International account, No. 8470, on January 24, 2014
25            (deposit charged as Money Laundering in Count 9 of the Indictment); and

26        (5)   transfer of $245,000 from Vanguard Blackstone International account to Columbia Bank Blackstone
              International account, No. 8470, on February 2, 2015 (transaction charged as Money Laundering in
27            Count 10 of the Indictment)

28        [28] According to the corporate directives Kelley created for Blackstone on July 1, 2008, however,
     Blackstone's only function was to track those reconveyances that Post Closing Department already had received by

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 18

By claiming that Blackstone International was earning income by conducting business, Kelley not only sought to avoid scrutiny of his conduct by the IRS and public, he sought to offset the income he declared, by declaring business expenses.  For tax years 2011 and 2012, for example, Kelley declared that Blackstone International had a total in excess of $60,000 in business expenses each year.  Because the Blackstone International tax returns reflected only the total amount of categories of business deductions, however, without additional information, it was impossible to determine what individual expenditures comprised the categories of claimed business deductions.

**P.      The Investigation**

*1.      The IRS Interview and Search Warrant*

During late 2012, the Internal Revenue Service initiated an investigation of whether Kelley had underreported United National's income between 2006 and 2008.  In furtherance of that investigation, IRS Special Agents interviewed Kelley on April 19, 2013.

During the interview, among other things, Kelley asserted that Blackstone International earned the $245,000 he transferred to it in 2011 and 2012 by continuing to perform work on reconveyance files.  Subsequent to the interview, however, Kelley filed a Blackstone International tax return for the tax year 2013, in which he significantly modified the business deductions he claimed.  For example, while for the tax year 2012, Kelley claimed "Conference Education" expenses and "50% Sales Expenses" [meals] of $4,979, and $4,987, respectively, for 2013, he did not claim any such expenses.

On March 16, 2015, IRS agents executed a search warrant at Kelley's residence in Tacoma.  During the execution of the warrant, agents failed to locate evidence supporting Kelley's claim that Blackstone International was currently earning income by document

---

July 1, 2010, which had yet to reconvey.  With this limited mission, Blackstone neither had the means to earn $245,000 per year by tracking reconveyances nor the need to pay in excess of $60,00 in business expenses.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 19

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    tracking.[29]  They did locate documents entitled "Category Summary," however.  Those

2    documents identified the individual expenditures which comprised the broad categories

3    of business deductions that Kelley declared during 2011 and 2012.

4         The Category Summary documents revealed that, even if Kelley had been

5    operating some business through Blackstone International, the expenses Kelley claimed

6    were not "ordinary and necessary" business expenses.  Instead, these documents revealed

7    that for 2011 and 2012, Kelly had declared as business tax deductions ordinary expenses

8    associated with family life, including (1) purchases at "Teaching Toys and Books," a

9    children's toy and books store which does not carry items associated with

10   reconveyance-tracking; (2) a family tour of National Parks, including Yellowstone

11   National Park, Mount Rushmore, and Glacier National Park; (3) purchases of family

12   meals at the Keg Restaurant, including the purchase of the "Kids Plates" that Kelley's

13   kids ordered; (4) a zoo membership for his children; (5) the depreciation of his wife's car,

14   which, according to declarations to her insurance provider, she drove for "pleasure," not

15   work; (6) his wife's happy hour drinks during which Kelley was not present and no

16   reconveyance business was discussed by Kelley's wife or her colleagues; and (7) his

17   wife's work travels and conferences, which were related to her job as a French professor

18   at a local university.

19                    2.    *Analysis of Bank Records*

20        In order to investigate conduct not related to the filing of tax returns, the Federal

21   Bureau of Investigation ("FBI") joined the IRS investigation.  An analysis of Kelley's

22   bank and business records by an FBI analyst has revealed that between January 2006 and

23   June 2008, Post Closing Department should have issued thousands of refunds to Fidelity

24   and Old Republic borrowers.  In fact, however, Post Closing Department issued only a

25   total of approximately 82 refunds, totaling approximately $18,225, to Fidelity and Old

---

[29] While they located five relatively short spreadsheets, which related to reconveyances for real estate transactions that had been conducted many years earlier, they found no other evidence suggesting that Kelley was engaged in an ongoing recnveyance-tracking business.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 20

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Republic borrowers.  Nearly all of the refunds issued to Fidelity borrowers were issued

2  after borrowers demanded refunds.  With respect to Old Republic, nearly all of the

3  refunds were issued to borrowers who were part of the two batches of randomly issued

4  refund checks that Kelley ordered Post Closing Department Operations Manager J.J. to

5  issue after becoming concerned that Old Republic employees were asking too many

6  questions.

7  **II.    STATEMENT OF PROCEEDURE**

8      On April 15, 2015, a Federal Grand Jury for the Western District of Washington

9  returned an Indictment charging Kelley with (1) Possession and Concealment of Stolen

10  Property, in violation of Title 18, United States Code, Section 2315; (2) False

11  Declaration, in violation of Title 18, United States Code, Section 1623(a); (3) Attempted

12  Obstruction of Civil Lawsuit, in violation of Title 18, United States Code, Section

13  1512(c)(2); (4) Corrupt Interference with Internal Revenue Laws, in violation of Title 26,

14  United States Code, Section 7212(a); (5) Filing False Income Tax Return, in violation of

15  Title 26, United States Code, Section 7206(1); and (6) False Statement, in violation of

16  Title 18, United States Code, Section 1001.  In addition, the Indictment sought the

17  forfeiture of in excess of $1,400,000, in stolen funds that Troy Kelley possessed, pursuant

18  to Title 28, United States Code, Section 2461(c).  Dkt. 1.

19      On April 16, 2015, Kelley entered a plea of not guilty before Magistrate Judge

20  Creatura.  Dkt. 7.  While Kelley initially was represented by Mark Bartlett, after

21  Angelo Calfo filed a notice of appearance on September 1, 2015, Dkt. 35, the Court

22  granted Mark Bartlett's motion to withdraw.  Dkt. 42.

23      On September 3, 2015, the Grand Jury returned a Superseding Indictment.  With

24  the exception of the charge of Attempted Obstruction of Civil Lawsuit, in violation of

25  Title 18, United States Code, Section 1512(c)(2), the Superseding Indictment charged all

26  of the offenses which were initially brought in the Indictment.  In addition, the

27  Superseding Indictment charged Money Laundering, in violation of Title 18,

28  United States Code, Section 1956(a)(1)(B)(i), sought the forfeiture of in excess $1.3

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 21

1    million in funds which were "involved in" the money laundering charges, pursuant to

2    18 U.S.C. § 982(a)(1), and charged additional counts of Filing False Income Tax Returns.

3    Dkt. 39.

4           On September 11, 2015, Kelley entered a plea of not guilty before

5    Magistrate Judge Christel.  Dkt. 51.  Trial was set to commence on March 14, 2016.

6    Dkt. 50.

7           On September 29, 2015, Kelley moved the Court for a pretrial evidentiary hearing

8    concerning the seizure of funds pursuant to a civil seizure warrant, Dkt. 58, and, on

9    October 30, 2015, Kelley moved to (1) sever counts; (2) dismiss Count 3 of the

10   Superseding Indictment, charging Perjury, in violation of Title 18, United States Code,

11   Section 1623(a) (asserting that it was duplicative of Count 2 which also charged Perjury),

12   and (3) dismiss Count 12 of the Superseding Indictment, charging Filing a False Tax

13   Return, in violation of 26 U.S.C. § 7206(1) (asserting that it had been charged outside the

14   statute of limitations).  Dkt. 68–70.

15          The Court scheduled an evidentiary hearing for December 1-2, 2015.  Dkt. 67.  At

16   the conclusion of the hearing, the Court directed the government to release seized funds

17   to Kelley's counsel and directed Kelley's counsel not to disperse the funds without

18   authorization from the Court.  Dkt. 100.  In addition, the Court (1) denied Kelley's

19   motion to sever counts, (2) found that Counts 2 and 3, charging perjury, were duplicative,

20   and directed the government to elect between dismissing one of the counts or

21   consolidating them;[30] and (3) deferred ruling on Kelley's motion to dismiss Count 12.

22   Dkt. 101.

23          The government anticipates that the government's evidence will require

24   approximately three to four weeks to present.

25

26

27

28
           [30]  The government subsequently elected to consolidate the counts.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 22

1

III.    LEGAL ISSUES

2

A.    Possessing and Concealing Stolen Property

3

4    Count 1 of the Indictment charges Troy Kelley with Possessing and Concealing

5   Stolen Funds, in violation of 18 U.S.C. § 2315.[31]  In order to convict the defendant of that

6   offense, the government must prove beyond a reasonable doubt that:  "(1) the property

7   was [stolen, unlawfully converted, or taken]; (2) after the property was [stolen,

8   unlawfully converted, or taken], it crossed a United States boundary; (3) the defendant

9   possessed [or] concealed . . . the property; (4) the defendant knew the property was stolen

10  [unlawfully converted, or taken]; and (5) the property was worth $5,000 or more."

11  *United States v. Mardirosian*, 602 F.3d 1, 7 (1st Cir. 2010); *accord* Ninth Circuit Model

12  Criminal Jury Instruction 8.190.  Possessing and concealing stolen property, as well as

13  the precise means by which the theft occurred (stealing, converting, or taking by fraud)

14  are alternative means of violating § 2315 as opposed to distinct crimes.  *See Schad v.*

15  *Arizona*, 501 U.S. 624, 636 (1991) (plurality opinion) (discussing similar language in

16  18 U.S.C. § 2313).  Accordingly, there is no requirement that the jury agree unanimously

17  as to whether the defendant possessed or concealed the stolen property (or both), or how

18  exactly the theft was committed.  *Id*.

19    The term "taken," as used in 18 U.S.C. § 2315, includes property taken by fraud.

20  *United States v. McClintic*, 570 F.2d 685, 689 (8th Cir. 1978).  Any unauthorized taking

21  will suffice, moreover, including a theft committed in violation of state law.  *See, e.g.*,

22  *Rugendorf v. United States*, 376 U.S. 528, 536-37 (1964); *United States v. Miller*,

23

24  _____

25  [31] Section 2315 provides in relevant part:

26  Whoever . . . possesses . . . [or] conceals . . . any goods, wares, or merchandise, securities, or money of the
    value of $5,000 or more, . . . which have crossed a State or United States boundary after being stolen,

27  unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken . . .
    [s]hall be fined under this title or imprisoned not more than ten years, or both.

28  18 U.S.C. § 2315.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 23

688 F.2d 652, 655-56, 663 (9th Cir. 1982).[32]  While a felonious taking requires that the property be taken "from one having the attributes of an owner," *United States v. Carman*, 577 F.2d 556, 565 (9th Cir. 1978), the government is not required to prove who exactly owned the stolen funds.  *See United States v. Crawford*, 239 F.3d 1086, 1092 (9th Cir. 2001).  Rather, the government need only prove that the defendant knew he was not the owner when they were taken.  *Id.* at 1093.

Money is property covered by the express terms of § 2315, *see also* 18 U.S.C. § 2311 (defining "money"), and this includes money stolen via wire transfer, as the statute is not limited to money the thief physically steals.  *See United States v. Kroh*, 915 F.2d 326, 328 (8th Cir.) (en banc), *adopting* 896 F.2d 1524, 1528-29 (8th Cir. 1990).  A defendant possesses funds in a bank account that is under his control, regardless of whether the account is held in a third-party's name.  *See United States v. Savage*, 67 F.3d 1435, 1442-43 (9th Cir. 1995); *United States v. Reagan*, 725 F.3d 471, 484 (5th Cir. 2013); *see generally United States v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001) (stolen property may be constructively possessed).  To prove possession of stolen funds, the government must directly trace the funds, that is, it must show that stolen funds remained in the account.  *Cf. United States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009) (holding under another section of the National Stolen Property Act that stolen property must "be 'directly traceable' to the fraud or theft.").

In the present case, the evidence will prove that Kelley defrauded title companies—thereby inducing the title companies to remit fees which they had received from borrowers and wished to return to borrowers if they went unused—by falsely representing that Post Closing Department would refund unused trustee fees to borrowers.  In truth and fact, Kelley intended to convert the unused trustee fees, and did

---

[32] Under Washington State law, among other things, "theft" means "[b]y color or aid of deception" obtaining "control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." *See* RCW § 9A.56.020(1)(b).  In addition, the term "theft" includes "wrongfully obtain[ing] or exert[ing] unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." *See* RCW § 9A.56.020(1)(a).

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 24

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

convert them, to his own use.  Kelley transported fraudulently-obtained funds interstate by wiring them from Columbia Bank in Washington to Nevada State Bank in Nevada, and from Nevada to Vanguard in Pennsylvania.  The government will demonstrate, moreover, that of the $3.6 million Kelley ultimately moved to the Vanguard Berkeley United account, $1.4 million can (conservatively) be directly traced to the reconveyance fees Kelley fraudulently took from Fidelity and Old Republic.  Vanguard records reveal, moreover, that stolen funds remained in Kelley's Vanguard accounts through January 2012.

Kelley's intent to conceal the funds is demonstrated by the facts that he engaged in a convoluted series of transfers in moving the funds out of state, deposited them into an account opened in the name of a shell company, Berkeley United, and ultimately contributed them to Wellington Trust.  The fact that Kelley, through Blackstone International, contributed 99% of Berkeley United's assets to Wellington Trust did nothing to diminish that control, and, therefore, his possession, of the funds.  This is so, because Kelley also completely controlled the Wellington Trust.

### B.     False Declaration

Counts 2 through 5 of the Superseding Indictment charge Kelley with False Declarations, in violation of 18 U.S.C. § 1623(a).[33]  With the exception of Count 3, which charges Kelley with making a false declaration in a pleading he filed with the Court on April 8, 2011, each of the counts relates to answers Kelley provided while being deposed on August 2, 2010, in *Old Republic v. Kelley.*

In order to convict the defendant of False Declaration, the government must prove beyond a reasonable doubt that the defendant:  (1) knowingly made a (2) false (3)

---

[33] Section 1623(a) provides, in relevant part:

> Whoever under oath . . . in any proceeding before and ancillary to any court or grand jury of the United States makes any false material declaration . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1623(a).

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 25

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

material declaration (4) under oath (5) in a proceeding before or ancillary to any court of the United States. *See* 18 U.S.C. § 1623(a); *United States v. Wilkinson*, 137 F.3d 214, 226 (1998).[34]  False declarations made during a federal civil deposition occur ancillary to a Court of the United States and may be charged as Perjury. *United States v. McAfee*, 8 F.3d 1010, 1014 (5th Cir. 1993).  While, in order to constitute perjury, a false declaration must have been made "under oath," the government need not prove who administered the oath or that the person who did so was authorized to administer it. *United States v. Molinares*, 700 F.2d 647, 651-52 (11th Cir. 1983).

A declaration or statement must be false to constitute perjury in violation of § 1623. *See United States v. Jaramillo*, 69 F.3d 388, 390 (9th Cir. 1995).  Section 1623 is not limited to the willful submission of false testimony, however. *United States v. Fornaro*, 894 F.2d 508, 512 (2nd Cir. 1990).  Rather, it merely requires that the defendant made a statement that he or she knew to be false at the time he made it. *Id.*[35]

Generally, falsity can be proved by compelling circumstantial evidence. *United States v. Boone*, 951 F.2d 1526, 1536 (9th Cir. 1991).  A jury may gauge the intentions of false testimony by the surrounding circumstances, *United States v.*

---

[34] False Declarations may be charged as a violation of either 18 U.S.C. § 1621(1) or 18 U.S.C. § 1623(a). *See United States v. McAffee*, 8 F.3d 1010 (5th Cir. 1993).  While there are several subtle differences between the statutes, the primary difference is the application of the "two-witness rule."  Generally, in order to prove § 1621, the two-witness rule requires that a perjury conviction be supported by something more than the testimony of a single witness. *See United States v. Menting*, 166 F.3d 923, 926 (7th Cir. 1999).  Section 1623 was enacted in 1970, however, in order to relax the government's burden of proof by modifying the common law "two-witness rule" for prosecuting perjury committed in relation to proceedings before or ancillary to any court proceeding. *United States v. Sherman*, 150 F.3d 306, 311 (3rd Cir. 1998).

[35] An answer which is literally true, even though deceptive, does not constitute perjury. *United States v. Dean*, 55 F.3d 640, 662 (D.C. Cir. 1995).  Likewise, a fundamentally ambiguous question cannot be the basis of a perjury conviction. *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003).  Though some disagreement exists as to what constitutes fundamental ambiguity, courts have held that a question is not fundamentally ambiguous if a person of "ordinary intelligence" could understand it based on the context and circumstances in which it was asked. *Id.*  Likewise, a question is not fundamentally ambiguous simply because the questioner and respondent might have different interpretations of it. *Id.*

While § 1623 provides a recantation defense, only an "outright retraction and repudiation" of false testimony qualifies. *United States* v. Wiggan, 700 F.3d 1204, 1216 (9th Cir. 2012).  In addition, courts have held that, in order to prevail, a defendant must unequivocally declare that his testimony is false and must do so before the testimony has affected the proceeding. *Id.*

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 26

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   *Larranaga*, 787 F.2d 489, 495 (10th Cir. 1986), or infer that a defendant knew his

2   testimony to be false from the disproof of that testimony.  *United States v. Alberti*,

3   568 F.2d 617, 624 (2nd Cir. 1977).

4        To be actionable under § 1623, a false statement also must be material.

5   *United States v. McKenna*, 327 F.3d 830, 839 (9th Cir. 2003).  In order to be considered

6   material, a statement need only be "capable of influencing" the decision-making body to

7   which it ultimately would be addressed.  *United States v. DeGeorge*, 380 F.3d 1203, 1218

8   (9th Cir. 2004) (upholding perjury conviction where during civil deposition, defendant

9   made false statements which revealed his "ulterior motives"); *United States v. Clark*,

10  918 F.2d 843, 847 (9th Cir. 1990) (holding that a false statement during a civil deposition

11  is material if the false statement itself had the tendency to affect the outcome of the

12  underlying civil suit for which a deposition was taken).

13       1.    *Counts 2 and 3 of the Superseding Indictment*

14       In the present case, Counts 2 and 3, which will be consolidated for purposes of

15  trial,[36] allege that in *Old Republic v. Kelley*, during his August 2, 2010, deposition,[37] and

16  in the declaration he submitted to the Court on April 8, 2011,[38] Kelley falsely denied that

17  after he learned of a class-action lawsuit, he sent class-action plaintiff F.C. a $250 refund

---

[36] Upon finding that Counts 2 and 3 of the Superseding Indictment are multiplicitous, the Court directed the government either to consolidate the counts, or to elect between counts.  *See United States v. Platter*, 514 F.3d 782, 786 – 787 (8th Cir. 2008) (requiring government to consolidate felon-in possession and drug user in possession charges in order to avoid multiplicity).  Accordingly, the government has elected to consolidate the counts.

[37] Count 2 alleges that during the deposition, Kelley falsely answered the following question:

Question:  Think it's most likely that you did not [send the receonveyance refund letter to F.C.]

Answer:  Yes

[38] Count 3 charges Kelley with making the following false statement in the deposition he submitted to the Court on April 8, 2011:

Old Republic has also submitted a copy of a letter from the *Cornelius* litigation in which someone tried to return money to the plaintiff in that case.  As I testified in my deposition, I didn't send this letter, and I don't know who did.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 27

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

check.  The evidence will establish that Kelley's under-oath testimony regarding this matter was false.  In addition to the strong circumstantial evidence surrounding the purchase—including the facts that the refund check was purchased near Kelley's home by someone who contemporaneously made a deposit to Kelley campaign account—Kelley told his Post Closing Department Operations Manager J.J. that he was going to send the refund check to F.C.  Not only that, Kelley's counsel, A.H., admitted in a letter he sent to the Fidelity's lawyer during the class-action litigation that Kelley, in fact, sent the refund check to F.C.

Kelley's false, under-oath testimony regarding the refund check also was material, as it was capable of influencing the decisionmaking bodies to which it was made.  First, in its Complaint in *Old Republic Title v. Kelley*, Old Republic alleged that Kelley had both (1) breached his contract with Old Republic and (2) improperly shut down Post Closing Department.  Kelley's defense to these respective allegations was that (1) he was not required to refund unused trustee fees and, therefore, had not breached the contract, and (2) he was not aware of the class-action lawsuits at the time he shut down Post Closing Department and, therefore, was not motivated to shut down quickly and improperly the business.

In mailing F.C. a refund check, however, Kelley undermined both of these defenses.  In sending a refund check to F.C., Kelley generally acknowledged that he understood that he was required to make refunds.  Likewise, sending the refund check to a class-action plaintiff within two days of the class-action lawsuits being filed was strong circumstantial evidence that Kelley was aware of the class-action lawsuits before he closed down Post Closing Department—providing a motive for shutting down quickly and improperly the business.

### 2.   *Counts 4 and 5 of the Superseding Indictment*

Count 4 the Superseding Indictment charges that during his August 2, 2010, deposition in *Old Republic v. Kelley*, Kelley falsely testified that Old Republic Vice

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

President Carl Lago authorized him to charge fees in addition to a flat $20-tracking fee.[39] Count 5 charges that, during that same deposition, Kelley falsely testified that his employees kept track of these authorized fees in specified columns in the spreadsheets they maintained.[40]

The evidence will establish that Kelley's answers were false.  Carl Lago will testify that he never acquiesced to, or even discussed, the possibility of Post Closing Department levying reconveyance fees in excess of the negotiated $20 flat tracking fee. Lago's testimony will be corroborated both by Kelley's employees, moreover, who will testify that they never kept track of any activities which might generate such fees. Kelley's false, under-oath testimony regarding charging ancillary fees also was material in that the testimony directly address Old Republic's claim that Kelley had improperly retained fees he had promised to refund.  Accordingly, the testimony clearly was capable of influencing a jury charged with determining whether Kelley had violated the contract.

## C.    Money Laundering

Counts 6-10 charge Money Laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).[41]  These counts relate to Kelley's transfer of $245,000

---

[39] Count 4 charges Kelley providing the following false answer to the following question:

Question:  Who at Old Republic discussed or negotiated with you any of your charges beyond the $20 fee specified in the agreement with Old Republic?

Answer:  Carl [Lago].

[40] Count 5 charges Kelley with providing the following false answer to the following question:

It wouldn't just be "PCD fees $55" without indicating what?

Answer:   No, there were separate columns for each different fee.

[41] That statute provides, in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction which in fact involves the proceeds of specified unlawful activity –

(B) knowing that the transaction is designed in whole or in part –

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 29

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   per year from the Vanguard Berkeley United account, to a Blackstone International

2   account at Columbian Bank in an effort to disguise previously stolen reconveyance fees

3   as legitimate, current business income.

4          To convict a defendant of money laundering under § 1956(a)(1)(B), the

5   government must prove that (1) the defendant conducted or attempted to conduct a

6   financial transaction, (2) the transaction involved the proceeds of unlawful activity, (3)

7   the defendant knew that the proceeds were from unlawful activity, and (4) the defendant

8   knew that the transaction [was] designed in whole or in part—to conceal or disguise the

9   nature, the location, the source, the ownership, or the control of the proceeds of specified

10  unlawful activity.  *United States v. Wilkes,* 662 F.3d 524, 545 (9th Cir.2011).  The term

11  "proceeds" is further defined as gross receipts.  *See* 18 U.S.C. § 1956(c)(9).  The statutory

12  definition of specified unlawful activity includes mail fraud and wire fraud.  *See*

13  18 U.S.C. § 1956(c)(7)(A) (incorporating offenses listed in 18 U.S.C. § 1961(1)).  The

14  transfer of proceeds of a specified unlawful activity by wire constitutes a financial

15  transaction.  *See* 18 U.S.C. § 1956(c)(4)(i).

16         Where the proceeds of a specified unlawful activity are commingled with clean

17  money, all of the funds in the account become tainted.  *See United States v. English,*

18  92 F.3d 909, 916 (9th Cir.1996).  Accordingly, the money transferred from a commingled

19  account does not need to be traceable to fraud, theft, or any wrongdoing at all.  It is

20  enough that the money, even if innocently obtained, was commingled in an account with

21  money that was obtained illegally.  *See Id.  See also United States v. Lazarenko,* 564 F.3d

22  1026, 1035 (9th Cir. 2009).

23

24

----

25                          (i)        to conceal or disguise the nature, the location, the source, the
26                                     ownership, or the control of the proceeds of the specified unlawful
                                       activity;

27         Shall be sentenced to a fine . . .  or imprisonment  . . . .

28         18 U.S.C. §  1956(a)(1)(B)(i)

1    In the present case, Kelley commingled tainted funds with other funds.  On

2 June 18, 2008, in three Columbia Bank accounts Kelley held a total of $3.7 million, at

3 least $1.6 million of which he had fraudulently taken from Fidelity National Title and

4 Old Republic Title.  On that same date, Kelley combined the funds he held in the three

5 accounts, and, through a convoluted series of transfers, Kelley moved $3.6 million of the

6 tainted funds to an account opened in the name of a shell company, Berkeley United.[42]

7 As a result of this commingling, all of the $3.6 million was tainted.

8    In order to repatriate the tainted funds, between 2011 and 2015, moreover, Kelley

9 engaged in financial transactions.  That is, he wire-transferred $245,000 per year from

10 Vanguard to a Columbia Bank account opened in the name of Blackstone International.

11 The financial transactions involved the proceeds of unlawful activity, that is, the tainted

12 funds Kelley held in the Vanguard Berkeley United account.

13    Finally, by drawing the money through Blackstone International and making it

14 appear that Blackstone International was a legitimate business with current income and

15 corresponding expenses, Kelley concealed the true source of the money, that is, the

16 scheme to defraud title companies.

17    **D.    Corrupt Interference with Internal Revenue Laws**

18    Count 11 charges Kelley with obstructing the administration of the Internal

19 Revenue Service laws, in violation of 26 U.S.C. § 7212(a).[43]  To establish a violation of

20

21 _____

22    [42] Kelley then wire transferred the commingled funds to a newly-opened Blackstone International account
    at Nevada State Bank.  On June 27, 2008, moreover, he transferred $3,634,673 of these funds, containing at least
23 $1,463,171 of fraudulently-obtained funds from the Blackstone International account at Nevada State Bank to a
    newly-opened account at Vanguard, held in the name of a newly-formed shell company, Berkeley United LLC, a
24 move that was designed to conceal the location of the funds.

25    [43] That Section provides, in relevant part:

26        [w]hoever corruptly or by force or threats of force (including any threatening letter
        or communication) endeavors to intimidate or impede any officer or employee of
27        the United States acting in an official capacity under this title, or in any other way
        corruptly or by force or threats of force (including any threatening letter or
28        communication) obstructs or impedes, or endeavors to obstuct or impede, the due
        administration of this title, shall, upon conviction, . . . .

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 31

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

the omnibus clause[44] of that statute, the government must prove beyond a reasonable doubt that the defendant: (1) corruptly endeavored (2) to obstruct the administration of the IRS.  *United States v. Hanson*, 2 F.3d 942, 946-47 (9th Cir. 1993).  The government need not prove that there was an ongoing tax investigation at the time the defendant attempted to obstruct the IRS.  *United States v. Massey*, 419 F.3d 1008, 1010 (9th Cir. 2005) (citing *United States v. Kuball*, 976 F.2d 529, 531 (9th Cir. 1992)).  Likewise, the government need not prove willfulness.  *United States v. Kelly*, 147 F.3d 172, 177 (2nd Cir. 1998).

An act is done corruptly if carried out "with the intention to secure an unlawful benefit for oneself or for another."  *Hanson*, 2 F.3d at 946.  A broad reading of the term "corruptly' is supported by its modifying phrase "in any other way."  *See United States v. Mitchell*, 985 F.2d 1275, 1279 (4th Cir. 1993).  The obstructive conduct the omnibus clause is aimed at prohibiting includes efforts to impede "the collection of one's taxes, the taxes of another, or the auditing of one's or another's tax records," *United States v. Kuball*, 976 F.2d 529, 531 (9th Cir. 1992) (citing *United States v. Reeves*, 752 F.2d 995, 998 (5th Cir. 1985)), or to secure an unwarranted financial gain, *United States v. Dykstra*, 991 F.2d 450, 453 (8th Cir. 1993).  There is no requirement that the defendant's actions actually impede the IRS, however.  *United States v. Rosnow*, 977 F.2d 399, 410 (8th Cir. 1992).

---

26 U.S.C.§  7212(a).

[44] Section 7212(a) contains two clauses.  The first clause prohibits threats or forcible endeavors designed to interfere with federal agents acting pursuant to Title 26.  *E.g.*, *United States v. Przybyla*, 737 F.2d 828, 829 (9th Cir. 1984).  The second more general clause, known as the "omnibus clause," prohibits any act that corruptly obstructs or impedes, or endeavors to obstruct or impede, the due administration of the Internal Revenue Code.  *See United States v. Koff*, 43 F.3d 417, 418 (9th Cir. 1994).  It is a broad statute and covers any of a variety of methods that a person might use to obstruct the IRS.  *See United States v. Salman*, 531 F.3d 1007, 1015 (9th Cir. 2008) (attempting to use fictitious financial instruments to pay tax debts); *Terrell v. C.I.R.*, T.C. Memo 1982-651 at n.3 (helping to prepare false Forms W-2 on behalf of third parties); *United States v. Popkin*, 943 F.2d 1535, 1540-41 (11th Cir. 1991) (helping conceal the proceeds of client's drug trafficking); *Workinger*, 90 F.3d at 1409, 1411 (9th Cir. 1996) (submitting false financial statements to IRS officers); *United States v. Mitchell*, 985 F.2d 1275, 1278-79 (4th Cir. 1993) (among other things, "improperly filing an application for tax‑exempt status, misrepresenting the purpose of [the defendant's] organization to get tax exempt status . . . .").

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 32

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

In the present case, the evidence will establish that by (1) underreporting United National's gross receipts between 2006 and 2008, (2) claiming family expenses as business expenses between 2011 and 2012, and (3) making false statements to IRS Agents when questioned about this conduct, Kelley sought to impede the collection of his taxes.  In doing so, Kelley sought to secure an unlawful benefit to himself.

### E.      Filing False Income Tax Return

Counts 12 and 13 charge Kelley with filing false tax returns, in violation of 26 U.S.C. § 7206(1).[45]  Count 12 relates to United National's 2008 tax return in which Kelley underreported United National's gross receipts.  Count 13 relates to Kelley's failing to report income on his 2008 personal Form 1040 Tax Return, as a result of underreporting United National's gross receipts during that same year.

Counts 14, 15, and 17 charge Kelley with filing false tax returns for the years 2011, 2012, and 2013, respectively.  These counts allege that, during the relevant years, Kelley falsely declared $245,000 in income on Blackstone's Forms 1120S Tax Returns, when, in fact, he had earned the income years earlier.  In addition, Counts 14 and 15 allege that Kelley declared on Blackstone's Forms 1120S Tax Returns false business deductions.

To establish the offense of Filing a False Tax Return, in violation of 26 U.S.C. § 7206(1), the government must prove beyond a reasonable doubt: (1) the defendant made and subscribed a return, statement, or other document that was incorrect as to a material matter; (2) the return, statement, or other document subscribed by the defendant contained a written declaration that it was made under the penalties of perjury; (3) the defendant did not believe the return, statement, or other document to be true and correct

---

[45] That makes it a crime if a person:

> [w]illfully makes and subscribes any return . . . which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every matter . . . .

26 U.S.C. § 7206(1).

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 33

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   as to every material matter; and (4) the defendant falsely subscribed to the return,

2   statement, or other document willfully, with the specific intent to violate the law.

3   *United States v. Brooksby,* 668 F.2d 1102, 1103-04 (9th Cir.1982). The existence of a tax

4   deficiency is not an element of this crime. *See Id.*

5          Money that has been stolen, embezzled, or wrongfully misappropriated constitutes

6   taxable income. *See James v. United States*, 366 U.S. 213 (1961). Pursuant to 26 U.S.C.

7   § 162, a taxpayer is entitled to deduct "ordinary and necessary expenses paid or incurred

8   during the taxable year in carrying on any trade or business."

9          False information is material if it had a natural tendency to influence or was

10  capable of influencing or affecting the ability of the IRS to audit or verify the accuracy of

11  the tax return or a related return. *See United States v. Gaudin*, 515 U.S. 506, 509 (9th Cir.

12  1995). "[I]nformation is material if it is necessary to a determination of whether income

13  tax is owed." *United States v. Scholl*, 166 F.3d 964, 980 (9th Cir. 1999).

14         "'Willfulness' in the context of criminal tax cases is defined as a 'voluntary,

15  intentional violation of a known legal duty.'" *United States v. Powell*, 955 F.2d 1206,

16  1210 (9th Cir. 1992) (quoting *Cheek v. United States*, 498 U.S. 192, 200 (1991)). A

17  defendant's ignorance of the tax law or good faith misunderstanding of the tax laws is a

18  defense to willfulness. *Cheek*, 498 U.S. at 202-03. While the defendant's good faith

19  misunderstanding of the law need not be objectively reasonable, the jury may consider

20  the reasonableness of the defendant's beliefs in determining whether such beliefs were

21  honestly or genuinely held. *Powell*, 955 F.2d at 1212. The defendant's willfulness may

22  be inferred from the defendant's acts and proved solely by circumstantial evidence.

23  *United States v. Woodley*, 9 F.3d 774, 779 (9th Cir. 1993).

24         The government may rely solely on circumstantial evidence to prove willfulness in

25  criminal tax cases. *United States v. Woodley*, 9 F.3d 774, 779 (9th Cir. 1993) (affirming

26  convictions for failure to file and tax evasion based on circumstantial evidence). Thus,

27  trial courts should follow a liberal policy in admitting evidence directed towards

28  establishing the defendant's state of mind. No evidence which bears on this issue should

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 34

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

be excluded unless it interjects tangential and confusing elements which clearly outweigh its relevance. *United States v. Collorafi*, 876 F.2d 303, 305 (2nd Cir. 1989). Factors that are relevant to a defendant's willfulness, include the existence of a tax due and owing, *United States v. Wunder*, 919 F.2d 34,37 (6th Cir. 1990); evidence that a defendant attempted to conceal his income, *United States v. Eargle*, 921 F.2d 56 (5th Cir. 1991); the defendant's background, *United States v. Ostendorff*, 371 F.2d 729, 731 (9th Cir. 1967); and the amount of the defendant's gross income, *United States v. Payne*, 800 F.2d 227 (10th Cir. 1986) (the higher the defendant's gross income, the less likely the defendant was unaware of filing requirement).

In the present case, Kelley's underreporting of income in 2008, over reporting of income between 2011 and 2013 and declaration of false and fraudulent business deductions in 2011 and 2012 skewed an accurate determination of whether tax was owed, and, as a result, the conduct was material. *Scholl*, 166 F.3d 964. The Income Tax Returns Kelley filed contained written declarations that they were being signed subject to the penalties of perjury.

In the present case, Kelley's education, moreover, suggests that he was well aware that (1) using accrual accounting, he was required to recognize as income retained unused trustee fees during the years that reconveyances he tracked were completed, that is, between 2006 and 2008, and (2) he could not claim ordinary family expenses as business deductions during 2011 and 2012.[46] The fact that through June 2008 Kelley fraudulently sought to conceal his retention of unused trustee fees from Fidelity and Old Republic, moreover, suggests that he intentionally did not declare the fees on his tax returns

---

[46] Kelley has both JD and MBA degrees. Not only has he taken tax and taught tax courses, Kelley was the President of First American Tax Exchange Corporation, a qualified intermediary for 1031 deferred tax exchanges of like-kind investment property.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 35

1   between 2006 and 2008 because he realized that either the title companies or borrowers

2   might challenge his conduct and seek the return of the fees.[47]

3   **F.    False Statement**

4       Count 16 of the Superseding Indictment charges Kelley with making false

5   statements, in violation of 26 U.S.C. 1001.[48]  This count is based upon Kelley's

6   assertions to IRS agents on April 19, 2013, that, each year, he and Blackstone continued

7   to work on old reconveyances and that he declared income as he earned the money.

8       A conviction under § 1001 requires the government to prove beyond a reasonable

9   doubt that the defendant: (1) made a statement, (2) that was false, and (3) material,

10  (4)  with specific intent, (5) in a matter within the agency's jurisdiction.  *United States v.*

11  *Selby*, 577 F.3d 968, 977 (9th Cir. 2009).  To be material, a false "statement must have a

12  natural tendency to influence, or [be] capable of influencing, the decision of the

13  decisionmaking body to which it [is] addressed."  *United States v. Gaudin*, 515 U.S. 506,

14  512 (1995).  The false statement need not actually influence the agency, and the agency

15  need not rely on the information for the statement to be material.  *United States v.*

16  *Service Deli., Inc.,* 151 F.3d 938, 941 (9th Cir. 1998).  Rather, the "test [for materiality]

17  is the *intrinsic* capabilities of the statement itself, rather than the possibility of the actual

18  attainment of its end as measured by collateral circumstances."  *Id.*  Thus, even where a

19  law enforcement agency's investigation is complete, so that a defendant's false

20  statements to agents add nothing and are not actually capable of influencing the decisions

21  of the particular agents, false statements may be material as long as they are "of a type

22  capable of influencing a reasonable decisionmaker."  *United States v. McBane*, 433 F.3d

23  344, 350-51 (3rd Cir. 2005).

24

25      [47]  Most of the reconveyances that Post Closing Department tracked closed during the 2006-to-2008 time
26  period.  Accordingly, if Troy Kelly actually believed he was entitled to retain these fees as gross receipts and income
    using accrual accounting, he would have recognized the fees between 2006 and 2008.

27      [48]  That statute makes it a crime if a person "in any matter within the jurisdiction of the executive,
28  legislative or judicial branch of the Government of the United States, knowingly and willfully . . . makes any
    materially false, fictitious, or fraudulent statement."  18 U.S.C. § 1001(a)(2)

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 36

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    In the present case, Kelley, who had no records from which to work, and no

2   employees, could not possibly have been continuing to work on the old reconveyances.

3   And Kelley clearly acted willfully.  He had to know that that statement was untrue since

4   he would have been supervising or performing any work that was done.  Kelley's

5   assertion, moreover, clearly was calculated to influence the IRS agents to whom it was

6   made and had a natural tendency to influence or was capable of influencing the IRS.

7   **G.    Forfeiture**

8          *1.    Overview*

9

10   The government must establish the forfeitability of property by a preponderance of

11   the evidence.  *United States v. Martin,* 662 F.3d 301, 307 (4th Cir.2011).  The question

12   before the fact finder is "whether the government [has established the] requisite nexus

13   between the property and the offense."  Rule 32.2(b)(1)(A).  The nexus that the

14   government must show depends on the statutory basis for forfeiture—"involved in,"

15   "traceable to" and "used in."  18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 982(a)(1).

16    A fact finder may base its forfeiture determination on evidence already in the

17   record, as well as any additional evidence or information submitted by the parties.

18   Rule 32.2(b)(1)(B).  Because forfeiture is part of sentencing, the Rules of Evidence do

19   not apply.  *United States v. Capoccia,* 503 F.3d 103, 109 (2d Cir.2007).  Accordingly,

20   hearsay may be considered and relied upon so long as it has sufficient indicia of

21   reliability.  *Id.*

22        *2.    Procedure Relating to Forfeiture of Specified Property*

23   The Superseding Indictment provides Kelley with notice that upon his conviction

24   of Money Laundering, in violation of 18 U.S.C. §  1956, pursuant to 18 U.S.C.

25   § 982(a)(1), the government will seek the forfeiture of specific property "involved in"

26   that offense, that is, $908,397.51 that was transferred from a Vanguard Blackstone

27   International account, to Bank of America Account No. XXXX3414, on March 26, 2015,

28

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 37

1    and $447,421.00 that was transferred from a Vanguard Blackstone International account

2    on March 26, 2015.

3          Pursuant to 18 U.S.C. § 982(a)(1), the Court, "in imposing a sentence on a person

4    convicted of an offense in violation of section 1956 ... of this title, shall order that the

5    person forfeit to the United States any property, real or personal, involved in such

6    offense, or any property traceable to such property." The term "involved in" is defined in

7    the statute. In *United States v. Cheesemen,* 600 F.3d 270 (3rd Cir.2010), however, the

8    Third Circuit indicated that the term should be defined by using their ordinary and natural

9    meaning. The Third Circuit held that "involved in" in 18 U.S.C. § 922(g)(3) had its plain

10   meaning of "to engage as a participant"; "to relate closely"; "to have within or as part of

11   itself"; and "to require as a necessary accompaniment." *Id.* at 278.[49]

12         While, there is no constitutional "right to a jury verdict on forfeitability" in a

13   criminal forfeiture proceeding, *United States v. Phillips*, 704 F.3d 754, 769-71 (9th Cir.

14   2012), Federal Rule of Criminal Procedure 32.2(b)(5)(A) states that a special jury verdict

15   is available if the government is seeking forfeiture of specific property; in that

16   circumstance, the district court must determine whether either party wants the jury to

17   determine the forfeitability of specific property. If the parties wish for the jury to

18   determine whether specifically identified property is to be forfeited, the trial court

19   generally should bifurcate forfeiture proceedings from the ascertainment of guilt,

20   requiring separate jury deliberations and allowing argument of counsel. *United States v.*

21   *Feldman,* 853 F.2d 648, 661-62 (9th Cir.1988).

22

23

24

---

25        [49] "Involved in" has also been interpreted to include property that was itself being laundered, "as well as
26   property used to facilitate a money laundering offense." *In re 650 Fifth Ave. and Related Properties,* 777
     F. Supp. 2d 529, 562 (S.D.N.Y.2011) (citing *United States v. Eleven Vehicles,* 836 F. Supp. 1147, 1153
27   (E.D.Pa. 1993), and collecting other cases from the Eleventh, Tenth, Ninth, and Fifth); see also *United States v. All*
     *Monies ($477,048.62) In Account No. 90-3617-3, Israel Discount Bank, New York, N.Y.,* 754 F. Supp. 1467, 1473
28   (D.Haw. 1991).

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 38

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

### 3.   Procedure Relating to Money Judgment

The Superseding Indictment also provides Kelley with notice that upon his conviction of possession of stolen funds, in violation of 18 U.S.C. § 2315, pursuant to 18 U.S.C. § 982(a)(1)(C) and 28 U.S.C. § 2461(c), the government will seek a money judgment of $1,463,171, representing an amount which "constitutes or is derived from proceeds traceable to [such] violation."[50]  Where the government seeks a money judgment for the amount of the proceeds of the defendant's crime, there is no nexus determination to be made by the jury and the defendant is not entitled to a jury determination on the amount of the money judgment.  *United States v. Tedder,* 403 F.3d 836, 841 (7th Cir. 2005) ("Rule 32.2 does not entitle the accused to a jury's decision on the amount of the forfeiture"); *United States v. Phillips,* 704 F.3d. 754, 771 (9th Cir. 2012) ("Given that the only issue here was a monetary forfeiture, no jury determination was necessary").[51]

## IV.   EVIDENTIARY ISSUES

### A.   Defendants' Prior Statements

A statement is not hearsay if the statement is offered against a party and is the party's own statement.  Fed. R. Evid. 801(d)(2); *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir. 1981).  Such admissions may be oral or written.  *See In re Homestorecom, Inc. Securities Litigation*, 347 F. Supp. 2d 769, 781 (C.D.CA 2004) (emails written by a party are admissions of a party opponent and admissible as non-hearsay under Rule 801(d)(2)).

---

[50]  Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), a person convicted of Possession of Stolen Funds, in violation of 18, U.S.C. § 2315, shall forfeit to the United States "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [such] violation."

[51]  Rule 32.2(b)(1)(A) establishes that the government may seek a personal money judgment against the defendant ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay").  *See also United States v. Casey,* 444 F.3d 1071, 1077 (9th Cir. 2006) (a money judgment is warranted in a criminal case against a convicted defendant even if the defendant is insolvent).

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 39

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    When the government offers some of the defendant's prior statements, the door is

2  not thereby opened to the defendant to put in all of his out-of-court statements because,

3  when offered by the defendant, the statements are hearsay.  *Burreson*, 643 F.2d at 1349.

4  The only limitation of this principle is the doctrine of completeness which has been

5  applied by some courts to require that all of a defendant's prior statements be admitted

6  where it is necessary to explain an admitted statement, to place it in context, or to avoid

7  misleading the trier of fact.  Fed. R. Evid. 106.

8    In the present case, the government anticipates playing excerpts of Kelley's

9  August 2, 2010, deposition.  Because the deposition is lengthy, and, in some instances

10 dwelled on topics of only tangential relevance, the government does not intend to

11 introduce his entire taped testimony, which lasts approximately six hours.  In addition,

12 the government anticipates playing voicemail messages left by Kelley for Old Republic

13 Title Vice President C.L. and for AUSA L.L.  While the government does not plan to

14 offer transcripts to the jury with respect to the video-taped deposition,[52] it will offer

15 transcripts during the playing of the voicemail messages.[53]

16   The government also will offer at trial Kelley's written statements, including

17 (1) Kelley's tax returns, supporting profit and loss statements, and ledgers, and

18 (2) documents relating to Kelley's formation and operation of various entities, including

19 United National, Blackstone International, Attorney Trustee Services, Berkeley United,

20 and Wellington Trust.  These documents bear Kelley's signature and, pursuant to Fed. R.

21 Evid. 801(d)(2), they are admissible as his adoptive admissions.  *See United States v.*

22 *Smith*, 609 F.2d 1294, 1301 n.7 (9th Cir. 1979) (records containing defendant's signature

23

24   [52] The government may seek to use various sections of the deposition transcript as demonstrative exhibits
25 during its opening statement or closing argument.

26   [53] Government-prepared transcripts may be used by the jury to follow tape recordings where certain factors
are present: the district judge reviews the transcript for accuracy, the agent who participated in the taped
27 conversation testifies to the accuracy of the transcript, and the district judge gives the jury a limiting instruction.
*United States v. Booker*, 952 F.2d 247, 249 (9th Cir. 1991).  The government will not seek admission of the
28 transcripts, and will request a limiting instruction that the tape, not the transcript, controls.  *See* 9th Cir. Model Jury
Instr. 2.7.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 40

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   "may more appropriately be regarded as non-hearsay admissions under Fed. R. Evid.

2   801(d)(2)(A) and 801(d)(2)(B)).  The documents also are readily authenticated, as they

3   either are certified copies of public records, which are self-authenticating under Fed. R.

4   Evid. 902(4), were located in Kelley's residence during the execution of a search warrant,

5   *see Burgess v. Premier Corp.,* 727 F.2d 826, 835-36 (9th Cir.1984) (all exhibits found in

6   defendant's warehouse were adequately authenticated simply by their being found there);

7   or, given their appearance and content, clearly relate to entities operated by Kelley, s*ee*

8   *Alexander Dawson v. N.L.R.B.,* 586 F.2d 1300, 1302 (9th Cir.1978) (circumstances of

9   discovery, along with content of documents, were sufficient to demonstrate authenticity).

10          In addition, the government will offer emails written by Kelley to others.  The

11   government will establish the authenticity of the emails by showing that they deal with

12   facts known peculiarly by Kelley and his representatives; were emailed in reply to

13   previous emails; and fit into a progressive course of action by Kelley.  In addition, the

14   emails bear Kelley's names, return email addresses, and titles.  *See United States v.*

15   *Console*, 13 F.3d 641, 661 (3d Cir. 1993) (A document . . . may be shown to have

16   emanated from a particular person by virtue of its disclosing knowledge of facts known

17   peculiarly to him);  *United States v. Reilly*, 33 F.3d 1396, 1407-08 (3rd Cir. 1994) (Where

18   letters fit into a course of correspondence or a progressive course of action, proof of the

19   letter's relationship to these events can authenticate any of the letters.)[54]

20          **B.     Statements by Agents**

21          Statements also are not hearsay if they are authorized by the defendant, Fed. R.

22   Evid. 801(d)(2)(C ), or made by a "party's agent or servant concerning a matter within

23   the scope of the agency or employment made during the existence of the relationship."

24   Fed. R. Evid. 801(d)(2)(D).  The burden of proof in proving such agency is low, i.e.,

25

26

27          [54] "Authenticity may be based entirely on circumstantial evidence, including [a]ppearance, contents,
28   substance . . .  and other distinctive characteristics of the writing."  Fed. R. Evid. 901(b)(4).

GOVERNMENT'S TRIAL BRIEF/                                    UNITED STATES ATTORNEY
*U.S. v. Troy Kelley* (CR15-5198RBL) - 41                    1201 PACIFIC AVENUE, SUITE 700
                                                            TACOMA, WASHINGTON 98402
                                                            (253) 428-3800

1  "[e]vidence of agency must be substantial, although proof by a preponderance is not

2  necessary." *United States v. Jones*, 766 F.2d 412, 415 (9th Cir. 1985). [55]

3       In the present case, the government will offer statements made by A.H., Kelley's

4  counsel during the class action litigation.  In addition, the government will offer

5  statements, including statements made verbally and in emails, which were made by

6  Kelley's employees, including, J.J., D.L., and A.M.  With Kelley's knowledge and

7  expectation, these individuals represented Kelley and made statements within the scope

8  of that representation.  As such, their statements are admissible pursuant to Fed. R. Evid.

9  801(d)(2)(D).

10  ### C.    Business Records—Rule 803(6)

11       The admissibility of business records is governed by Rule 803(6) of the Federal

12  Rules of Evidence.  A document is admissible under this Rule if two foundational facts

13  are established: (a) the document was made or transmitted by a person with knowledge at

14  or near the time of the incident recorded, and (b) the document was kept in the course of

15  a regularly conducted business activity.  *United States v. Ray*, 930 F.2d 1368, 1370

16  (9th Cir. 1990).  Similarly, a record generated by a third party and received and relied

17  upon, such as an invoice, becomes a business record of the company relying upon it.

18  *United States v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993).

19       The government need not establish precisely when or by whom the document was

20  prepared; all the rule requires is that the document be made "at or near the time" of the

21  act or event it purports to record.  See *Ray*, 920 F.2d at 1370.  The government also need

22  not show that the records are accurate; it only needs to show that the records are kept in a

23  regular manner and are relied upon for the management and operation of the business.

24

---

25      [55] In *Jones*, 766 F.2d 412, the Ninth Circuit found that there was sufficient evidence of agency in an

26  extortion case where the agents arrived at the "time and place the extortionist had set for the ransom drop," one
agent requested that the victim "walk down an alley with him," and both agents asked her for the bag she was

27  carrying.  The Court found that this "independent non-hearsay evidence strongly suggests that [the two agents] had
been in contact with the extortionist and were performing functions on his behalf, namely the pick-up of the ransom

28  money." *Id.*

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 42

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   *Johnson v. United States*, 325 F.2d 709, 711 (1st Cir. 1963).  Incompleteness, ambiguities

2   and inaccuracies in records go to weight, not admissibility.  *United States v. Catabran*,

3   836 F.2d 453 (9th Cir. 1988); *United States v. Hudson*, 479 F.2d 251, 254 (9th Cir. 1972).

4          The foundation may be established either through a custodian of records or "other

5   qualified witness."  The phrase "other qualified witness" is broadly interpreted to require

6   only that the witness understand the record-keeping system.  *Ray*, 930 F.2d at 1370;

7   *United States v. Franco*, 874 F.2d 1136, 1139-40 (7th Cir. 1989); *United States v.*

8   *Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986) (Thus, contrary to defendant's arguments,

9   there is no reason why a proper foundation for application of Rule 803(6) cannot be laid,

10  in part or in whole, by the testimony of a government agent . . .).  The witness need not

11  personally have recorded the information nor know who actually did make and keep the

12  records.  *United States v. Bland*, 961 F.2d 123, 126-27 (9th Cir. 1992).  In determining if

13  these foundational facts have been established, the court may consider hearsay and other

14  evidence not admissible at trial.  See Fed. R. Evid. 104(a); 1101(d)(1); *Bourjaily*,

15  483 U.S. at 178-79.

16         In lieu of live testimony, the foundation for admissibility of a business

17  record may be established by a certification that complies with Fed. R. Evid.

18  902(11), that is, a declarant, who is a custodian or other "qualified person,"

19  must certify that the record "(A) was made at or near the time of the

20  occurrence of the matters set forth by, or from information transmitted by, a

21  person with knowledge of those matters; (B) was kept in the course of the

22  regularly conducted activity; and (C) was made by the regularly conducted

23  activity as a regular practice."  Fed. R. Evid. 902(11).[56]

24         In the present case, the government plans both to call custodians of records and to

25  rely on 902 certifications in order to offer numerous business records.  These records

26

27         [56] Rule 902(11) requires that the government, as the offering party, provide written notice to defendants of
    the intention to offer business records under these provisions.  *See* Fed. R. Evid. 902(11).  The records and

28  declarations must be made available to the defendants for inspection "sufficiently in advance of their offer into
    evidence to provide an adverse party with a fair opportunity to challenge them." *Id.*

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 43

include bank records, dating from January 2006 to 2015, and various business records relating to fraudulent deductions Kelley declared in 2011 and 2012.

### D.    Residual Clause—Rule 803(7)

The residual hearsay exception permits a district court to admit an out-of-court statement not covered by Rules 803 or 804 if the court determines that:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. Rule 803(7).

The Ninth Circuit has held that bank records may be admissible under the residual hearsay exception.  *See Karme v. Comm'r,* 673 F.2d 1062, 1064–65 (9th Cir.1982) (discussing foreign bank records).  Other courts of appeals have similarly concluded.  In doing so, they have noted that, in general, bank records provide circumstantial guarantees of trustworthiness because the banks and their customers rely on their accuracy in the course of their business.  *See United States v. Puella*, 964 F.2d 193, 202 (3d Cir.1992); *United States v. Wilson,* 249 F.3d 366, 376 (5th Cir.2001) (admitting foreign bank records under the residual hearsay exception), *abrogated on other grounds by Whitfield v. United States,* 543 U.S. 209 (2005); *United States v. Nivica,* 887 F.2d 1110, 1127 (1st Cir.1989) (same).

In the present case, among other records, the government will offer Columbia Bank records for the Stewart Title and Fidelity National Title accounts that Post Closing Department maintained at Columbia Bank prior to January 2006.  Agents located these records on a computer seized from Kelley's residence during the execution of a search warrant.

As bank records, they offer a circumstantial guarantee of trustworthiness.  *See Puella,* 964 F.2d at 202.  In addition, they will be offered in support of a material fact, that is, they desmonstrate that, until March 2005, Kelley refunded unused trustee fees to

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 44

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   borrowers.  Finally, the records are the most probative available evidence on this point.[57]

2   Accordingly, the records are properly admitted pursuant to Fed. R. Evid. 803(7).

3           The authenticity of these records will be established by the following facts,

4   moreover: (1) they have the official appearance of bank records; (2) the records were

5   addressed to Kelley's business office, which was located in his home; and (3) the IRS

6   seized the records from the computer located in Kelley's home business office.  *See*

7   *United States v. Turner*, 718 F.3d 226, 233 (3rd Cir. 2013) (where IRS seized foreign

8   bank records from defendant's home business office, government "easily met its burden"

9   of establishing authenticity without calling a witness from the foreign bank).

10          **E.       Public Records—Rule 803(8)**

11          "Records kept by public agencies may be admissible under the business records

12  exception, Fed. R. Evid. 803(6), as well as under the public records exception, Fed. R.

13  Evid. 803(8)."  *United States v. Bohrer*, 807 F.2d 159, 162 (10th Cir. 1986).  Fed. R.

14  Evid. 803(8) allows admission of public records "setting forth . . . matter observed

15  pursuant to duty imposed by law as to which matters there was a duty to report,

16  excluding, however, in criminal cases matters observed by police officers and other law

17  enforcement personnel . . . ."  Fed. R. Evid. 803(8).  Certified copies of such records are

18  self-authenticating.  Fed. R. Evid. 902(4)

19          In the present case, the government will seek to offer certified copies of various

20  public records, including (1) records maintained by the States of Washington and Nevada

21  relating to entities that Kelley operated; (2) the Complaint filed by the plaintiff in

22  *Cornelius v. Fidelity National Title*; (3) various pleadings filed in *Old Republic v. Kelley*;

23  and (4) Tax Returns and Forms Kelley filed with the IRS.  Each of these documents are

---

[57] While Kelley was questioned about the records during his August 2010, deposition, in *Old Republic v. Kelley*, pursuant to an agreement reached by the attorneys, the records were destroyed.  In addition, during the government's investigation, Columbia Bank notified the government that, because of their age, the bank no longer maintains the records.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 45

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   records which were prepared by public agencies dealing with official activities of the
2   agency necessary for the performance of the duties of the office.  Fed. R. Evid. 803(8).[58]

### F.      Non-Hearsay—Rule 801(a)

The general hearsay prohibition is applicable only when an out-of-court statement
is offered to prove the truth of the assertion it contains.  Fed. R. Evid. 801(a)(3);
*United States v. Abascal*, 564 F.2d 821, 830 (9th Cir. 1977).  An out-of-court statement
offered to prove the effect upon the hearer or reader, therefore, is not objectionable as
hearsay.  See *United States v. Freeman*, 619 F.2d 1112 (5th Cir. 1980) (letters expressing
investors' complaints admissible in prosecution based upon fraudulent investment
scheme to rebut defendant's assertion of ignorance and good faith).

In the present case, the government will offer (1) emails by borrowers to Post
Closing Department, in which the borrowers demand refunds of unused trustee fees;
(2) an email Fidelity National Title employee M.M. sent to Kelley the day after
class-action lawsuits were filed, in which she notified him of the lawsuits and that they
implicated him; (3) the class-action Complaint filed in *Cornelius v. Fidelity National
Title*; and (4) the Complaint filed in *Old Republic v. Kelley*.  Those documents are not
offered for the truth of the matters asserted.  Rather, they are offered in order to
demonstrate their effect on Kelley, that is, to demonstrate that his motive for moving
funds to an account opened in the name of a shell company was to conceal them.  The
Complaints also are offered in order to demonstrate that false statements Kelley made
during an August 2010 deposition and in a declaration, which are charged as perjury in
Counts 2 through 5 of the Superseding Indictment, respectively, were material.

### G.      Expert Testimony

The admission of expert testimony is governed by Rule 702 of the Federal Rules of
Evidence.  The district court's gate-keeping function requires that the court determine

---

[58] As noted above, Kelley's tax returns and entity formation documents also are Kelley's adoptive admissions.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 46

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  that the proffered expert testimony is both relevant and reliable.  *Daubert v. Merrell Dow*

2  *Pharm, Inc.*, 509 U.S. 579, 588 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137

3  (1999); *United States v. Hankey*, 203 F.3d 1160, 1167-69 (9th Cir. 2000).  Thus, in

4  assessing non-scientific testimony, the court should consider whether it addresses an

5  issue beyond the common knowledge of an average layman; is presented by a witness

6  having sufficient expertise; and asserts a reasonable opinion given the state of the

7  pertinent art or scientific knowledge.  *United States v. Vallejo*, 237 F.3d 1008, 1020

8  (9th Cir. 2001).  In assessing scientific-type expert testimony, the court must determine

9  whether the scientific theory on technique has been tested, whether it has been reviewed,

10  whether there are standards and controls, and whether it has been legally accepted in the

11  relevant scientific community.  *Daubert*, 509 U.S. 592-93.

12      The district court retains broad direction in determining the reliability of expert

13  testimony.  *Vallejo*, 237 F.3d at 1019.  Moreover, there is no required procedure, and the

14  court need not hold separate hearing outside the preference of the jury.  *United States v.*

15  *Alatorre,* 222 F.3d 1098, 1100-01 (9th Cir. 2000).

16      Near the end of its case, the government will call IRS RA Paul Shipley, who is

17  trained in accounting and the computation of tax liabilities.  This witness will provide an

18  analysis of the numerous financial records introduced into evidence and explain the tax

19  consequences of the government's evidence.  RA Shipley also will provide Rule 1006

20  summaries of voluminous records.

21      In addition, the government will call an FBI Fingerprint Specialist who will testify

22  that he did not locate any fingerprints on the deposit slip submitted to him.  He also will

23  explain why fingerprints often are not located on items such as paper documents.

24  ### H.      Summaries and Demonstrative Charts

25      Two types of charts are typically used in criminal cases—summary charts of

26  voluminous records and demonstrative charts used merely as testimonial aids.  These

27  charts are admissible pursuant to Rules 1006 and 611(a) of the Federal Rules of

28  Evidence, respectively.

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 47

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1          1.      *Summary Charts*

Rule 1006 permits the admission into evidence of summaries of voluminous records.  *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991).  As a condition precedent to the introduction of the summary into evidence, the proponent must establish the admissibility of the underlying documents, but he need not admit them.  *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988).  The proponent also must make the underlying documents available to the opposing party for inspection.  *Id*.  Admission of the underlying records, moreover, does not exclude the admission of a summary chart.  *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988).

In the present case, the government will seek to introduce summary charts through IRS RA Paul Shipley and FBI Analyst Jared Young.  These charts will relate primarily to financial records, show how much money Kelley took by fraud, and reflect the government's evidence of Kelley's income and tax liability.  The testimony and charts will be based on documents and testimony that either will have been introduced in evidence, or if not introduced, would meet the criteria for admissibility pursuant to Rule 1006.

2.      *Demonstrative Charts*

The Court has discretion under Fed. R. Evid. 611(a) to allow demonstrative charts—which are not admitted into evidence—as testimonial aids, including during opening statements.  When using the charts, however, it may be necessary to implement three precautionary measures, that is, the Court should (1) examine the charts out of the presence of the jury to decide that the contents will be supported by the proof; (2) refuse to admit the charts into evidence; and (3) instruct the jury that although the charts may be published to the jury during testimony, they are presented as a matter of convenience and a juror should disregard them to the extent the juror finds they are not accurate.  *United States v. Sourland*, 730 F.2d 1292, 1300 (9th Cir 1984).

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 48

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    In the present case, in addition to offering summary chats, the government intends

2  to use demonstrative charts though the testimony of, among others, IRS RA Paul Shipley

3  and FBI Analyst Jared Young.

4  **V.    CONCLUSION**

5    Should any additional issues arise, the government will notify the Court and

6  counsel.

7    DATED this 7th day of March, 2016.

8

9                                Respectfully Submitted,

10                               ANNETTE L. HAYES
                                 United States Attorney
11

12                               *s/Arlen R. Storm*

13                               ARLEN R. STORM
                                 ANDREW C. FRIEDMAN
14                               KATHERYN KIM FRIERSON
                                 Assistant United States Attorneys
15                               700 Stewart Street, Suite 5220
16                               Seattle, Washington  98101-1271
                                 Telephone:  (206) 553-7970
17                               Fax:  (206) 553-0755
18                               E-mail:  Arlen.Storm@usdoj.gov
                                 Andrew.Friedman@usdoj.gov
19                               Katheryn.K.Frierson@usdoj.gov

20

21

22

23

24

25

26

27

28

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 49

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

| | |
|---|---|
| 1 | <p style="text-align:center">CERTIFICATE OF SERVICE</p> |
| 2 | I hereby certify that on March 7, 2016, I electronically filed the foregoing with the |
| 3 | |
| 4 | Clerk of the Court using the CM/ECF system which will send notification of such filing |
| 5 | to the attorney of record for the defendant. |

1           CERTIFICATE OF SERVICE

2       I hereby certify that on March 7, 2016, I electronically filed the foregoing with the

3

4   Clerk of the Court using the CM/ECF system which will send notification of such filing

5   to the attorney of record for the defendant.

6                                           */s/Kelly M. Shirkey*
                                            KELLY M. SHIRKEY
7                                           Legal Assistant
                                            United States Attorney's Office
8                                           1201 Pacific Avenue, Suite 700
                                            Tacoma, Washington 98402
9                                           Phone: 253-428-3800
                                            FAX:   253-428-3826
10                                          E-mail: Kelly.Shirkey@usdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S TRIAL BRIEF/
*U.S. v. Troy Kelley* (CR15-5198RBL) - 50