THE HONORABLE RONALD B. LEIGHTON

1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10 | UNITED STATES OF AMERICA,

Case No.  3:15-cr-05198-RBL

11 |                              Plaintiff,

DECLARATION OF ANGELO J.
CALFO IN SUPPORT OF
DEFENDANT'S OPPOSITION TO
UNITED STATES' MOTION IN
LIMINE TO EXCLUDE 404(B)
EVIDENCE REGARDING JASON
JERUE

12 |     vs.

13 | TROY X. KELLEY,

14 |                              Defendant.

15

NOTED FOR:
FRIDAY, MARCH 18, 2016

16

17

ORAL ARGUMENT REQUESTED

18

19        I, Angelo J. Calfo, declare as follows:

20        1.        I am a partner with Calfo Harrigan Leyh & Eakes LLP ("CHLE"), the law firm

representing Mr. Kelley in this prosecution.

21        2.        Attached as Exhibit 1 is a true and correct copy of the government's Rule

22 404(b) disclosure.

23        3.        Attached as Exhibit 2 is a true and correct copy of an FBI memorandum

24 detailing an interview of Jason Jerue conducted on March 12, 2015.

25

DECLARATION OF ANGELO J. CALFO IN
SUPPORT OF DEFENDANT'S MOTION IN
LIMINE TO EXCLUDE 404(B) EVIDENCE
REGARDING JASON JERUE - 1

1    I declare under penalty of perjury under the laws of the United States of America that

2  the foregoing is true and correct.

3       DATED this 10th day of March, 2016 at Seattle, Washington.

4

5                          _s/Angelo J. Calfo_

DECLARATION OF ANGELO J. CALFO IN
SUPPORT OF DEFENDANT'S MOTION IN
LIMINE TO EXCLUDE 404(B) EVIDENCE
REGARDING JASON JERUE - 2

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on March 10, 2016, I electronically filed the foregoing with the

3 Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 following:

5        Andrew C. Friedman        andrew.friedman@usdoj.gov

6        Arlen R. Storm        arlen.storm@usdoj.gov

7        Katheryn Kim Frierson        katheryn.k.frierson@usdoj.gov

8        Richard E. Cohen        richard.e.cohen@usdoj.gov

9

10        *s/Susie Clifford*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF ANGELO J. CALFO IN
SUPPORT OF DEFENDANT'S MOTION IN
LIMINE TO EXCLUDE 404(B) EVIDENCE
REGARDING JASON JERUE - 3

EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*Western District of Washington*

*Please reply to:*
*Andrew C. Friedman*
*Assistant United States Attorney*
*Direct Line: (206) 553-2277*

*700 Stewart Street, Suite 5220*   *Tel:  (206) 553-7970*
*Seattle WA, 98101-1271*   *Fax: (206) 553-0882*
*www.usdoj.gov/usao/waw*

January 22, 2016

<u>**BY E-MAIL**</u>

Angelo J. Calfo, Esq.
Calfo Harrigan Leyh & Eakes LLP
Seattle, Washington  98104-4022

  Re: <u>*United States v. Troy Kelley*</u>, No. CR15-5198RBL (W.D. Wash.)

Dear Angelo:

  We write to provide you notice concerning evidence that the Government intends to introduce at trial that could be considered evidence offered pursuant to Rule 404(b) of the Federal Rules of Criminal Procedure.  Although much of this evidence is admissible because it is inextricably intertwined with the Government's case-in-chief, the evidence also is admissible under Rule 404(b), including for the purposes identified below:

  ■ Evidence that, beginning in 2005, your client and his business, United National LLC d/b/a Post Closing Department, stopped refunding money that he should have refunded to borrowers who used Stewart Title as their escrow company.  This evidence that your client committed the same fraud and theft relating to Stewart Title, as he did with respect to Fidelity National Title and Old Republic Title, is admissible to prove your client's knowledge and intent and plan to commit crimes with which he is charged, including possession of stolen property.

  ■ Evidence that your client failed to pay income taxes on money that he retained, rather than returning to borrowers who used Stewart Title as their escrow company.  This evidence that your client engaged in the same failure to report money stolen from Stewart Title clients as he did with respect to Fidelity National Title and Old Republic Title clients, is admissible to prove your client's knowledge and intent and plan to commit crimes with which he is charged, including possession of stolen property and corrupt interference with Internal Revenue laws.

- Evidence of the manner in which your client distributed assets of, and funds held by, United National LLC d/b/a Post Closing Department, when he dissolved the company in 2008. Evidence of the distributions, which were not consistent with the ownership structure of the company, is admissible to prove your client's knowledge and intent and plan to commit crimes with which he is charged, including possession of stolen property.

- Evidence that your client's Belizean Trust, Wellington Trust, through which your client indirectly held the money stolen by him, was entirely under your client's control, rather than a trust in which persons endowed with different roles in fact exercised the roles and responsibilities assigned to them. This evidence is admissible to prove your client's knowledge and intent and plan to commit crimes with which he is charged, including possession of stolen property.

- Evidence that, following the 2008 dissolution of United National LLC, your client continued to funnel jobs and funds to Jason Jerue, including employment by Attorney Trustee Services, Inc., employment by the Washington State Auditor's Office, and two payments of approximately $10,000 each, presumably in the hope that Jerue would not reveal information concerning events at Post Closing Department. This evidence is admissible to prove your client's knowledge and intent and plan to commit crimes with which he is charged, including possession of stolen property.

- Evidence that your client improperly failed to produce documents and records in his possession that he was required to produce in civil litigation, involving Old Republic Title and Fidelity National Title, between 2008 and 2011, and falsely represented that all records relating to his business, United National LLC d/b/a Post Closing Department had been destroyed or lost before he was requested to produce them. This evidence of your client's failure to produce incriminating records is admissible to prove your client's knowledge and intent and plan to commit crimes with which he is charged, including possession of stolen property.

- Evidence that your client failed to pay applicable Washington State taxes on the entirety of United National LLC's gross receipts from 2005 through the present. This evidence is admissible to prove your client's intent and

plan to commit crimes with which he is charged, including possession of stolen property, money laundering, corrupt interference with Internal Revenue laws, and filing false returns.

■ Evidence that your client falsely represented that Calvin Pearson, a bank executive, held a position at his company, United National LLD d/ba/a Post Closing Department, that Pearson did not hold. This evidence is admissible to prove your client's intent to defraud escrow companies and borrowers and, therefore, to prove your client's intent and plan to commit crimes with which he is charged, including possession of stolen property. It also is admissible to prove your client's knowledge, intent, plan, and absence of mistake in filing false income taxes returns on which he improperly deducted as business expenses personal expenses relating to Mr. Pearson.

■ Evidence that your client improperly caused United National LLC d/b/a Post Closing Department to provide employment-related benefits to his wife, although his wife was not an employee, and did not work for, United National LLC or for that company's parent company, Blackstone International, Inc. This evidence is admissible to prove your client's knowledge, intent, plan, and lack of mistake in committing crimes with which he is charged, including filing false tax returns for 2011 and 2012 on which he deducted expenses relating to his wife.

■ Evidence that your client improperly concealed personal expenses concerning which he was questioned during his 2010 deposition as business expenses and was on notice, including through the questioning, that this was improper. This evidence is admissible to prove your client's knowledge, intent, plan, and absence of mistake in committing crimes with which he is charged, including filing false tax returns for 2011 and 2012 on which he deducted similar expenses.

//

//

//

Sincerely,

ANNETTE L. HAYES
United States Attorney

  s/Andrew C. Friedman

ANDREW C. FRIEDMAN
KATHERYN K. FRIERSON
ARLEN R. STORM
Assistant United States Attorneys

# EXHIBIT 2

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/28/2015

JASON JERUE, date of birth (DOB) ████ 1969, address ████████
████ Camarillo, CA 93010, cellular telephone number ████████████ was
interviewed at the U.S. Attorney's Office in Seattle, WA by SA Michael D.
Brown, Assistant U.S. Attorneys Arlen Storm, Andrew Friedman, and Katheryn
Frierson, and IRS SA Aaron Hopper. Also present for the interview was
JERUE's attorney Russ Leonard. After being advised of the identity of the
interviewing Officials and the nature of the interview, JERUE provided the
following information:

JERUE had not spoken with TROY KELLEY about this meeting with the U.S.
Attorney's Office or his Grand Jury subpoena. JERUE took a week off at the
State Auditor's Office (SAO), and he believed his supervisor, MATT MILLER
knew that he had been called in for the meeting. The SAO was in the process
of collecting his work product to comply with a separate Grand Jury
subpoena.

JERUE has a checking account with BANK of AMERICA (BOA) and a credit
card with CAPITAL ONE, which had a $400 limit.

JERUE's wife MEREDITH JERUE (MEREDITH) has an account with ACTORS
FEDERAL CREDIT UNION, a BOA Checking account, a VISA credit card, and an
AMERICAN EXPRESS credit card. JERUE was on the VISA card with MEREDITH.
JERUE has no investment accounts.

JERUE does not hold any officer position of any entity, LLC or
otherwise. JERUE is not a beneficiary of any trust or grantors or any
property. JERUE has no foreign bank accounts.

JERUE was hired by FIRST AMERICAN TITLE working in Information
Technology. He was self taught from a young age. JERUE computerized his
step-father's construction business, designing an accounting and payroll
program. JERUE took to his job at FIRST AMERICAN supporting all branches;
about 400 employees. About 75 percent of the time he was supporting the

Investigation on   03/12/2015   at   Seattle, Washington, United States (In Person)

File #   194A-SE-4846141                                    Date drafted   03/16/2015

by   Michael D. Brown

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

end-user. JERUE was very busy.  His assistance was utilized regularly,
especially handling issues related to malware.

   JERUE lost his job with FIRST AMERICAN in 2000. He was working for
Property Data Services in the L.A. branch at the time. KELLEY asked JERUE
to move to the Glendale Branch. JERUE was working with computerized data
related to a huge development tract, including GIS Data and Hazard Maps.
JERUE was asked by a FIRST AMERICAN employee or contractor to snatch map
data for their use. JERUE reported this up the chain, and he subsequently
stopped getting paid. About a month after JERUE lost his job, KELLEY lost
his job. KELLEY ended up filing a wrongful termination lawsuit, which JERUE
joined at KELLEY's suggestion. KELLEY was accused of taking a tacky
painting out of the office. KELLEY was also involved with something called
the ROSEMONT, a mansion that FIRST AMERICAN took possession of after it
went into foreclosure.  KELLEY told JERUE that he had been asked by FIRST
AMERICAN to look after it because there was a psycho tenant who supposedly
damaged the property by driving a car onto it.

   JERUE and KELLEY went to lunch together late in JERUE's employment with
FIRST AMERICAN, sometime after he went to work in Property Data Services.
JERUE did not like going to lunch with KELLEY because there was no
variety.  KELLEY only wanted to eat at the same place every day and eat the
same thing, Margherita Pizza.

   When JERUE was working in CA, he lived with a girlfriend in Burbank and
then with his parents in Studio City. After he lost his job, JERUE decided
to move to Washington to live with a friend in a Lyndon, WA apartment. He
had known this friend, HANS ALEX KUNST, since the 2nd grade.  JERUE was the
God-father of KUNST's son.  By about 2008, JERUE had lost communication
with KUNST.

   In Washington, JERUE worked as a temporary employee for a patent
attorney, BOB HUGHES. He worked for HUGHES in Bellingham, WA for about nine
or 10 months. He then worked for SUNFIRE, a high end home theater design
company in Snohomish County, WA.  JERUE was a technical writer, working on
advertising for the company for about one year.

   JERUE moved back to his parent's house in Studio City in early 2003.
This was when he re-established contact with MEREDITH, whom he had known in
school many years before. MEREDITH was a Stage Manager and traveled
frequently for her job. JERUE traveled with her and ended up in Atlanta,
GA.

   JERUE received his general college education in Pierce College before
going to PEPPERDINE to study English and Advertising. He quit after 3 years

because he could not afford it.

JERUE and MEREDITH moved to Kirkland, WA from Atlanta, taking a U-HAUL through Chicago, IL to pick up furniture MEREDITH had inherited. They leased an apartment for a year and then moved to a house on the lake, which JERUE described as a shack. They lived there until October 2011, occupying the property the entire time. The address was 4617 Lake Washington Blvd NE, Kirkland, WA. The landlord was MIKE BARTO.

JERUE had only worked in a coffee shop in Atlanta, and he was now only living on MEREDITH's income. In Kirkland, she worked for EAGLE RIVER INVESTMENTS/FINANCE as a Bookkeeper/Office Assistant. MEREDITH managed leases for boats and airplane storage.

In 2005, KELLEY called JERUE asking him if he needed a job. JERUE was unemployed at the time. JERUE kept his same telephone number, which was how KELLEY was able to get a hold of him. JERUE's telephone number was (206) 334-5393. KELLEY asked JERUE to meet him at a marina in Kirkland.

KELLEY was in a pinch because someone was leaving his company. He needed JERUE to go up to Everett to work in a tiny office. JERUE was going to be trained by a woman in that office, MICHELLE ORLANDO.  The job involved working on spreadsheets, making telephone calls, and things like that. JERUE was not paid much, maybe $12 an hour for a 40 hour work week, Monday through Friday. JERUE accepted the job with an understanding from KELLEY that the pay would increase once he got up to speed.

KELLEY's company was called POST CLOSING DEPARTMENT (PCD). UNITED NATIONAL was another name for the company, and was the primary company name listed on PCD's website.

KELLEY worked out a business agreement with STEWART TITLE executive CARL Last Name Unknown (LNU).  JERUE did not know all of the details of this agreement.  PCD had an account with STEWART TITLE, providing reconveyance tracking services. PCD leased space out of the office and used one of STEWART TITLE's computers. JERUE believed the lease payment was included in PCD's invoicing for all client services.

JERUE started work with PCD in approximately August 2005.  He eventually received the title of Operations Manager.

JERUE reviewed a business account application and certificate of authority over a WELLS FARGO account set up for PCD, bates stamped WELLS FARGO_1731-1733 and WELLS FARGO__1736-1737.  JERUE noted that the signature on WELLS FARGO_001737 was not his own. None of the handwriting on the form belonged to JERUE. To give PCD more cache, KELLEY gave one of his friends,

who was an attorney, a position with the company. At some point, JERUE recalled KELLEY asking JERUE to remove the friend's name from the PCD website.

JERUE reviewed a PCD business card, bates stamped ORT_1804. JERUE was given the title of Vice President of PCD. JERUE was given business cards with this title, but he didn't need them. He generally referred to himself as Operations Manager.

JERUE was trained in the Everett office inside the STEWART TITLE building. JERUE confirmed that he was trained by MICHELLE ORLANDO after reviewing document bates stamped, ORT_0001641, a list of PCD employees. ORLANDO trained him for a couple days and then left the company. JERUE took copious notes during this time but ended up having to call KELLEY for help. KELLEY walked JERUE through the job, which involved data entry, printing and filling out forms. JERUE was supposed to pick up an inbox labeled "PCD" from the main STEWART TITLE office in the same building. JERUE gathered information from the escrow files inside the inbox and entered it into a spreadsheet. If needed, JERUE printed forms and sent out substitutions for trustees.

STEWART TITLE's escrow files generally included a print out and a check made out to PCD. The information that JERUE transferred to a spreadsheet included the escrow number, deed of trust (DOT) number, grantor name, trustee name, lender, check amount, sale or refinance category, borrower name, and property address.

In the beginning, JERUE only worked on STEWART TITLE reconveyances. The first goal was to put on PCD's radar those properties that STEWART TITLE had closed. JERUE then identified the trustee, who was the only party that could legally record the reconveyance. Generally, STEWART TITLE was assigned as trustee from the beginning. If the trustee was not STEWART TITLE than JERUE filled out and sent a form to the trustee requesting that STEWART TITLE become the trustee. The form asked the trustee to simply sign STEWART TITLE over as the substitute trustee. Once STEWART TITLE was established as the trustee, JERUE printed out the deed of reconveyance form, signed it, and sent it to the county recorder's office. When the County Recorder's website reflected that the deed was recorded, JERUE copied the assigned reconveyance number to PCD's spreadsheet. These steps constituted what was referred to as reconveyance tracking. JERUE periodically checked the county websites until the deed of reconveyance had been recorded.

The check that PCD received from STEWART TITLE included a tracking fee of about $15-25 as well as extra funds meant to cover fees charged by the county (recording fees) or trustee (reconveyance processing fees). This

check averaged between $90-120. The recording fee was small and the reconveyance processing fee was usually about $100.

JERUE entered the information into the spreadsheet and emailed the latest version to KELLEY.  JERUE remembered taking a check written by KELLEY to STEWART TITLE's accounting office.  JERUE believed the check covered lease payments.  JERUE did not handle the details of STEWART TITLE invoices.

PCD's brochure described one of it's services as assigning the client as the trustee in order for them to collect the reconveyance processing fees.

JERUE did not include on the tracking spreadsheet notes detailing what specific work was done on each file, and which files required more work.

JERUE noted that when the major lenders acted as trustee, they often were slow in recording the deed of reconveyance with the county.

More often than not, the assigned trustee was the title company that handled the closing.

When trustee fees were required to be paid out, PCD sent checks to various third parties. KELLEY signed and sent JERUE and AMBER MURRAY a few checks at a time to send out as needed.

For re-finances, there was usually nothing to do on the file other than check the county website to document when the reconveyance was recorded. The trustee, usually PCD's client, sent the deed of reconveyance to the county to be recorded.

Most of the STEWART TITLE files JERUE worked on did not involve the process of requesting a substitution of trustee. JERUE did not recall being pressured to write a ton of letters to third party trustees asking for this. The $90-100 in funds collected by PCD in excess of the basic tracking fee was usually not needed.

In the rare event that PCD had to pay a third party trustee, JERUE filled out a pre-signed check (signed by KELLEY), and mailed it to said third party. JERUE then noted this on the spreadsheet.  If PCD's client was already assigned as the trustee, JERUE wrote up the deed of reconveyance recording form and sent it to the county.  It usually only took about 1-2 weeks for a reconveyance to be recorded with the county.

For STEWART TITLE, the majority of the time JERUE received the file from STEWART TITLE's office, entered the basic information in the spreadsheet,

and checked the county clerk's website to determine if the reconveyance was recorded. When recorded, he noted the corresponding recording number in the spreadsheet.

For the STEWART TITLE account, JERUE recalled sending letters to lenders requesting that they process the reconveyances.

The majority of the checks STEWART TITLE provided PCD were for $100-$135. The fee charged for reconveyance processing was determined by the trustee. Funds that PCD received in excess of the $15-25 tracking fee were also deposited into KELLEY's account.

PCD received STEWART TITLE's closed files with the intent of ensuring the deed of reconveyance was processed and recorded with the county. STEWART TITLE employees often placed sticky notes on the files indicating what was needed, either for the deed to be reconveyed and sent to county, or for a substitution letter to be sent out to the current trustee.

In most cases, STEWART TITLE was the assigned trustee and any excess funds were kept by KELLEY in his PCD account. JERUE recalled that STEWART TITLE files needed more work than those provided by FIDELITY TITLE (FIDELITY) or OLD REPUBLIC TITLE (ORT).

JERUE used a rubber stamp provided by KELLEY to sign and submit deposits of STEWART TITLE checks into KELLEY's PCD bank accounts at COLUMBIA BANK. MURRAY ended up handling most of the STEWART deposits.

In 2007, JERUE's brother died. This was a very difficult time for JERUE.

KELLEY asked JERUE to handle the ORT account. JERUE picked up the files, peeled off the checks, entered in the data on the spreadsheet, and identified the primary parties involved, including the lenders and trustees. As with STEWART TITLE, JERUE handled any related paperwork, mailed forms, made telephone calls, and tracked reconveyances. Compared with STEWART TITLE, ORT required even less disbursements out of PCD's account for third party expenses. Most of the time, PCD just held onto any funds received in excess of the tracking fee, with no anticipated third party expenses. Most of the checks that ORT provided PCD were for larger amounts, exceeding the base tracking fee. KELLEY asked JERUE to send out refunds on rare occasions using a small stack of pre-signed checks. This was generally in response to people complaining and asking for them.

KELLEY asked JERUE to post the reconveyance tracking spreadsheet on PCD's website so that it could be accessed by ORT. KELLEY wanted JERUE to

remove any financial data, such as check amounts, as he did not want those
details visible to just any ORT employee.

There was often discord between KELLEY and ORT employees PATTI LAVECK
and JANET SUMMERS. On at least one occasion, KELLEY called JERUE asking him
to alter the ORT tracking spreadsheet and send it to LAVECK and/or SUMMERS.
KELLEY was frantic because LAVECK and/or SUMMERS had asked him for the
financial backup for the reconveyance tracking work. JERUE thought this
sounded like a margin call.  KELLEY asked JERUE to pull up the ORT
spreadsheet on his computer and provide KELLEY with the last check number
he had used.  KELLEY then asked JERUE to drag the check numbers down the
page so that it fills the cells with check numbers in sequential order.

KELLEY's back was up against the wall, and he needed to close out the
month. KELLEY called him late at night asking him to "zero out" the
balances so that it appeared that all of the funds on file for ORT
customers, i.e. those funds collected in excess of PCD's tracking fee, were
disbursed, and no longer being held by PCD. JERUE took the starting check
number and dragged it down to list checks in sequence. He then filtered the
spreadsheet by those Deed of Trust (DOT) numbers that had a corresponding
reconveyance number, and zeroed out the balances.  This was done to create
the appearance that deeds of reconveyance that had been recorded with the
county, and therefore no longer required any third party services, had a
zero balance remaining. Any excess funds were to be included in separate
columns indicating that they were sent out as refunds or used for third
party expenses.  In reality, these checks did not go out as indicated on
the spreadsheet.  JERUE sent the zeroed out spreadsheet to LAVECK and
KELLEY.

JERUE zeroed out a lot of entries in each instance, and estimated that
he did this on at least 15 separate occasions for the ORT account.

The computer that JERUE used for PCD work was old.  He eventually
disposed of it when it malfunctioned.

JERUE worked on the STEWART TITLE account for about five to six months
before KELLEY hired MURRAY to replace him. KELLEY had JERUE put an
advertisement out for the position when PCD started getting more business.
JERUE trained MURRAY. She was a quick learner, and she was very competent.

In 2005, PCD's account with FIDELITY was up and running. DEE LAMB worked
on this account from STEWART TITLE's office building. She did not get along
with STEWART TITLE staff, and KELLEY was asked to remove her.  LAMB started
working from home about the time JERUE started working at STEWART TITLE.
LAMB primarily worked with FIDELITY's Lynnwood branch. LAMB was prone to

accidentally screw up files, overwrite or delete information on PCD's spreadsheets. JERUE occasionally went to LAMB's home office in Everett to help her with computer problems. LAMB had lost her husband, and was lonely.

MURRAY, JERUE, and LAMB forwarded problem files to KELLEY on a regular basis. A couple times, all three of them met up with KELLEY in person to pass them along. More often than not, it was just MURRAY, JERUE, and KELLEY who met in person.

After MURRAY took over the STEWART TITLE account, and JERUE started work on the ORT account, JERUE began working from his home in Kirkland.  LAMB handled the FIDELITY files, and KELLEY was her supervisor.  KELLEY asked JERUE to look over LAMB's FIDELITY spreadsheets to identify any glaring mistakes before sending it on to KELLEY.  KELLEY also asked JERUE to help LAMB with any computer problems and also things like moving furniture in her home.

KELLEY expressed to JERUE that he thought LAMB felt her work was being taken away from her. LAMB entered data into the spreadsheet, emailed a copy to JERUE, and tracked reconveyances. JERUE was not aware if LAMB was sending out refunds to clients. JERUE sent LAMB updated spreadsheets, those that included all the information she sent over time, naming the files with the current date so she knew which one to work on.  KELLEY and LAMB handled refunds for FIDELITY. This was not JERUE's job.

PCD's website had a portal that allowed JERUE to upload the spreadsheets for the clients to view. These spreadsheets were the versions with the financial data removed.  JERUE did this every couple months. KELLEY could see how often it was being accessed/downloaded, and noted to JERUE that PCD clients were not accessing it much at all.

JERUE was a fast tracker. He became PCD's tracking guy because he was able to minimize keystrokes needed to access records on the county websites.

JERUE was shown a document, bates stamped SEADEP_315, an e-mail from JERUE to HENDERSON dated 3/22/2007.  KELLEY set up a 800 number that forwarded calls to LAMB's telephone. LAMB received most of the calls relating to the FIDELITY account, calls from borrowers or FIDELITY employees.  KELLEY created a 800 number to forward PCD calls to JERUE's cellular telephone. JERUE asked KELLEY to disable it.

JERUE was shown documents, bates stamped YATES_1643 and YATES_1705, a PCD spreadsheet with escrow files dated 7/10/2006-12/26/2006.  JERUE

thought that they looked like the type of spreadsheets he uploaded to the PCD website because there were no financial columns. KELLEY believed that this information was not the concern of general employees.

KELLEY met with JERUE and MURRAY when he came up north to Everett. He gave them blank checks that he signed to use to cover any incidentals on the file, recording fees or rush mailing fees.

The types of problems that came up with a file included demands for refunds. JERUE recalled getting calls from Escrow Officers asking if reconveyances were satisfied. They asked for excess funds to be refunded to borrowers. JERUE referred these to KELLEY, who evaluated the file. If KELLEY was busy, he may have asked JERUE to calculate the balance owed the borrower and write a refund check. This rarely occurred.

Other examples of problem files included deceased property owners, or housing tracts where deeds were intertwined. There were a steady flow of problem files.  JERUE referred any file that required legal judgments to KELLEY. Only KELLEY made decisions related to refund requests.

JERUE was shown documents, bates stamped SEADEP_314-SEADEP_316, an e-mail exchange between JERUE and TAMI HENDERSON dated 5/2007.  The text in JERUE's e-mail on 5/9/2007 sounded like something KELLEY dictated to JERUE either by telephone or by sending him text via email. This was definitely something KELLEY would have wanted JERUE to convey to FIDELITY.

PCD's spreadsheet, also referred to as a log, had embedded formulas that were originally set up by KELLEY's brother, GREG KELLEY (GREG). JERUE used GREG's spreadsheet as a template, simply clearing the cell content for his own use.

Based on a review of SEADEP_316, it appeared that the $15 fee was all PCD was supposed to collect from the client. JERUE did not itemize the services rendered on each file.

JERUE was shown a document, bates stamped SEADEP_330, an e-mail from JERUE to HENDERSON dated 10/18/2007.  JERUE noted that the text in the e-mail was KELLEY's language, something that KELLEY sent JERUE to proofread and send. JERUE did not specifically recall sending this e-mail, but it was definitely not something he would write on his own. It was something that KELLEY would formulate independently.

When KELLEY was running for the Washington State Legislature, he was less available. He got annoyed with JERUE reached out to him to discuss issues with PCD.

If JERUE was slammed, MURRAY may have helped with him a little with ORT.  MURRAY may have also helped LAMB if needed.

JERUE worked with ORT's Kent, Bellevue, Seattle, and Burien branches. That was all he could recall at the time of the interview.

JERUE did not recall seeing many checks come in from ORT that only included the $20 tracking fee.

JERUE was shown a document, bates stamped ORT_0004823, an e-mail exchange between JERUE and SUMMERS dated 3/26/2007. JERUE understood tracking to mean simply checking the county website to see if the reconveyance was recorded. KELLEY was the only one responsible for refunding borrowers.  JERUE noted that KELLEY wanted to be in full control of any message going out to LAVECK or SUMMER relating to PCD business.

KELLEY had instructed JERUE to tell Escrow Officers, in the event they were asked about the excess fees required for post closing services, that they should say PCD needed money in the account in case documents needed to be produced or they had problems with the file prior to the reconveyance being recorded.

If recording fees were sent out to the county, it was entered in the spreadsheet, and usually highlighted in pink by KELLEY.  JERUE noted that this was infrequent. Most files were easy, and funds in excess of PCD's tracking fee were not needed.  At the point the deed of reconveyance was recorded, no more funds were needed.

JERUE thought that MURRAY may have started working from home around May 2008.  MURRAY called JERUE to tell him about a fire at the STEWART TITLE building, saying that she would not be able to go into work that day. Thinking back, this would imply that MURRAY was still working there, but he was not sure if she split her time working at home for some time prior to the fire.

After MURRAY called JERUE about the fire, JERUE called KELLEY to inform him.  KELLEY wanted JERUE to go to the building to take pictures.  KELLEY kept old paperwork in the basement of STEWART TITLE.

Nothing was simple with KELLEY when it came to money.

KELLEY was unable to provide JERUE with health insurance through his employment with PCD, so he put MEREDITH on PCD's payroll as a way to reimburse JERUE for health related expenses.  MEREDITH ran some errands for PCD, including picking up some escrow files, but she never worked with spreadsheets.  MEREDITH did very little work for PCD.  JERUE was on the

health plan that MEREDITH had through her primary employer.  However, MEREDITH had to pay out of pocket for JERUE's health expenses.

JERUE and MEREDITH rented a storage locker in Kirkland to store old furniture MEREDITH inherited from her mother.  The items were originally in Chicago, and they picked it up in a U-HAUL before moving to Kirkland.  They did not want the furniture in their home, so they kept it in storage. KELLEY never used it to store anything, including PCD files.

JERUE contacted KELLEY in the Spring of 2008, maybe March 2008.  KELLEY wanted JERUE to meet him at LAMB's house to pick up FIDELITY files that she had collected, and delete documents on her computer related to PCD business.

KELLEY was looking to pull out of the business because of the class action lawsuit.  KELLEY thought LAMB was a live wire, and ultimately decided to fire her.

KELLEY arrived at LAMB's house with a black SUV, and loaded up a lot of FIDELITY files that LAMB had stored at her home in boxes.  KELLEY took those files to his home in Tacoma.

JERUE maintained copies of spreadsheets on his computer at the time. KELLEY always wanted to maintain copies of everything.  JERUE used to bring files to KELLEY's house, especially those he brought back from Oregon. JERUE recalled that KELLEY's house was on a steep hill, and he had to carry heavy boxes up stairs.  JERUE recalled seeing KELLEY standing at the top of the driveway, never offering to help.  KELLEY's garage was filled with a bunch of escrow files that would not have been in the STEWART TITLE building at the time of the fire.  JERUE did not believe many files were in STEWART TITLE at the time of the fire.

JERUE learned about the class action lawsuit from KELLEY.  JERUE recalled the moment he got the call from KELLEY.  JERUE was at a doctor's office, and he was staring at a salt water aquarium in the waiting room. JERUE believed that the doctor's appointment may have been for MEREDITH. KELLEY sounded very distraught on the telephone, sounding as though he just found out about the lawsuit.  KELLEY said that all big title companies were getting hit, including FIDELITY.  KELLEY said that he wanted to start rolling things back.  He said that PCD was not being sued but that KELLEY's name or PCD showed up one of the lawsuits.  KELLEY warned JERUE that his employment was not looking so good as he was going to be shutting things down.  JERUE had counted on the job when he planned a pregnancy with MEREDITH.  KELLEY had given him assurances that he would be financially secure for some time.  As a result, JERUE was in shock when he heard from KELLEY about the lawsuits.  JERUE and KELLEY spoke again by telephone after

the initial conversation.  KELLEY mentioned in one of the calls that he was going to try and keep the business with TED URTON, the manager of FIDELITY's operation in Salem, Oregon.  Also, while JERUE would be staying on a bit longer, MURRAY would have to be fired.

KELLEY asked JERUE to look up the plaintiff on one of the class action lawsuits, FRANK CORNELIUS.  JERUE searched for CORNELIUS on the Internet, noticed he was an attorney, and then relayed this information to KELLEY. KELLEY wanted JERUE to see if CORNELIUS was in PCD's spreadsheet and to relay his address and any balance on file.  JERUE found CORNELIUS in the spreadsheet and noted that no refund had been processed.  JERUE relayed this information, including CORNELIUS' address, to KELLEY.  KELLEY said that he had to fix this, and he planned to send CORNELIUS a refund.  KELLEY added that he planned to send CORNELIUS a check with delivery confirmation.  JERUE took this to mean he was going to send it certified mail.  JERUE did not send the check himself.

KELLEY related to JERUE that he thought CORNELIUS was a plant, since he had not called or complained about refunds until the lawsuit was filed. KELLEY said that this was the first time hearing about CORNELIUS and any anticipated refund.

JERUE was shown documents, bates stamped ORT_1845 and ORT_1846, two PCD letters addressed to CORNELIUS, dated 1/7/2008 and 5/15/2008.  JERUE did not recognize either letter.  JERUE noted that the wording was not standard for PCD letters.  JERUE did not send any letters or checks to CORNELIUS.

KELLEY referred to CARL LNU with STEWART TITLE as the "good Carl." KELLEY referred to CARL LNU with ORT as a "psycho-huckster."

JERUE was shown documents, bates stamped BOA _0000202, a copy of a PCD check made out to KELLEY for $250 dated 5/16/2008, and JP_0000622, a copy of a WASHINGTON MUTUAL deposit slip (customer "Friends of Troy Kelley") for $155 dated 5/16/2008.  JERUE identified KELLEY's handwriting on both documents, stating that it was absolutely KELLEY's handwriting.

JERUE recalled hearing KELLEY talk on the telephone about Belize one time when JERUE was helping KELLEY exchange a cable modem.  JERUE was not sure of the context.

JERUE did not question KELLEY about how he ran PCD, especially about financial matters.  JERUE did not feel that KELLEY would want him to bring it up, adding that the result would not have been pleasant.

KELLY's plan after the class actions were filed was to shut everything down with PCD, but keep things going with URTON by forming a new company.

KELLEY mentioned to JERUE that any money coming in to the company would barely cover JERUE's salary.  When KELLEY closed down PCD, he wanted JERUE to get rid of everything related to PCD.

The tracking work in Oregon was different.  Accessing counties in Oregon required special access, made through the use of FIDELITY's computers. JERUE frequently stayed at the RED LION INN near Salem, OR when he was working on Oregon accounts.

KELLEY liked to create a false sense of urgency, putting undue pressure on JERUE.  KELLEY often used guilt to motivate JERUE, saying things like he was going out on a limb for him.

JERUE described ATTORNEY TRUSTEE SERVICES (ATS) as an effort to squeeze the stone, which is to say that it was a way to keep the business going after the class action lawsuits.  ATS was built under a new business model, where no funds were held beyond the tracking fee.

KELLEY quitclaimed, or transfered, the deed for his house to his wife.

JERUE wrote a check to KELLEY's campaign in the amount of $339 on 7/11/2008.  KELLEY advised JERUE that he needed money from outside his family to contribute to his campaign to reach a specific fundraising goal. KELLEY immediately reimbursed JERUE for this contribution.

KELLEY worried a lot, and decided to handle business issues at night. KELLEY often texted JERUE asking him to look up escrow customers on the PCD spreadsheet.  These were usually related to trouble files that had been referred to KELLEY.

JERUE was asked about early morning texts JERUE sent to KELLEY in June 2008, around the time of the fire at STEWART TITLE.  JERUE responded that as a matter of course, JERUE did not decide to text KELLEY at early hours. The time stamp on the telephone record may indicate that KELLEY was on the east coast when he received the texts.  JERUE advised that he had never committed arson, and had nothing to do with the fire at the STEWART TITLE building.  He did not think that KELLEY would be capable of this either. KELLEY sounded surprised when JERUE told him about the fire at the STEWART TITLE building.  JERUE believed that KELLEY took the opportunity of the fire to close down PCD, by claiming business records were destroyed. KELLEY mentioned to JERUE that he was going to say his computer was in the fire.  KELLEY made it clear that the fire was going to be his catch all.

JERUE completed work for ATS out of the Salem office, picking up escrow files, printing out forms and tracking reconveyances.  SUZETTE HAMAKER worked part-time for ATS at the FIDELITY offices in Eugene, OR.

Regarding the ORT lawsuit and reported efforts to have him served with a subpoena to appear for a deposition, JERUE advised that while he was not actively hiding from the process servers and attorneys, he was not particularly seeking them out either. JERUE did not want to be involved with the case. JERUE recalled being home with his son one time when he heard someone banging on the front door.

KELLEY described ORT attorney SCOTT SMITH as a psycho. KELLEY warned JERUE to watch out, telling him stories about process servers doing illegal things to try and anger people, such as breaking into homes.

JERUE and KELLEY's communication stopped for some time after ATS stopped doing business. KELLEY had promised one year salary as severance pay. But then KELLY said that things were too crazy, and that JERUE needed to apply for unemployment. JERUE called KELLEY after unemployment payments began running out. KELLEY said he would give JERUE part of what he had promised. They met up in Issaquah, WA. KELLEY handed JERUE an envelope with a check just under $10,000. JERUE believed KELLEY wrote the check out for an amount under $10,000 in order to avoid a gift tax.

KELLEY called JERUE to offer him part-time work with the Washington State Auditor's Office (SAO). The position was with the Information Technology staff, and had something to do with a special project. At the time, MEREDITH was working and JERUE was taking care of their son. Part-time work from home in California was ideal given the circumstances.

The second check that KELLEY provided JERUE towards a promised severance package was sent to JERUE's mother, SANDY EVANS, so that JERUE could ensure it was used for his son, SPYRO. JERUE did not want it to be spent by MEREDITH for other things. JERUE transferred some of the money to MEREDITH right away, telling her that it was money his step-father loaned to him for rent. JERUE and MEREDITH had explored separation but decided to stay together for their son.

On at least two occasions, JERUE sent refund checks to borrowers at KELLEY's direction. KELLEY called JERUE, asked him how many blank checks he had in his possession, checks that KELLEY had signed and given him for expenses that came up while tracking reconveyances. On one occasion, JERUE thought there were about 19 checks left in his possession. KELLEY asked JERUE to give out refunds for the same number of customers, using all the checks he had in his possession. JERUE described this as a panic batch. After reviewing checks issued out of PCD's accounts on dates 8/16/2006 and 3/27/2007, JERUE advised that he reconized his handwriting, and believed the checks to be examples of panic batches of refund checks. JERUE filtered the spreadsheet by satisfied/recorded reconveyances in order to

194A-SE-4846141

Continuation of FD-302 of  Interview of Jason Jerue                              , On  03/12/2015  , Page  15 of 15

locate customers that were due refunds.  If there was a balance remaining
for that file, he wrote out a check for that person.  The number of refunds
was determined by how many checks he had in his possession.

When JERUE started work at the SAO, he gave a friend's Lynnwood address
to the SAO's Human Resources person.  It was KELLEY's idea to use the
Washington address.  KELLEY did not seem sure of the rules governing
residency and employment with the SAO.