IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:15-cr-05198-RBL |
| Plaintiff, | DEFENDANT TROY KELLEY'S SENTENCING MEMORANDUM |
| vs. | **Sentencing date: June 29, 2018** |
| TROY X. KELLEY, | |
| Defendant. | |

## I.    INTRODUCTION

As evidenced by the nine acquittals and dismissals of charges in this case, and the hung jury at the first trial (10–2 in favor of acquittal on the primary charge), reasonable persons might dispute whether Troy Kelley committed any crime.  However, no one can dispute that Troy has dedicated his life to supporting his family and serving his country and community.  He has been a devoted husband, father, son, brother, and friend, as evidenced by the more than 40 letters submitted in his support.  These are members of our community who know about his conviction—many of whom sat in on his trials and heard the evidence—and yet stand by him, eager to help Troy and his wife, Diane, and their teenage sons, Jackson and Brett, begin their life anew after the wreckage of fierce civil litigation, a lengthy grand jury investigation, and two criminal trials, all

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

of which have devastated Troy financially, emotionally, and even physically.  Troy lost his law license and what would have been a continued career of public service.  The conduct for which Troy was convicted, most of which occurred ten to twelve years ago, is not something he or anyone else would ever seek to repeat.  This has been a highly unusual, politically-charged case.  The three years of litigation, the media coverage and the intense public shaming, and the conviction and its consequences on Troy and his family and career, have served all the purposes for which jail time is intended.

This was perhaps most poignantly articulated by the letter of support submitted to this Court from someone who does not know Troy personally at all but who has intimate knowledge of the government's case against Troy.  A juror from the first trial took the extraordinary step of reaching out to defense counsel of his own accord to write in support of Troy.  Calfo Decl., at ¶ 2–4.  As the juror wrote, "I do not believe incarcerating Mr. Kelley is merited by the case brought against him."  The juror continued:

> I argued and voted for guilty verdicts on some of the charges brought against Mr. Kelley.  However, I was and continue to be perplexed as to how any of the charges found their way to your court.  Some should have been discharged by the Internal Revenue Service.  Others were a matter for civil court and some of these had already been addressed in at least one prior case brought in a civil court.  I don't understand the vigor with which the government pursued this case. . . .

> I strongly believe Mr. Kelley has already received punishments appropriate for the crimes for which he has now been convicted.  He has paid, personally, professionally, and financially.

> I believe my opinion – that a sentence of jail is not warranted – is likely shared by other jurors with which I served. You may recall, the weekend before deliberation by my jury came to an end, another juror accidentally broke media sequester.  Her concerns were not over some factual detail she'd learned from the radio, regarding Mr. Kelley's guilt or innocence.  This same juror had already voted Mr. Kelley was guilty of certain charges.  Rather, she stated she could not continue with the knowledge that Mr. Kelley would risk jail time for any of the charges put before us.

Support Letters at 2.

LAW OFFICES
CALFO EAKES & OSTROVSKY PLLC
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

1    For the reasons set forth above and those contained in this memorandum, the defense

2    therefore respectfully requests imposition of a sentence of five years' probation, with six months

3    of home detention.

## II. ARGUMENT

### A. Legal Standard

In sentencing a defendant, this Court "shall consider" the factors set forth in 18 U.S.C. § 3553(a). As relevant here, these factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; and (4) the kinds of sentence and the sentencing range established for the offense as set forth in the guidelines. 18 U.S.C. § 3553(a). These factors all recommend against a prison sentence for Troy.

### B. Troy Kelley's History and Characteristics.

The government has taken a handful of statements Troy made over a period of ten years to create a caricature of him as a scheming criminal. However, try as it might, the government cannot successfully portray Troy as a pervasively dishonest person who should be removed from the community. The presentence investigation and the other evidence before the Court show that Troy is a simple man. He lives a frugal life. He has lived for years in the same house in Tacoma, drives a sensible car, and certainly never used any of the money he supposedly stole to fund a lavish lifestyle. He has no debt. He doesn't drink, smoke, or use drugs. Troy's friends repeatedly describe him as a rule-follower, even a stickler. Who is the real Troy Kelley? The letters from the people who know him best answer that question.

DEFENDANT TROY KELLEY'S SENTENCING
MEMORANDUM (NO 3:15-cr-05198-RBL) - 3

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

### 1. *Troy is a Devoted Father and Friend.*

Troy is described by the people who know him as a family man, a man of integrity, and a man dedicated to service. Troy is married to Diane Kelley, a French professor at the University of Puget Sound. They have been married for nearly 20 years and together for 28. They have two boys; Jackson is 16 and Brett is 14. Troy is a dedicated husband and father. He and Diane are very involved in their children's lives at this critical time in which they will be preparing for and soon leaving for college. Diane describes Troy as "a wonderful life partner," explaining:

> Troy is loving, kind, caring and respectful. Our family life has very little drama. We share the responsibilities of raising our two really fantastic boys together. We eat dinner together nearly every night. We play tennis together, watch movies and go on family outings. We both give kids rides to see their friends or to go play sports, offer guidance on homework, or on practice drives for driver's ed (our younger son will get his permit this coming summer). Troy takes care of all the finances, our budget, health care bills and the like.
> . . .
> He is a guiding, gentle father. . . . When both boys were small, he would spend time playing games with them, holding them as they napped, exploring public playgrounds all over town or hitting a wiffle ball on the street. As they got older, he coached their flag football and basketball teams and watched as they played soccer and tennis.

D. Kelley Letter at 3.

Even with all the turmoil brought about by this case, Troy and Diane have worked hard to keep their sons' "formative years in middle school and high school as normal as possible, even though ours have been torn apart." *Id.* at 4. Even "despite mental duress, losing weight and fighting for justice, Troy has been able to continue to spend quality time with [his] kids, going to sporting events, talking about news, colleges, world events and politics." *Id.* at 3.

As Diane's aunt Doris Bryant explains, Troy's commitment to his family shows in his sons' characters. Thanks to Troy, "both his sons have become wonderful young men: smart, open to learning, considerate, honorable, well-rounded, and possessed of a good sense of humor. *That doesn't happen by chance; it is the eventual outcome of good parenting and of having good role models at home.*" D. Bryant Letter at 1 (emphasis added).

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Troy's friends Anthony Baye and Kristina Keller called Troy "one of the most authentic, genuine, family-oriented, service-minded and community-focused individuals we've ever met." Baye and Keller Letter at 1. Dr. Jess Bouma, Troy's friend of ten years, echoes this sentiment, writing: "I would entrust Troy . . . to take care of my children should my wife and I be unable. I would trust him with my life if the circumstances should ever arise. I do not know how to say it more definitively or profoundly. Troy is trustworthy, stalwart and always has the best of intentions. I have complete faith in his character." J. Bouma Letter at 2.

So many of the letters written on behalf of Troy and his family contain this same theme: Troy has not lived a life of dishonesty but rather a life of loyalty, dependability, integrity, trustworthiness, and dedication.

### 2. *Troy Has Been A Dedicated Public Servant.*

Troy's high character also shows through in the commitment to service that has driven his professional career. As detailed in the pre-sentence report, while State Auditor, Troy notched several noteworthy accomplishments which saved the State millions and led to key improvements in government cybersecurity. PSR ¶ 67. Before that, as a state legislator, he focused on protecting veterans and protecting Washington consumers by fighting against unfair and deceptive payday lending practices, improving our criminal justice system, and other important issues. PSR ¶ 68. Troy received several awards for his service in the legislature. *Id.* During his time there, "Troy had an impeccable reputation and . . . solid working relationships." Grassi Letter at 2. A former colleague in the legislature writes that "[i]n his public service [and] in the military and professional life, Troy has been a model." Finn Letter at 1.

### 3. *Troy Has Served His Country Honorably*

In addition to his career in public service, Troy is a lieutenant colonel in the Army National Guard and was formerly a member of the Army Reserve. Even while serving as an elected official and undergoing a criminal prosecution, Troy has fulfilled his Guard service, including multiple

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

details in Korea.  At trial, two of his National Guard colleagues testified as character witnesses for Troy.  Both testified that he was an honest and ethical man and an excellent soldier.  Lieutenant Colonel Matt Cooper testified that he first met Troy when he was a State Legislator and Army Reservist.  The Washington National Guard proposed changes to the Washington Code of Military Justice, and Troy worked with Lt. Col. Cooper to pass the amendments.  Afterwards, Lt. Col. Cooper was so impressed with Troy that he recruited him to switch from the Reserves to the Guard.  Lt. Col. Cooper described Troy as "an outstanding officer" and a "very high-quality attorney."  Ex. A at 160:4-5.  Lt. Col. Cooper testified that "[a]s to truthfulness and honesty, [he] would rate [Troy] extremely high, the highest that I have worked with."  *Id.* at 163:21-22.  Lt. Col. Cooper reported that Troy had been "selected . . . to do some of the most important and most sensitive jobs that [the National Guard] had" including a very sensitive investigation into personnel irregularities.  *Id.* at 164:16-165:3.  Colonel Donald Bennet (Ret.) echoed Lt. Col. Cooper's sentiments, testifying that Troy has a good reputation for honesty, and that he was "a really good asset" to the National Guard.  Ex. B at 134:11-24.

Following trial, several of Troy's fellow Guardsmen have written letters of support, echoing Col. Bennet's and Lt. Col. Cooper's testimony.  For example, Major Alex Straub, a Judge Advocate, writes: "I have seen [Troy] display nothing but compassion and concern for those he is serving.  His easy-going attitude and uncanny ability to work through complex legal issues has made him an integral part of our legal team serving the Washington National Guard and I believe his departure from our organization will be felt by many of the officers and Soldiers he has advised and represented throughout his years of military service."  Straub Letter at 1.  Similarly, Todd Nygaard George of the Washington National Guard calls Troy "a caring leader who goes above and beyond what is expected of him. . . . [Lieutenant Colonel] Kelley is a good and decent person and I, for one, am a better person having known him."  George Letter at 1.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Simply put, whatever mistakes in judgment Troy might have made years ago, he is not the man prosecutors say he is. He is not a hardened criminal who should be locked away for years and years. He is a good man with a loving and stable family and deep ties to his community. He should be allowed to remain with his family and community.

## C. The Nature and Circumstances of the Offense.

### 1. Background—This Prosecution Started as a Result of a Political Attack.

This case began with a series of class action lawsuits filed by Hagens Berman against every major title company, alleging that the title companies improperly charged their customers upwards of $100 for reconveyance processing. Although each of these lawsuits was dismissed, Old Republic turned around and sued two vendors, Reconveyance Services, Inc., and Troy's company Post Closing Department, alleging that they failed to pay refunds contractually owed to escrow customers. The litigation between Troy and Old Republic was acrimonious, with both sides accusing the other of lying and other unsavory behavior. Ultimately, the parties settled for $1,150,000.00—less than a third of what Old Republic was seeking. Old Republic agreed to assume responsibility for any outstanding reconveyances and waived any future claims it may have against Troy. Although Old Republic had long claimed (and represented to the Court) that its suit sought money owed to its customers, and that it would refund to customers any award it obtained from Troy, Old Republic did not refund the vast majority of the settlement proceeds, instead keeping the money for itself.

In 2012, more than a year after the *Old Republic v. Kelley* lawsuit settled, James Watkins, Troy's opponent for the State Auditor race, publicized some of the allegations from the lawsuit by way of attacking Troy's character in the election. Despite this negative campaigning, Troy soundly defeated Mr. Watkins, even receiving the Seattle Times' endorsement. Nonetheless, the government, in response to the publicity surrounding Watkins' attacks, opened an investigation into Troy's business. That investigation ultimately resulted in this prosecution. Tellingly, before

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

the government started its investigation, no title company or homeowner complained that Troy's conduct constituted theft. This is consistent with the words of the government's expert at trial, Fred Phillips: "It is not my opinion that [the money paid to Troy] was stolen from anybody." Ex. C at 185:17.

After two trials, Troy stands convicted of eight counts: one count of possessing stolen property for breaching his contractual obligation to pay refunds to borrowers, two counts of making false statements in a deposition in the *Old Republic v. Kelley* suit, and five counts of making false statements on tax returns, based on his reporting of income in the wrong years. The jury acquitted Troy of the five most serious counts, for money laundering, acknowledging that Troy never tried to conceal the money he earned through his reconveyance processing business. In the first trial, the jury acquitted Troy of making any false statement to the IRS about the income he earned from his business and the jury hung on all other counts. In fact, the first jury was in favor of acquittal on the government's main count of possessing stolen property by a margin of 10–2.

### 2. The Nature and Circumstances of Troy's Conviction for Possession of Stolen Property.

#### a. Neither Borrowers nor Escrow Companies Suffered Actual Losses.

This is a highly unusual theft case because Troy was convicted of possessing "stolen" money that was *willingly* paid to him as a fee for a service. When escrow customers closed their transactions with Old Republic and Fidelity, they signed escrow contracts in which they explicitly approved the payment of the entire reconveyance fee to PCD and instructed the title companies to disburse the fees in accordance with the incorporated HUD-1s. Neither the escrow instructions nor the HUD-1s indicated that borrowers would be due a refund of any portion of the reconveyance fee. In short, from the customers' point of view, they agreed to pay the entire reconveyance fee to PCD in exchange for a service, and in fact received that service.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

1    The "theft" in this case comes from entirely separate contracts, between Troy and the title

2    companies.  According to the government, these contracts obligated Troy to pay refunds to escrow

3    customers, and Troy breached these contracts by failing to pay refunds.  This breach of contract is

4    the "theft" at issue in this case.

5    But there is no evidence customers were ever promised or expected a refund.  Certainly

6    there was no evidence they were lied to.  In fact, at closing in the second trial, the government was

7    forced to admit that "the borrowers didn't understand they were entitled to a refund," and "[t]hey

8    weren't promised" refunds.  Ex. D at 12:17–20.  Moreover, as the evidence at trial showed, the

9    $100–140 reconveyance fees borrowers agreed to pay PCD were comparable to what nearly every

10   other player in the market was charging, including third-party vendors like RSI and title companies

11   like First American, Chicago Title, and Stewart Title.  Even the "victim" Fidelity National Title

12   charged that amount when it took the reconveyance servicing in-house from Troy's company.  In

13   other words, the borrowers agreed to pay the entire reconveyance fee to Troy's company at market

14   rate in exchange for a service, received that service, and that was that.  These customers cannot

15   reasonably be considered "victims," as defined by the Sentencing Guidelines.

16   Under the Sentencing Guidelines, a person is only a victim if they have suffered some

17   "actual loss," which the Guidelines define as "pecuniary harm."  U.S.S.G. § 2B1.1, Notes 1, 3(A).

18   Customers who willingly pay their money in exchange for a service and receive that service cannot

19   be said to suffer any "pecuniary harm."  As such, the money willingly paid to Troy by borrowers

20   cannot be considered "loss" within the meaning of the sentencing guidelines, and the borrowers

21   who paid it to him cannot be considered "victims."  USSG §2B1.1., Note 1 ("'Victim' means . . .

22   any person who sustained any part of the actual loss.");  *United States v. Harris*, 821 F.3d 589, 606

23   (5th Cir. 2016) (concluding party was not a victim because it "suffered no pecuniary harm as a

24   result of [the defendant's] offense").

25

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

The few escrow customers who did testify at trial confirm they did not suffer any pecuniary harm because the money was spent exactly as they intended. In the first trial in this matter—in which the jury leaned 10–2 toward acquitting Troy—the government called six different escrow customers as witnesses, but not even one of these putative "victims" testified that they had been promised a refund of the reconveyance fee. For example, Russell Wright testified: "At the closing I didn't expect there to be a refund. I expected the funds to be used to file the reconveyance." Ex. E at 124:13–14. The government also interviewed five additional "victims," but none could recall anything about a refund, and the government elected not to call them at the first trial.

At the second trial, the prosecution declined to call *any* borrower "victims." Suffice it to say, this is highly unusual for a case that is supposed to be about massive theft from thousands of borrowers. But based on a recently discovered email from Old Republic's counsel, we now know why the government declined to call any borrowers: following the first trial, the government "*admitted that . . . they put too many borrowers on the stand* at the start of the case." Ex. F (emphasis added).

In other words, the government acknowledged that eliciting testimony from these supposed victims weakened their case. Again, this is because, as the government had to admit, "the borrowers didn't understand they were entitled to a refund," and "[t]hey weren't promised" refunds. Ex. D at 12:17–20. Which is to say, they agreed to pay the entire reconveyance fee to Troy's company. They were not victims.

Consistent with this, no borrower has *ever* come forward as a "victim" in this case. Unlike the usual theft case where someone goes to the police to report something stolen, this case started with Old Republic deciding to sue Troy for breaching a contract. Even following Troy's well-publicized conviction, there are apparently no borrowers currently seeking restitution from Troy. Indeed, despite its efforts, the government been unable to identify any actual people who supposedly lost money and are entitled to restitution.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

In short, there is no basis for concluding that escrow customers are victims for purposes of sentencing. They willingly agreed to pay reconveyance fees and received a service in exchange. While it might be true that Troy breached his contracts with the escrow companies, the escrow customers got everything they expected from their own contracts and thus did not suffer any "pecuniary harm."

Moreover, the fact that borrowers paid PCD market rate for reconveyance processing services and received those services is an independent reason to conclude they did not suffer any loss. The Guideline's Application Notes are clear: "Loss shall be reduced by . . . the fair market value of . . . the services rendered[] by the defendant." §2B1.1, Note 3(E). As the Ninth Circuit has explained, "'value may be rendered even amid fraudulent conduct,' and . . . in calculating loss, the district court should give credit for any legitimate services rendered to the victims." *United States v. Sayakhom*, 186 F.3d 928, 946–47 (9th Cir. 1999) (quoting *United States v. Blitz,* 151 F.3d 1002, 1012 (9th Cir.1998)). "This 'net loss approach' reflects the Sentencing Commission's position that an offender who transfers something of value to the victim is generally committing a less serious offense than one who does not." *United States v. Worley*, 16-13394, --- Fed. Appx. ---, 2018 WL 1640136, at *1 (11th Cir. Apr. 5, 2018).

Here, the evidence showed that the amount borrowers paid PCD was the same amount they would have paid for reconveyance processing if they had used Stewart Title, First American, Chicago Title, or any other major title company. Exs. G–M. Thus, even if Troy did cause some "loss" to borrowers, the loss was entirely cancelled out by the value of the services he rendered, and the total loss amount to borrowers is therefore $0.

In light of the guilty verdict on Count One, the only reasonable explanation is that the jury found the title companies were defrauded. In other words, the jury concluded that Troy made misrepresentations to induce the title companies to enter into a contract with PCD. Or, as the government itself put it: "Kelley defrauded title companies—thereby inducing the title companies

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

to remit fees which they had received from borrowers and wished to return to borrowers if they went unused." Dkt. No. 210 at 24. But in that case, all the title companies were deprived of was the benefit of their bargain. They entered into contracts with Troy on the condition that he would refund their customers, but he did not. The loss suffered was merely the right to choose a reconveyance servicing company that would handle fees in a particular way. There is no dollar value that could reasonably be associated with this intangible right. As a result, the proper loss figure in this instance is $0.

Although the title companies did not lose any money because the contractual refunds were owed solely to their customers, the government has recently argued that Fidelity and Old Republic are victims because they spent money in lawsuits back in 2008–2011 and in assisting the government with this investigation. However, the government has conceded that Fidelity waived any claim to restitution. Coming on top of its position that third-party vendors like PCD were entitled to keep funds paid to them on closing, Ex. N at 11, Fidelity's waiver of restitutions confirms it has not suffered any reimbursable economic losses. With respect to Old Republic, its settlement agreement with Troy explicitly acknowledged that the $1.15 million payment satisfied any debts he might have owed them and *released* Troy from any claims, including future claims, relating to his nonpayment of refunds. Ex. O ¶ 4. This settlement agreement conclusively undermines any claim that Old Republic is entitled to restitution. Thus, the appropriate loss amount for sentencing purposes is zero dollars.

> b. *Sentencing Troy Based on a Loss Amount of Nearly $3 Million Vastly Overstates the Seriousness of His Conduct.*

Even if this Court were to conclude that escrow customers suffered some ascertainable pecuniary harm, sentencing Troy based on a loss amount of nearly $3 million, as the government urges, would vastly overstate the seriousness of his conduct.

As discussed at length above, the "victims" here consented to pay Troy the full reconveyance fees. No one lied to them to obtain their money. They paid market-rate for PCD's

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

services.  By all accounts, each of the borrowers received the service for which they paid Troy.  How were they harmed?

Troy is not Bernie Madoff.  No one's life was ruined or even adversely affected by his failure to pay refunds.  As the Probation Department noted in its sentencing recommendation, "the loss to each victim was rather small and the impact of the losses to the victims went unnoticed in most cases."  Sentencing Recommendation at 3.  In fact, not a single "victim" has complained of theft, even after years of highly publicized civil and criminal legal proceedings against Troy.

The actus reus here was Troy's alleged breach of contracts with two highly sophisticated, billion-dollar title companies.  As this Court is aware, Troy has argued at length that breach of contract is a civil matter, not a criminal one.  There is no need to relitigate that here.  But suffice it to say, there is not a whole lot to distinguish this case from the cases previously cited by Troy, in which Courts of Appeals have concluded that a breach of contract was insufficient to prove theft.  Even if those cases can be distinguished, it is, at a minimum, a close call whether Troy stole money or merely breached his contracts with Fidelity and Old Republic.  This much is obvious from the first trial in which 10 jurors, viewing essentially the same evidence as the second jury, concluded that Troy did *not* steal any money.  The only way to explain this discrepancy is that reasonable minds, fully apprised of the evidence against Troy, can reach dramatically different conclusions as to whether he committed a crime.

### 3.  *The Nature and Circumstances of Troy's Convictions for Filing False Tax Returns.*

The government did not contend that Troy hid money and never reported or paid taxes on it.  Rather, its position was that Troy reported the funds as income in the wrong years and paid the tax in the wrong years, thus overreporting in some years and underreporting in others.  In fact, the government concedes the effect of Troy's reporting the funds over time has had zero tax impact: As of today, the IRS concedes it owes Troy $97,233.81 based on his reporting of income to date.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

The prosecutors view the tax loss as $308,000 under Agent Shipley's series of hypothetical assumptions about what would have happened as a result of Troy's tax reporting. Among those assumptions was that Troy would not have any unusual tax deductions (which he in fact did, including legal fees defending this case) and that Troy would only pay a set amount each year as each return was filed. We now know that the government's hypothetical assumptions were wrong—Troy did not have to pay the $308,000 that the government claims as a loss, and the IRS even owes him money. The tax loss is zero.

As for the business expense deductions the government charged as improper, the amounts were *de minimis*. By far, the largest business expense questioned by the government at trial was based on Troy taking a depreciation deduction for family vehicles—conduct that we all know frequently occurs but is never the subject of a criminal prosecution. Compared, for example, to the deductions taken by the FBI accountant initially assigned to this case, Mr. Beisheim, Troy's business expenses were much more reasonable. Troy's were for expenses he actually took, and which were arguably permissible—although they were ultimately not found to be. Mr. Beisheim, by contrast, was taken off the case after it was revealed that he was undergoing a civil audit for having taken as deductions expenses that he had never actually paid, among other things. Agent Shipley admitted that he is "sure that happens every day" that the IRS disallows $25,000 in deductions and the taxpayers are not prosecuted criminally. Ex. P at 46:23–47:2.

Nor was Troy trying to hide anything by reporting income as he did. Troy's tax reporting position was implemented before any government agency initiated an investigation. Five years before he was interviewed by the IRS, Troy set up a reporting plan for income from his reconveyance business. As explained at trial, and supported by communications with his accountant, Troy's reason for reporting the income over time was that he faced a risk that an unrecorded or improperly recorded reconveyance could lead to substantial civil liability.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

Of additional significance, Troy disclosed his possession of the funds on each return from 2008 going forward (again, prior to the initiation of any government investigation), on an attachment to those returns. This is important in considering the impact of his conduct as it shows that Troy was not concealing the funds but rather disclosing them to the IRS and reporting them in a way the government later contended was wrong. He also fully explained his tax reporting plan when interviewed by the government in 2013. While the government disputed the proper years of reporting, he was fully transparent with the IRS and investigators about the funds.

As Agent Nordyke admitted in the first trial, she had never before seen a situation where the government prosecuted a case because the taxpayer reported money in the wrong year. Ex. Q at 24:17–25:10. With a tax loss of zero, an academic dispute about the proper years for reporting, and tax issues that should have been addressed through a standard audit, the tax convictions overstate the seriousness of the offense.

### 4. The Nature and Circumstances of Troy's Convictions for Making False Statements in a Civil Deposition.

Troy was convicted on two false declaration counts in highly unusual circumstances. When Troy was sued civilly by Old Republic, he was deposed. As charged in Count 2, he was asked at one point whether he recalled sending a letter on a particular day, two years earlier, to a plaintiff in a previous class action suit brought against Old Republic's competitor, Fidelity. Troy responded numerous times that he did not recall whether he had sent it. Ex. R at 198:1–200:18. The specific question and answer with which he was charged was "You think it's likely that you sent it? No." Dkt No. 38 at ¶¶ 109–10.

Count 5 charged Troy with testifying in his deposition in 2010 that his company had kept a spreadsheet reflecting charges for fees. He was convicted of a false declaration for the following: "Question: It wouldn't just be 'PCD fees $55' without indicating what? Answer: No, there were separate columns for each different fee." *Id.* at ¶ 124.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

There is no reason to think that either of these statements had any impact whatsoever on Old Republic's suit against Troy. Whether Troy was the one who sent a letter to a plaintiff in the Fidelity lawsuit—when the letter indisputably came from his company—was not an issue in the Old Republic case. Moreover, before Troy's testimony on this point, he provided Old Republic's counsel an email in which he admitted that he had mailed the letter to Cornelius with a refund check in it. Ex. S. So while the government contends that Troy wanted to deceive Old Republic with this testimony, the reality is that Troy had previously admitted to Old Republic the very fact he is charged with denying in his deposition.

With respect to Troy's spreadsheet testimony, a newly produced memorandum from Scott Smith provides nearly conclusive proof that Troy did not make an impactful misrepresentation when he testified about the appearance of the tracking spreadsheets PCD sent to Old Republic. Ex. T. In the memorandum, written shortly after Troy's deposition. Mr. Smith admitted that the false statements about the number of columns on the spreadsheets made no difference to Old Republic. *Id.* at 4. As he concedes, at the time of Troy's deposition, Old Republic already had the actual spreadsheets and knew exactly what they looked like. *Id.* Mr. Smith then attributed Troy's inaccurate testimony to the fact that, because of how discovery was conducted, Troy's lawyer could not prepare him on the issue for his deposition. *Id.* The government's argument on materiality rested entirely on Mr. Smith's testimony about what was important in a lawsuit concluded six years prior. But Mr. Smith's contemporaneous account of events undermines that trial testimony and shows that Troy's testimony regarding the design of the tracking spreadsheets was had no impact on the lawsuit. And not only was Old Republic as a litigant not affected, the trial court never even considered Troy's testimony, since it never ruled on the merits of Old Republic's lawsuit.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

**D. There Is No Need for a Lengthy Prison Sentence Here.**

*1. The Collateral Consequences of this Prosecution Have Already Been Severe.*

For the past three years—ten including the civil cases—Troy and his family have been under siege. Troy has suffered personal, professional, and financial harm. He is no longer in public office, and never will be again. His bar license has been suspended, and he will not be permitted to practice law again. His mother explains that the case has "had a severe adverse impact on Troy, his wife, his children, me, and the rest of our family. We have had enormous stress and countless sleepless nights. The legal concerns have taken an immeasurable emotional, physical, and financial toll, and have destroyed Troy's career as a well respected, practical, bipartisan public servant." C. Kelley Letter at 2.

His family has also suffered tremendously. A friend and former fellow JAG officer explains: "I know that what hurts him most deeply about the prosecution against him is not for the hardship to himself, but to his family. As with most fathers, he cares deeply about this family, but Troy actually practices what he believes and is very much hands on about his involvement." Choe Letter at 1.

Diane writes in gut-wrenching detail of the struggle she and Troy have gone through to keep things normal for Jackson and Brett during this difficult time:

> We don't . . . talk to them in detail about the trauma that he and I are going through. We will, but we have been very conscious about trying to keep these formative years in middle school and high school as normal as possible, even though ours have been torn apart. It is a difficult tightrope to walk. We are very proud of our two incredible boys. They are smart, kind, talented, personable and generous. Perhaps others will tell you about them in their letters, but corrupt people would never be able to be the parents of boys like ours. They are a reflection of our family and our values.

D. Kelley Letter at 4. She also speaks to the harm the family has suffered:

> Troy and I live one day at a time, in perpetual fear. Through the past few years, every day, we have been afraid of what the prosecution will do, say or file. We have been afraid of what the newspapers will print. We have been afraid that the kids will be teased or hurt at school. We have been, and still are, afraid that the financial toll will be more than we can bear after a lifetime of hard work. I have been afraid that colleagues will treat me differently or that my mental state will

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

make me unable to do my job the way I want to. Troy is afraid to go out in public because he might be recognized. He cannot show his fear every minute of every day – seeing him that way would make me unable to function, and we have children to take care of. He has been very strong. But holding in fear, pain and anger has long term effects on mental and physical health. His life, and his ability to do good to help others in the public sphere, has been forever changed.

D. Kelley Letter at 3.

Given Troy's deep involvement in Jackson's and Brett's life, having their father gone during a crucial developmental stage would be devastating, as a family friend describes: "I am most concerned about the impact of any sentencing on those boys – an upcoming senior and an upcoming sophomore in high school. It is a pivotal age for them and I worry about the lasting impact this could have on their lives and ability to continue to be successful." Collie Letter at 1. Troy's mother, who lives in California and is in failing health, will also be severely affected by the sentence, as Troy's brother explains: "Mom and I need Troy to continue to help out for however much life Mom has left." G. Kelley Letter at 2. In sum, Troy and his family have already suffered severe consequences related to his convictions, and a prison sentence would have a serious collateral impact on those close to him.

### 2. There is No Need for Rehabilitation or Deterrence.

Juxtaposed against the harm that would occur to Troy and his family, and the harsh consequences they have already suffered, is the fact that prison would serve no purpose. There is no risk that Troy would reoffend. Throughout this litigation, he has continued to work in his role with the National Guard. Friends and co-workers describe the value he has added there; numerous others also describe his community involvement that they expect he will continue in the future. A friend writes to ask the Court "to please be lenient. Troy poses no menace to society. He is a good friend, husband and father. He's served his country for many years. *I believe that the world is a better place with him actively living and participating in our community.* This has been a difficult time for his family. I know that life will never be the same for them, regardless, but please don't

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

punish him further. . . . Please let Troy's life be meaningfully spent with the people that love him most." Dobosz Letter at 2 (emphasis added).

Nor is there a need for general deterrence. No one, seeing what Troy has gone through, would want to go through it. As Diane describes, "Because of what has happened during what should be his most productive professional years, Troy's life has been ruined. He has lost his reputation, his ability to serve in elected office, and he will never open another business ever again. All that he has worked for has been taken from him." D. Kelley Letter at 1. The publicity surrounding the case has surely already served the purpose of deterrence. These are issues that are normally dealt with civilly; advertising the fact that they can be pursued criminally should be deterrence enough.

### E. The Advisory Guidelines Range Does Not Alter the Defense Analysis.

The Guidelines range is just one factor to consider in sentencing; the Guidelines are not even considered presumptively reasonable. *See, e.g.*, *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable."). The pre-sentence report calculates an advisory guideline range of 78 to 97 months, based on a combined adjusted offense level of 28 and Troy's total lack of any criminal history. This calculation is flawed in several respects, however.

<u>Group One: Stolen Property Count</u>

As detailed above, no one suffered pecuniary harm on account of Troy's conduct. As such, the loss amount for the stolen property count should be $0, resulting in base offense levels of 6. USSG §2B1.1. Moreover, as no one suffered any pecuniary harm from Troy's stolen property conviction, the two-point adjustment based on the number of victims is inappropriate. *See* USSG §2B1.1(b)(2)(A); USSG §2B1.1., Note 1 ("'Victim' means . . . any person who sustained any part of the actual loss."); *United States v. Harris*, 821 F.3d 589, 606 (5th Cir. 2016).

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

The pre-sentence report's inclusion of a "sophisticated means" enhancement under USSG §2B1.1(b)(10)(C) is likewise erroneous. This enhancement was not included in the draft presentence report, but was subsequently included in the final version at the government's urging. The government sought the enhancement based on Troy's movement of assets through multiple bank accounts following the institution of class action lawsuits against his clients. But the "sophisticated means" enhancement only applies where the defendant engages in "especially complex or especially intricate offense conduct pertaining to the execution or concealment *of an offense*." USSG §2B1.1, Note 9 (emphasis added). In this case, the evidence showed that Troy's movement of assets had nothing to do with executing or concealing an offense, but was instead designed to shield assets from class action lawsuits. In fact, Troy was acquitted of five counts of money laundering alleging that he sought to conceal the proceeds of an offense. Accordingly, the "sophisticated means" enhancement is not appropriate here.

The adjusted offense level for Group One is therefore 6.

Group Two: False Declaration Counts

The defense does not dispute the presentence report's calculation with respect to group two. The base offense level for Troy's false declaration convictions is 14 and no upward adjustments are appropriate.

The adjusted offense level for Group Two is therefore 14.

Group Three: Tax Counts

As explained in detail above, the tax loss in this case was zero dollars. Indeed, at the end of the day, the government *owed Troy*. The base offense for the tax counts is thus 6. USSG §2T1.1(a)(2).

Starting from the correct tax loss, the criminal activity adjustment of USSG §2T1.1(b)(1) results in a six-point increase to an adjusted offense level of 12.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

The presentence report also errs by applying a "sophisticated means" enhancement to the tax counts. "'Sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." USSG §2T1.1(b)(2), Note 5.

Here, Troy was charged with reporting his income in the wrong years. The fact that a business entity was used was, the evidence showed, totally irrelevant to the tax issues. The government's agents testified that everything was reported through Mr. Troy's personal return. He simply did not report the funds in the years the government believes he should have reported them; it did not involve sophisticated means.

The adjusted offense level for Group Three is therefore 12.

<u>Multiple-Count Adjustments</u>

Pursuant to USSG §3D1.4, Groups Two and Three are each assigned one unit and group one is assigned one-half unit. These 2 ½ total units result in a three-level adjustment added to the highest group offense level—i.e., Group Two's adjusted offense level of 14 plus 3 results in a Total Offense Level of 17.

<u>Advisory Guideline Range</u>

Troy has no criminal background. Based on a total offense level of 17 and a criminal history category of I, the guideline range for imprisonment is 24–30 months.

The sentencing recommendation from United States Probation and Pretrial Services correctly seeks a downward departure of 30–49 months based on many of the same factors discussed herein, including Troy's strong family and community ties, his extensive history of public service, and the lack of need for any deterrence. Applying the same downward departures to the corrected guideline range yields a sentence of probation. The defense respectfully submits that probation is the appropriate sentence here.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

**F. Sentencing Recommendation.**

The review of the sentencing factors above points in one direction: harsh punishment or imprisonment is not necessary or appropriate. As defense lawyers, the Court might expect us to urge this notion, but we are not alone. Not only do Troy's family, friends, and professional associates urge the same result, but a juror from the first trial asks "that in your sentencing of [Troy] you exhibit mercy. I do not believe incarcerating Mr. Kelley is merited by the case brought against him. . . . I strongly believe Mr. Kelley has already received punishments appropriate for the crimes for which he has now been convicted. He has paid, personally, professionally, and financially." Support Letters at 2. And the government's previous offers to resolve the case confirm that even it sees no need for a long sentence: It twice offered to recommend a sentence of no longer than one year.[1] Exs. U–V. There is no one more objective than a juror—someone who provides a common-sense perspective devoid of legal training, sentencing guideline analysis, or the cynicism that may result from years of handling or judging criminal cases.

Diane Kelley perhaps provides the best insights into the fruitlessness of imposing a prison sentence on Troy:

> I beg you to use mercy as you decide Troy's sentencing. If prison is supposed to be punishment, he has been punished enough. If prison is supposed to reform, Troy is already a good man and prison will only change him for the worse. Taxpayers would be better off not footing the bill for Troy's incarceration. If given the chance to live his life, Troy will find ways to continue to serve his community and his country, love his family and friends, and raise two boys who may one day change the world.

D. Kelley Letter at 6. In sum, every purpose a prison sentence could serve counsels against imposing a term of imprisonment here.

For all these reasons, we respectfully recommend that the Court give a sentence of five years' probation, which shall include a condition that Troy serve six months' home detention. We believe this sentence is reasonable in light of a careful consideration of all sentencing factors,

---

[1] Illustrating the oversized role politics have played in this case, the first offer required that Mr. Kelley resign from office within one week following entry of the guilty plea. Ex. U.

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224

including Troy's personal characteristics, the seriousness of the offense, the impact of the conviction's collateral consequences, and the lack of any need for deterrence of any kind.

### III. CONCLUSION

For the reasons set forth herein, the defense respectfully requests a sentence of five years' probation, with six months' home detention.

DATED this 22nd day of June, 2018.

CALFO EAKES & OSTROVSKY PLLC

By: _s/Angelo J. Calfo_
Angelo J. Calfo, WSBA #27079
Patricia A. Eakes, WSBA #18888
Emily Dodds Powell, WSBA #49351
Andrew R.W. Hughes, WSBA #49515
1301 Second Avenue, Suite 2800
Seattle, WA 98101
Telephone: (206) 407-2200
Email: angeloc@calfoeakes.com
pattye@calfoeakes.com
emilyp@calfoeakes.com
andrewh@calfoeakes.com

*Attorneys for Defendant Troy X. Kelley*

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200    FAX (206) 407-2224

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Andrew C. Friedman | Andrew.Friedman@usdoj.gov |
| Arlen R Storm | Arlen.Storm@usdoj.gov |
| C. Seth Wilkinson | Seth.Wilkinson@usdoj.gov |
| Michelle Jensen | Michelle.Jensen@usdoj.gov |
| Theron Buck | tbuck@freybuck.com |

*s/ Erica Knerr*
Erica Knerr

LAW OFFICES
**CALFO EAKES & OSTROVSKY PLLC**
1301 SECOND AVENUE, SUITE 2800
SEATTLE, WASHINGTON 98101
TEL (206) 407-2200   FAX (206) 407-2224