The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

TROY X. KELLEY,

Defendant.

NO. CR15-5198RBL

**SENTENCING MEMORANDUM**

## I.   INTRODUCTION

Troy Kelley is to be sentenced following jury verdicts finding him guilty of eight felonies, including possession of stolen property, making false declarations under oath, and tax fraud.  Together, the convictions reflect a sprawling, ten-year course of criminal conduct in which Troy Kelley:

- Stole nearly $3 million from Washingtonians in over 20,000 transactions;

- Secreted the stolen money by transferring it, through a series of bank accounts, to a shell company owned by a sham Belizean trust;

- Destroyed business records to avoid discovery of the theft, and then falsely claimed the records had been destroyed in a fire;

- Falsified two letters to the class representative in a nationwide class action in an effort to make Kelley's theft from the class representative look like an honest mistake;

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-1

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Perjured himself, repeatedly, in a federal deposition and in a subsequent sworn declaration submitted to U.S. District Court Judge James Robart; and

- Engaged in tax fraud, which involved (a) falsely representing that Kelley was running a business, when that business had been inactive for years; and (b) taking tens of thousands of dollars in business deductions for expenses that were obviously personal, including the purchase of Egyptian cotton sheets, massage treatments, and a family vacation.

Kelley, of all people, should understand the seriousness of theft, perjury, and tax fraud. As reflected in the PSR and the letters of support to the Court, Kelley presents himself to the world as the consummate rule follower. He is an attorney licensed to practice in three states. He clerked in the criminal division of the United States Attorney's Office in New York; he was an attorney for the SEC; he prosecuted cases for the military, and served as a state legislator. And, in a stunning display of audacity, Kelley ran for Washington State Auditor, the state's chief fraud watchdog, *knowing* he had stolen millions of dollars from Washingtonians—and used some of that stolen money to finance his campaign.

Yet, to this day, Troy Kelley disclaims any responsibility for his offenses. He is as unrepentant as any defendant in memory. Even in the face of eight unanimous jury verdicts, Troy Kelley asserts the protracted course of fraud described above is a "mer[e] civil contract dispute." PSR ¶ 56. He contends he was unfairly prosecuted because he is a politician, and complains that "it shouldn't be this hard to serve." *Id.* Kelley's background, the doggedness with which he pursued his decade-long fraud, and his refusal to accept responsibility for his conduct are serious aggravating factors.

The government recommends that the Court sentence Kelley to 87 months of imprisonment, which represents the low end of the applicable sentencing guideline range of 87-108 months. As discussed herein, this sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to impose just punishment, and to satisfy the other requirements of 18 U.S.C. § 3553(a).

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-2

## II.     BACKGROUND

The government appreciates that the Court is very familiar with this matter, having presided over two five-week trials.  The following discussion is intended to remind the Court of the facts most pertinent to the Court's sentencing determination.[1]

### A.     Kelley's Theft of Borrower Funds

#### 1.     Post Closing Department

The jury found that Kelley stole millions of dollars while operating his business, Post Closing Department ("PCD").  Escrow companies hired PCD to monitor county records following real estate closings to ensure that pre-existing deeds of trust (liens) on the properties were reconveyed.  PCD charged a flat fee of $15 or $20 per file to perform this service.  PCD employed approximately three employees at a time.  The employees generally worked from home on their own computers, and earned around $12 per hour.

To complete a reconveyance, PCD was sometimes required to pay third-party fees (trustee fees or recording fees) on behalf of the seller.  During the offense period, these fees were extremely rare, and in fact were only charged about 5% of the time.  Kelley and the escrow companies agreed the escrow companies would collect from each customer, and provide to PCD, a deposit of approximately $100 per file to cover potential trustee fees.  Kelley promised the escrow companies that, if no fees were charged, PCD would refund the unspent money to the borrowers.

#### 2.     Kelley's Theft From Fidelity Clients

In October 2003, Kelley met with Julie Yates of Fidelity National Title.  Kelley and Ms. Yates discussed the possibility of PCD tracking reconveyances for customers of Fidelity's Lynnwood office.  Ms. Yates and Kelley orally agreed that PCD would receive a $15 flat fee per file, and would hold the additional funds in case third-party fees were

---

[1] This factual statement is based on the exhibits admitted at trial and the transcripts of witness testimony.  Because the exhibits have been previously submitted to the Court, and the Court observed the witness testimony, the government is not filing the source material with this Memorandum, but will do so if the Court so requests.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-3

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

charged.  Kelley told Ms. Yates that PCD would refund any unspent money to borrowers.
Kelley then sent Yates a confirming email stating that PCD would charge a single $15 fee
per file, and that "a full refund will be issued to the borrower" if no third-party fees were
incurred.  Trial Exhibit ("TE") 300A.  On October 9, 2003, Kelley and Ms. Yates
executed a contract providing, *inter alia*, that "at the completion of post closing
documentation, if extra funds are left over, PCD shall forward funds to customer."  TE
300.

Kelley subsequently met with Michelle Millsap, the manager of Fidelity's Pierce
County office, about providing the same service for Fidelity's Pierce County customers.
Ms. Millsap and Kelley agreed PCD would do so on the same terms as Fidelity
Lynnwood.  Kelley specifically promised Ms. Millsap that PCD would refund unused
trustee fees.

Kelley initially paid refunds to Fidelity customers as promised.  However,
sometime in 2005, Kelley began a wholesale practice of stealing borrowers' money,
instead of refunding it, when no third party expenses were incurred.  From this point
forward, PCD refunded Fidelity customers' money only when customers called to
complain that they had not received a refund.  Kelley was elected to the state legislature
in 2006, but continued his theft unabated.

### 3.     Kelley's Agreement with ORT and Theft from ORT Clients

In April 2006, Kelley met with Carl Lago of Old Republic Title ("ORT") about
performing reconveyance tracking for ORT.  By this time, Kelley had been secretly
stealing Fidelity client funds (and paying refunds only in response to complaints) for
approximately a year.  However, Kelley told Mr. Lago, as he had previously told Fidelity,
that PCD would refund unused trustee fees to ORT's customers.  Kelley then sent Mr.
Lago an example of a form refund letter, which Kelley said would accompany the refund
checks PCD would send out.  TE 419.   Kelley also wrote to Mr. Lago that PCD's
"tracking and refund service" would be priced at $20 per file.  *Id.*  In May 2006, Kelley

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-4

1   and Mr. Lago executed a contract providing that PCD would be entitled to a single $20

2   tracking fee, including "management of funds due trustees and client refunds." TE 431.

3       Kelley stole from ORT clients from the outset of the relationship, and generally

4   issued refunds to ORT customers only when they complained.  In addition, PCD employee

5   Jason Jerue testified (and bank records confirm) that on two occasions Kelley called Mr.

6   Jerue and told him to immediately issue a series of refund checks.  Mr. Jerue testified that,

7   during these calls, a "tense" sounding Kelley asked Mr. Jerue how many pre-signed PCD

8   checks Jerue had available.  Mr. Kelley then told Mr. Jerue to use all of the checks

9   (approximately 10-15 checks each time) to write refunds.  Apart from these limited

10  situations, PCD did not issue refunds to borrowers.

11      In this manner, Kelley stole at least $2.9 million of borrower funds from more than

12  20,000 Fidelity and ORT customers.  According to the government's financial analysis

13  (which is discussed in more detail below), Kelley handled more than 21,000 Fidelity and

14  ORT transactions in which he received extra funds to cover third-party fees.  Refunds were

15  due on more than 20,000 of these.  But Kelley paid, at most, 82 refunds.

16      Trial Exhibit 2710, which is reproduced below, summarizes Kelley's treatment of

17  borrowers' funds.  The smallest (red) portion represents the 82 refunds Kelley paid; the next

18  smallest (blue) portion represents genuine third-party fees, and the largest (green) portion

19  represents transactions where Kelley fraudulently retained—stole—the customer funds:



20  NUMBER OF POSSIBLE THIRD-
    PARTY PAYMENTS, 1,046, 4.84%                    NUMBER OF POSSIBLE
                                                     REFUNDS, 82, 0.38%

27  NO THIRD-PARTY
    PAYMENT OR REFUND,
28  20,503, 94.79%

UNITED STATES v. KELLEY, CR17-005198RBL            UNITED STATES ATTORNEY
SENTENCING MEMORANDUM-5                                  700 STEWART STREET
                                                              SUITE 5220
                                                     SEATTLE, WASHINGTON 98101
                                                           (206) 553-7970

The $2.9 million loss figure undoubtedly understates the amount of money Kelley stole.  As FBI forensic accountant Jared Young testified at trial, all ambiguities in the bank records were resolved in Kelley's favor.  For example, all PCD checks for which no image was available were presumed to be refund checks.  Further, because bank records were not available for 2005, the $2.9 million figure does not include any loss for that entire year.  In reality, then, Kelley engaged in well over 20,000 acts of theft, for a total of well over $2.9 million.

### 4.    Kelley's Concealment of the Theft from the Escrow Companies

Between 2006 and 2008, Kelley sent the escrow companies numerous emails and other materials designed to make it appear that PCD was keeping only $15 or $20 per file, when in fact it was retaining over five times that much.  For example, in a February 2006 email, Kelley proposed to ORT's Patty LeVeck that ORT increase the sum ORT collected for potential trustee fees from each customer, which in turn would have increased the sum Kelley could steal from each.  Kelley stated in the email that the amount of money PCD would "hold" would increase, but that "our $20 tracking fee does NOT change."  TE 441 (uppercase in original).  Kelley sent a similar email to Fidelity's Julie Yates.  TE 303.  Another email to ORT prepared by Kelley and sent by Mr. Jerue stated that PCD's "fee is $20 flat for each item."  TE 440.  Of, course the notion of a $15 or $20 fee was a sham because Kelley was keeping *all* of the money forwarded to him for each borrower.

PCD also sent ORT at least two spreadsheets designed to hide PCD's theft of client funds.  On the first spreadsheet (Exhibit 438), the nine refunds that PCD had actually paid (as a result of one of the batches of refund checks Kelley told Mr. Jerue to issue) were all grouped on the first screen of a 4,000 line spreadsheet, making it appear at first glance that PCD was regularly paying refunds.  The second spreadsheet (Exhibit 436), contained fictitious entries indicating PCD had paid third-party fees on behalf of borrowers, when in fact no such payments had been made.  These entries made it falsely appear to ORT that no refunds were due on the files at issue.  In fact, PCD owed refunds to thousands of ORT borrowers.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-6

**B.     The Class Action Suits and Kelley's Fraudulent Windup of PCD**

**1.     The Class Action Suits**

On May 14, 2008, the Hagens Berman law firm filed a group of consumer class action complaints challenging Fidelity, ORT and other escrow companies' practice of collecting reconveyance tracking fees.  The cases argued that this service should have been included in the customers' basic escrow fee.  While the suits did not focus on PCD's refund practices, the prospect of large-scale litigation over (and civil discovery into) reconveyance practices threatened to expose Kelley's theft of reconveyance funds.  Mr. Jerue testified that, immediately after these lawsuits were filed, Mr. Jerue received a call from a "freaked out" Troy Kelley.  Kelley told Mr. Jerue that, while PCD was not named as a defendant, "things were going to get pretty hairy."  As result, Kelley said, he wanted to "turtle up" the company.  Kelley, who was by then a sitting state legislator, then took a series of steps to cover up his misconduct, destroy the evidence of this theft, and hide the stolen money.

**2.     The Cornelius Letters**

The class representative in the Fidelity class action was a Fidelity client named Frank Cornelius.  PCD had handled Mr. Cornelius's reconveyance tracking, and had failed to refund Mr. Cornelius $250 in unused trustee fees—a fact sure to be revealed in discovery.  To address this, on May 15, 2008 (the day after the class actions were filed), Kelley falsified two letters to Mr. Cornelius to make it appear that PCD generally paid refunds, and that the failure to pay Mr. Cornelius was a simple administrative mistake.

First, Kelley prepared what appeared to be a form letter, attaching a refund check, to Mr. Cornelius.  TE 805.  Kelley backdated the letter by four months—to January 7, 2008.  This "January 7" letter stated that "refunds are issued [by PCD] after the reconveyance is recorded;" that the reconveyance had been recorded for Mr. Cornelius's property; and that a check was therefore enclosed.  *Id.*  The letter thus gave the

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-7

1    impression that PCD issued refunds as a matter of routine, and in fact had sent a timely
2    refund to Mr. Cornelius.

3          Kelley then prepared a second letter with the correct date (May 15, 2008).  TE
4    804.  This letter stated that "a review of our records shows that you did not cash our
5    check of January 7, 2008," and that the check mysteriously had not been "returned by the
6    post office."  *Id.*  Therefore, the letter indicated, PCD was enclosing a second "official
7    bank check" refunding the unused trustee fees.  *Id.*  Kelley then purchased a cashier's
8    check and sent the check, along with both letters, to Mr. Cornelius.

9          Kelley needed to create an explanation for why Mr. Cornelius had not received the
10   "original" letter and check in the first place.  To do this,  Kelley intentionally typed the
11   wrong address on the "original" letter—using the street number "3527**1**," when Mr.
12   Cornelius's true address was "3527":

13        **Letter #1**                                    **Letter #2**

14   January 7, 2008                              May 15, 2008

15   Frank Cornelius                              Frank Cornelius
     35271 – 201st Place SW                       3527 – 201st Place SW
16   Lynnwood, WA 98036                           Lynnwood, WA 98036

17        Re:   Escrow No.  16-07080155               Re:   Escrow No.  16-07080155
              DoT's: 2007-10150206 & 2007-10260339          DoT: 2007-10150206 & 2007-10260339

18   Dear Homeowners:                             Dear Mr. Cornelius:

19   With these falsified letters, Kelley made it appear—to Mr. Cornelius, his lawyers, and
20   Fidelity—that Mr. Cornelius had failed to receive a refund only because of a single
21   erroneous digit in the address, and, further, that PCD generally paid refunds as a matter of
22   course.  In fact, Mr. Cornelius's post-lawsuit refund was one of only two refund checks
23   written by PCD in the entire first half of 2008.  TE 2708.[2]

24

25

26

27   ───────────────────────
28   [2] The only other refund check written in 2008 was written to a borrower who requested a refund.  TE 561.
     UNITED STATES v. KELLEY, CR17-005198RBL                          UNITED STATES ATTORNEY
     SENTENCING MEMORANDUM-8                                          700 STEWART STREET
                                                                      SUITE 5220
                                                                      SEATTLE, WASHINGTON 98101
                                                                      (206) 553-7970

### 3.    Kelley's Destruction of Business Records

Next, Kelley set about destroying and/or concealing the evidence of his theft—PCD's business records. Mr. Jerue testified that Kelley stored most of PCD's business records in an extended garage at Kelley's home. Other records were stored at the residence of PCD employee Dee Lamb. Mr. Jerue and Ms. Lamb testified that Kelley and Mr. Jerue went to Ms. Lamb's house to retrieve the records. They further testified that Mr. Jerue, at Kelley's direction, deleted all electronic PCD records from Ms. Lamb's computer. Kelley and Mr. Jerue then collected all of Ms. Lamb's paper files, loaded most of them into Kelley's SUV, and placed the remaining documents into Mr. Jerue's car. Kelley told Mr. Jerue to "dump" the records Mr. Jerue had collected. Kelley also told Mr. Jerue "to get rid of everything" else Mr. Jerue had in his possession. Mr. Jerue testified that when Kelley left Ms. Lamb's house with his car full of PCD records, Kelley headed south, towards Kelley's Tacoma residence (and not north toward Stewart Title, where a limited number of PCD records were later destroyed in a fire).

In June 2008, while Kelley was in the middle of closing down PCD, a major fire occurred at Stewart Title's Everett offices. PCD had previously tracked reconveyances for Stewart Title. PCD employee Amber Murray had periodically worked out of Stewart Title's office, but had ceased doing so before the fire. Mr. Jerue and Ms. Murray testified that some documents relating to *Stewart Title* clients may have been stored in the Stewart Title building. But Mr. Jerue testified that no documents relating to *Fidelity* or *ORT* clients were stored at Stewart Title, and that Kelley instead stored these documents in Kelley's extended garage.

Kelley used the Stewart Title fire as a basis to avoid producing business records when Kelley received a subpoena in the class action litigation. In an October 31, 2008 response to the subpoena (on which Kelley was copied), Kelley's attorney falsely stated that Kelley "ran the business relevant to this litigation" from the Everett Stewart Title building, and also falsely stated that the "only surviving records [from the fire] are tax

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-9

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  returns." TE 1607B.  As a result, the class action attorneys representing the Fidelity and

2  ORT borrowers never obtained PCD's business records.

3       **4.**     **Kelley's Concealment of the Crime Proceeds**

4       By the time the class action suits were filed in May 2008, Kelley had accumulated

5  over $3.2 million of Fidelity and ORT borrower funds, which he held in two Columbia

6  Bank accounts.  A third Columbia Bank account for Stewart Title clients contained an

7  additional $532,096.  On June 12, 2008 (less than a month after the class actions were

8  filed), Kelley initiated a series of transactions designed to hide the stolen money from

9  potential borrowers.

10       Between June 12 and June 26, 2008, Kelley established four new accounts at four

11  different financial institutions:  Wells Fargo, U.S. Bank, Nevada State Bank, and

12  Vanguard.  The first three accounts were used solely as conduits for the stolen funds, and

13  Kelley closed each of them shortly after transferring the stolen money through each

14  respective account.  The flow of funds is summarized on Exhibit 1116:



25       As shown in the diagram, Kelley ultimately deposited the stolen money in a

26  Vanguard account that Kelley set up in the name Berkeley United—a limited liability

27  shell company Kelley had formed days earlier.  TE 902.  To further insulate the money,

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-10

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Kelley created a sham Belizean trust called "Wellington Trust," and amended Berkeley United's formation documents to make Wellington Trust the 99% owner of Berkeley United.  Kelley then opened a bank account in Wellington Trust's name at a Belizean bank, and submitted wire instructions linking the Vanguard account to the Belizean account.  TE 1113.  This arrangement gave Kelley the ability to quickly wire the stolen money to Belize if necessary, though Kelley never actually did so.

## C.   Kelley's Perjury in the ORT Litigation

Judges Settle and Pechman dismissed the class actions against ORT and Fidelity on September 4, 2009 and April 1, 2010, respectively.[3]  However, in the course of defending the suit against it, ORT discovered, as Kelley had feared it would, that Kelley had stolen ORT's clients' unused trustee fees.  In response, on December 9, 2009, ORT filed a civil suit against Kelley in King County Superior Court seeking to recover (a) the stolen client funds; and (b) ORT's attorney fees.  Kelley removed the case to U.S. District Court, where it was assigned to the Honorable James L. Robart.

During his litigation with ORT, Kelley, a licensed attorney, military officer, and sitting legislator, committed blatant perjury—both in his deposition, and in a sworn declaration Kelley later submitted to Judge Robart.  While the jury was only asked to render verdicts on two of Kelley's statements, much of Kelley's deposition testimony was plainly false, and often bordered on the absurd.

### 1.   Testimony About Destruction of PCD Business Records

First, Kelley lied about his destruction of PCD business records.  As noted above, Kelley had falsely claimed in the class action litigation that the Stewart Title fire had destroyed all of PCD's business records except for tax returns.  Kelley made the same claim when he testified under oath in his ORT deposition.  Kelley testified that his

---

[3] Contrary to Kelley's repeated assertions, these dismissals did not in any way excuse Kelley's theft of refund money.  Rather, the dismissals were based largely on the finding that the escrow companies were permitted to charge a *tracking* fee (or hire a third party to provide tracking services), and were not obligated to track reconveyances free of charge as part of the basic escrow fee.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-11

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

attorney's October 31, 2008 letter was accurate in stating that all PCD records had been destroyed, except, Kelley testified, for "business cards and a few other things" in Kelley's home office.  TE 1621 at 183.  Kelley also testified that he had inadvertently lost all of PCD's emails by turning off PCD's webpage when the company closed.  *Id.* at 109.  To explain the disappearance of electronic evidence, Kelley testified that his computer had mysteriously stopped functioning, and that he had given it to Goodwill.  *Id.*  44. Following the deposition, Kelley prepared and submitted to Judge Robart a sworn declaration in which he reiterated these statements.  TE 1614 at 9-10.

### 2.    Testimony About Additional Service Fees

Second, Kelley lied about his entitlement to service fees beyond his flat $15 or $20 tracking fee.  As discussed above, witness testimony, contracts, and emails all make clear that PCD was entitled to a single flat fee of $15 or $20 per file.  However, Kelley testified at his deposition that two Fidelity representatives (Julie Yates and Chet Hodgson), as well as ORT's Carl Lago, had all *orally* agreed that PCD could collect a whole host of additional fees on top of the agreed $15 or $20 fee.  *Id.* at 83-4.  According to Kelley, these oral agreements allowed PCD to collect a fee every time a PCD employee wrote a letter, made a phone call, or conducted a computer search.  *Id.* at 24-25.  Kelley testified that ORT and Fidelity did not want these agreements in writing for what Kelley described as unexplained "liability purposes."  *Id.* at 89, 240.

Kelley claimed that, for every single ORT client, he had earned additional fees exactly equal to the amount of the trustee fee deposit he was holding for that client. Therefore, Kelley claimed, when he transferred the customers' money to his Belizean trust, he was not stealing it—it was compensation for "fees earned and services provided."  *Id.* at 114.  Furthermore, Kelley testified, PCD had carefully documented all of the additional fees it had earned on a detailed log.  Unfortunately, Kelley testified, the log was lost in the Stewart Title fire.  *Id.* at 26.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-12

1    Of course, the evidence at trial proved this fantastic story was false.  Ms. Yates,
2    Mr. Hodgson, and Mr. Lago all testified that they never told Kelley he could charge
3    additional fees.  Kelley's employees (including Mr. Jerue and Ms. Murray) uniformly
4    denied that they maintained any log like the one described by Kelley.  Indeed, these
5    employees testified that there was no need for any such log because PCD was only
6    entitled to a single flat fee.  The jury convicted Kelley of making a false declaration for
7    this testimony.

8        **3.    Testimony About Cornelius Letter**

9        Third, Kelley lied about the fraudulent letters Kelley sent Frank Cornelius on May
10   16, 2008.  One issue in the ORT litigation was whether Kelley knew about the class
11   actions when he wound up PCD and transferred the $3.6 million to the Belizean trust.
12   Kelley testified at his deposition that he did not have "any particular knowledge of the
13   class actions" in May of 2008, and further, that those class actions had no significance to
14   him because escrow companies are "sued all the time."  *Id.* at 141.

15       As part of this line of questioning, counsel asked Kelley whether he had prepared
16   the phony letters to Frank Cornelius.  Kelley repeatedly denied preparing or sending the
17   letters, or directing anyone else to do so.  *Id.* at 198-99.  When asked who else could
18   possibly have sent the letters, Kelley pointed to Amy Cobine—a former business
19   associate from Oregon.  *Id.* at 200.  Then, over a year after the deposition, Kelley
20   submitted a sworn declaration to Judge Robart reiterating that "as I testified at my
21   deposition, I didn't send this letter, and I don't know who did."  Ex. 1614 at 9.  The jury
22   convicted Kelley for these false statements.

23       **4.    The ORT Settlement**

24       On May 3, 2011, Kelley and ORT settled the litigation, with Kelley agreeing to
25   pay ORT $1,150,000.  Under the settlement agreement, Kelley agreed that ORT could
26   determine how much of the settlement would be used to cover ORT's attorney fees
27   (which totaled approximately $1.25 million), and how much would be distributed to ORT

28

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-13

clients.  ORT agreed to indemnify Kelley for any future claims against Kelley by ORT clients seeking unpaid refunds.  TE 1616.  ORT ultimately used $978,889.64 to pay attorney fees, and distributed $169,850 to ORT clients.  TE 1617.

**D.     Kelley's Tax Fraud**

**1.     The Tax Scheme**

Despite Kelley's testimony in the ORT litigation that he had "earned" the stolen money for "services performed," Kelley did not pay a dime of taxes on the stolen money during the years he was operating PCD.  In February 2009, following Kelley's closure of PCD and his circuitous transfer of the stolen money to Vanguard, Kelley's newly-hired accountant, Martin Leffler, asked Kelley about the source of the $3.6 million in the Vanguard account.  TE 192.  Kelley responded that this was "money deposited where we have not yet done any work, and not yet earned income."  TE 1902.  Kelley told Leffler that he would pay taxes on this money "when income is earned by Blackstone for work performed."  TE 1901.

Kelley began tapping into the stolen money in mid-2011.  First, in May 2011, Kelley used $1,150,000 to fund his settlement with ORT.  Then, beginning on June 3, 2011, and continuing through February 2, 2015, Kelley made a series of annual $245,000 withdrawals of the untaxed, stolen money.  Kelley used the money to fund personal expenses and (as discussed below) his campaign for Washington State Auditor.  In all, Kelley transferred to himself five annual payments totaling $1,225,000.

To explain the source of the $245,000 per year, Kelley pretended he was continuing to operate his reconveyance business.  In reality, Kelley had closed PCD, terminated its employees, and destroyed its business records years earlier, in 2008.  Nonetheless, Kelley claimed $245,000 per year of current business income on his tax returns for 2011, 2012, and 2013.  When he made the first (2011) payment, Kelley told his accountant, Mr. Leffler, that the money represented "a payment to Blackstone for work."  TE 1913.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-14

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Over the same period, Kelley also claimed more than $130,000 worth of business deductions for expenses that were plainly personal. TE 2817.  By claiming that he had incurred business expenses, Kelley made it appear on his tax filings that he was actually running a business, while gaining the added benefit of reducing his tax bill.  For example, Kelley took business deductions for costs associated with his wife's Toyota Highlander; annual trips to wine country with two other couples; tennis lessons at the Tacoma Lawn Tennis Club; spa treatments for himself and his wife; high thread count sheets; and other household purchases.  Kelley claimed annual business deductions of $66,147 and $60,425 for the years 2011 and 2012—years during which he was not even operating a business.  *Id.*

## 2.    The I.R.S. Investigation

I.R.S. Special Agent Carrie Nordyke interviewed Kelley on April 19, 2013.  Special Agent Nordyke testified that Kelley stated during the interview that, under his agreements with title companies, PCD was entitled to collect fees in addition to his $15 base tracking fee.  Kelley further told Nordyke that, as of 2013, his business was "continuing to perform work, and that there was a whole host of charges that hadn't been done yet."  Specifically, Special Agent Nordyke testified, Kelley said he was "continuing to do reconveyance services, sending letters out, making phone calls, and so forth."  After making these statements, Kelley abruptly terminated the interview, saying that his "parking was up and he needed to go."

The I.R.S. executed a search warrant at Kelley's residence on March 16, 2015.  Agents searched Kelley's home office, and examined his computers, for evidence that Kelley was, as he claimed, continuing to run a reconveyance business.  The agents found no evidence of business activity for any of the tax years at issue (2011-2013).

Revenue Agent Paul Shipley calculated the tax consequences of Kelley's scheme.  To do so, Agent Shipley determined that if Kelley had correctly declared the stolen money as income in the years it was stolen, and had not taken any fraudulent business

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-15

deductions, Kelley's total tax liability for the period 2005 to 2020 should have been $1,890,643.  TE 2824.  Shipley then calculated Kelley's tax liability based on Kelley's actual filings, which claimed the income at a rate of $245,000 per year beginning in 2011.  Shipley extrapolated this analysis forward to 2020, assuming that Kelley continued to declare $245,000 of income per year, and continued to claim fraudulent business deductions at the same rate as in 2011 and 2012.  Agent Shipley concluded that this would have resulted in a total liability of $1,582,379, or $308,263 less than the tax he should have paid.  *Id.*

**E.   Kelley's Use of Stolen Money for Campaign Expenses**

Kelley declared his candidacy for Washington State Auditor on April 13, 2012.  The same day, Kelley opened a campaign bank account at Wells Fargo in the name "Friends of Troy Kelley."  Two weeks later, on May 1, 2012, Kelley opened a second Wells Fargo account, also in the name Friends of Troy Kelley.  Kelley used these two accounts, and three other accounts in the same name (the "Campaign Accounts") to fund most of his campaign.

FBI Forensic Accountant Jared Young traced the sources of funds in the Campaign Accounts and determined that Kelley used substantial amounts of stolen money to fund his campaign.  *See generally,* Attachment A (Declaration of Jared Young).  First, Mr. Young determined that Kelley's campaign was largely self-funded.  That is, of the $663,060 deposited into the Campaign Accounts, $509,788—77%—came from Kelley's personal Bank of America account (the "Troy Kelley BOA Account").  *Id.* at ¶ 7.  The remaining $153,272—23%—came from family members, friends, and other third party contributors.  *Id.*

Next, Mr. Young examined the Kelley BOA Account (the account that was source of 77% of the campaign funds).  Mr. Young found that over half of the funds deposited into the Troy Kelley BOA Account came from the Berkeley United Vanguard account containing the stolen money.  Specifically, Mr. Young found that, over the period June

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-16

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2011 to October 2012, $400,000, or 52.9%, of the net deposits into the Troy Kelley BOA Account originated from the Berkeley United Vanguard account. *Id.* at ¶ 13.

Because Kelley commingled the $400,000 from Berkeley United with other funds Kelley deposited into the BOA Kelley Account, it is not possible to conduct dollar-for-dollar tracing, that is, to say that all $400,000 was used to fund Kelley's campaign. However, in one case, Mr. Young was able to a trace the majority of a specific $100,000 sum from the Berkeley United Vanguard account to the Campaign Accounts. *Id.* at ¶¶ 19-21.  More generally, since the account Kelley used to fund the Campaign Accounts was itself funded 52.9% with money from the Berkeley United account, it is fair to say that 52.9% of Kelley's personal contributions to his campaign from that account, or $269,677, originated from the Vanguard account containing the stolen funds.

**F.     The Prosecution of Troy Kelley**

**1.     The Indictment and First Trial**

On April 15, 2015, the grand jury returned a 10-count indictment, which was superseded by a 17-count superseding indictment on September 3, 2015.  The superseding indictment charged Kelley with possession of stolen funds, false declarations, money laundering, and tax offenses.  Kelley remained in office as Washington State Auditor, but took a leave of absence, while awaiting trial.

Kelley's first trial took place in March 2016.  Kelley's defense to the fraud charges relied on two retained expert witnesses.  First, attorney Mark Schedler testified that, when borrowers signed HUD-1 settlement statements, they were as a matter of law agreeing that PCD was entitled to keep the money it received—regardless of whether Kelley had promised he would return it.  Second, attorney James Savitt testified that the agreements between PCD and the escrow companies were legally ambiguous.

Following the presentation of evidence, the Court dismissed Count 4 (false declaration), and the jury acquitted Kelley on Count 16 (false statement).  The jury was

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-17

1  unable to reach a verdict on the remaining counts.  After an unsuccessful interlocutory

2  appeal by Kelley, the Court set the second trial for November 13, 2017.

3  Following the first trial, Kelley returned to his role as Washington State Auditor.

4  Kelley immediately demanded the resignations of his chief of staff and communications

5  director, without providing any reason for doing so.  *See* Attachment B.  When Governor

6  Jay Inslee expressed concern about the unexplained firings, Kelley accused the governor

7  of attempting to "influence the ongoing federal administration of justice," and requested

8  that the Governor direct his General Counsel, who previously worked in the United States

9  Attorney's Office, to refrain from contacting the USAO.  *See* Attachment C.

10  ## 2.    Fidelity's Discovery of Additional Emails

11  Shortly before the first trial, Fidelity had disclosed that in responding to a

12  document subpoena it had not reviewed backup tapes that potentially contained emails

13  between Kelley and Julie Yates for the years 2003-2005.  At the first trial, the defense

14  contended that these tapes likely contained exculpatory evidence.  For example, the

15  defense attorney argued in closing that "I would sure like to see" the emails between

16  Kelley and Yates.

17  During the lead-up to the second trial, the government requested that Fidelity

18  retrieve, to the extent possible, any relevant emails between Kelley and Ms. Yates from

19  the backup tapes.  Fidelity was ultimately able to recover Ms. Yates's emails for the year

20  2003, but not for the years 2004 or 2005.  Before Fidelity produced the emails, Kelley

21  (who had previously claimed the emails would be exculpatory) moved the Court to order

22  the government to cease all efforts to obtain email or other documents from Fidelity, and

23  further, to prevent the jury from seeing any emails that Fidelity produced.  Dkt. 469.  The

24  Court denied the motion.

25  The new emails corroborated Ms. Yates's testimony that Kelley had agreed to

26  charge only a single $15 fee, and underscored the falsity of Kelley's deposition testimony

27  that he was entitled to charge additional fees.  Specifically, in Exhibit 300A, Kelley told

28

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-18

Yates that "I think we should not charge additional fees for additional work," and that "a full refund will be issued to the borrower."  In Exhibit 300B, Kelley stated that "we will not be charging additional fees beyond the single $15 tracking fee."

### 3.    The Second Trial

#### a.    Kelley's Unexplained "Discovery" of Exhibit A-529

The second trial commenced on November 13, 2017.  During cross-examination of the government's first witness, the defense produced, for the first time, a document purporting to be a January 12, 2004, email from Kelley to Ms. Yates.  *See* TE A-529.  In the purported email, Kelley proposed "testing" an additional $5 "incentive" fee for PCD employees.  Ms. Yates testified that she did not remember this portion of the email; that the email itself made "no sense;" and the email's date was inconsistent with its content.

Ms. Yates and Kelley were the only two parties to the email contained on Exhibit A-529.  The document was not produced by Fidelity, so it could only have originated from Kelley.  On November 17, 2017, the government wrote to the defense requesting an explanation of the exhibit's origin, and further requesting that the defense make the original document available for inspection.  Kelley refused both requests.  The government then filed a motion seeking sanctions for defendant's failure to disclose Exhibit A-529 in discovery.  Dkt. 517.  In responding to the motion, the defense provided no information about the source of the mystery document.  The Court denied the motion for sanctions.

Kelley has never explained the appearance of Exhibit A-529.  There are only two possible explanations, and both involve additional litigation fraud by Kelley.  The first possibility is that the email is genuine.  If so, Kelley must have retained the document when he closed PCD in 2008, meaning that he committed additional acts of perjury when he testified that all of PCD's records, apart from business cards and tax returns, had been destroyed.  The possibility that the document is genuine seems unlikely, however, because the search of Kelley's home and computers did not retrieve Exhibit A-529.

1  Moreover, if Kelley had maintained the document, he likely would have used it in the

2  ORT litigation and at the first trial.  The only other explanation is that Kelley fabricated

3  or altered the document in an act of fraud on this Court.  It is significant that the

4  document appeared shortly after Fidelity concluded that it could not retrieve emails for

5  2004—and therefore was not in a position to dispute its authenticity.  Either way,

6  Kelley's use of Exhibit A-529 is another incident of serious litigation misconduct—

7  whether in the Old Republic litigation before Judge Robart, or the trial before this Court.

8  **b.     The Jury Verdict**

9  The jury deliberated for two days following the close of evidence.  On December

10  20, 2017, the jury returned verdicts finding Kelley guilty on Count 1 (Possession and

11  Concealment of Stolen Property); Counts 2 and 5 (False Declaration); Count 11 (Corrupt

12  Interference With Internal Revenue Laws), and Counts 12-15 and 17 (Filing False

13  Income Tax Return).  The jury acquitted Kelley on Counts 6-10 (Money Laundering).

14  Following the trial, the Court granted Kelley's unopposed motion to dismiss Count

15  11 based on an intervening Supreme Court decision.  The Court denied Kelley's motions

16  for acquittal on Counts 1 and 2, and for a new trial under Rule 33.

17  **III.     SENTENCING GUIDELINES**

18  The correct guideline range is **87-108** months.  As explained below, the

19  government objects to Probation's failure to apply an abuse of trust enhancement, but

20  otherwise agrees with Probation's calculations.  For guideline purposes, the eight

21  convictions are scored in the following three groups under USSG § 3D1.1.

22  //

23  //

24

25

26

27

28

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-20

## A.      Group 1:  Stolen Property

### 1.      Guideline Calculation

The correct guideline calculation for the stolen property offense is:

| Item | Guideline | Adjustment |
|------|-----------|------------|
| Base | 2B1.1(a)(2) | +6 |
| Loss in excess of $1,500,000 | 2B1.1(b)(1)(I) | +16 |
| Offense involved more than 10 victims | 2B1.1(b)(2)(A) | +2 |
| Sophisticated means | 2B1.1(b)(10)(C) | +2 |
| Abuse of trust | 3B1.3 | +2 |
| **Total** | | 28 |

Following is a discussion of each enhancement:

### 2.      Loss Calculation

The government established at trial that Kelley stole at least $2,938,708 from borrowers.  This calculation was described in the testimony of FBI Forensic Accountant Jared Young, and summarized on Exhibit 2711.

As reflected on Exhibit 2711, between 2006 and 2008, PCD collected $3,762,264 from Fidelity and ORT.  TE 2711.  Mr. Young determined that PCD was entitled to keep (at most) $583,330 in fees for these customers, and paid out (at most) $222,000 in trustee and recording fees.  Kelley should have refunded the remaining $2,956,933.  Instead, Kelley paid only $18,225 in refunds (when customers demanded them) and pocketed the remaining $2,938,708.  *Id.*  Therefore, the loss exceeds $1,500,000, resulting in a 16-point enhancement.[4]

---

[4] The fact that Kelley paid out $1,150,000 of the funds through a settlement payment to ORT does not affect the loss calculation.  The Guidelines provide that the loss shall be reduced by "the money returned . . . to the victim *before* the offense was detected."  USSG 2B 1.1 Application Note 3(E)(i) (emphasis added).  The time of detection is the earlier of "the time the offense was discovered by the victim or government agency," or "the time the defendant knew or reasonably should have known that the offense was about to be detected by a victim or government

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-21

### 3.  Victim Adjustment

The Court should apply a two-level adjustment because the offense involved 10 or more victims.  USSG§ 2B1.1(b)(2)(A).  As discussed in Section II.A.3, and reflected on Exhibit 2710, Kelley stole from thousands of victims.

### 4.  Sophisticated Means

The Court should also apply a sophisticated means enhancement under USSG 2B1.1(b)(10).  The threshold for this enhancement is not high.  The Ninth Circuit has held that "conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *United States v. Jennings*, 711 F.3d 1114, 1145 (9th Cir. 2013) (applying identical enhancement for tax offenses).  The use of fictitious entities, corporate shells, and falsified documents all constitute sophisticated means.  Application Note 9(B); *see United States v. Tanke*, 743 F.3d 1296, (9th Cir. 2014) (falsified invoices and checks); *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (defendant "used several different bank accounts to move funds around, fabricated numerous documents, and manipulated others to lie for him); *Jennings*, 711 F.3d at 1145 (use of bank account with misleading name).

Here, Kelley used a host of sophisticated means to commit and conceal his offense, including:

- Falsifying documents, such as the "zeroed out" spreadsheet provided to ORT, and the two fraudulent letters to Frank Cornelius;

- Creating a series of bank accounts at three different banks in the names of multiple corporate entities, including a shell company (Berkeley United) to obscure the path of the stolen funds;

- Registering a Belizean offshore trust and placing the stolen assets in yet another account benefitting that trust; and

---

agency." *Id.*  Here, Kelley returned the $1,150,000 only after ORT detected the offense and brought suit requiring him to do so.  Accordingly, the payments were not made "before the offense was detected" and should not be credited against the loss.  In any case, even if the $1,150,000 was deducted, the loss would still be $1,788,708, well above the $1,500,000 threshold.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-22

- Attempting to legitimize the stolen funds through a complex tax fraud scheme in which Kelley claimed to earn the stolen money years after he shuttered his business.

The Court should apply the sophisticated means enhancement.

### 5. Abuse of Trust

Finally, the Court should also apply a 2-point abuse of trust enhancement. This enhancement applies when the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." USSG § 3B1.3. The "decisive factor in deciding whether a defendant occupied a position of trust" is "the presence or lack of professional managerial discretion." *United States v. Aubrey*, 800 F.3d 1115, 1124 (9th Cir. 2015); *see* USSG § 3C1.3 Application Note 1 (a "position of trust" is "characterized by professional or managerial discretion").

Here, the "decisive factor"—the presence of managerial discretion—is clearly satisfied. Kelley was the owner of PCD and made all the business's management decisions, including whether and when to issue refunds. Kelley's position facilitated both the commission and concealment of the offense: by assuming total discretion over the refund process, he was able to wrongfully steal refund money, and conceal from borrowers the fact that refunds were due.

Kelley assumed a position of trust because he stepped into the shoes of the escrow companies—which are fiduciaries—with regard to the management of reconveyance funds. The Ninth Circuit has held that an abuse of trust enhancement applies where, as here, the defendant subcontracts to take on responsibilities of a third party that itself occupies a position of trust. *Aubrey*, 800 F.3d at 1124. In *Aubrey*, the defendant embezzled money while operating as a subcontractor for FDHC, a fiduciary entrusted to administer federal grants to Indian tribes. Aubrey opposed the enhancement, arguing that it was FDHC, not Aubrey, that occupied the position of trust. This is the precise reasoning that Probation offers in declining to recommend the adjustment in the instant case. But the Ninth Circuit rejected this argument in *Aubrey*, finding that when "FDHC

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-23

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

delegated financial management" to Aubrey's company, Aubrey "stepped into the shoes of FDHC," and therefore took on FDHC's position of trust. *Id.* at 1184.

Here, as Probation acknowledges, escrow companies are fiduciaries that occupy a position of trust. *United States v. Brande,* 86 Fed. Appx. 338, 342 (9th Cir. 2004) (unpublished) (citing *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996). Kelley stepped into the shoes of the escrow companies when he persuaded the escrow companies to outsource part of their responsibilities (tracking reconveyances and managing trustee fees) to PCD. In this role, PCD took over total responsibility for managing the reconveyance monies. Under *Aubrey*, the enhancement clearly applies.

**B.     Group 2: False Declaration**

The government agrees with Probation's calculation of Group 2:

| Item | Guideline | Adjustment |
|------|-----------|------------|
| Base Offense Level | 2J1.1 | +14 |
| Interference with the administration of justice | 2J1.3(b)(2) | +2 |
| **Total** | | **17** |

Under the multiple-count adjustment guidelines, these convictions have no effect on the guideline calculation. The Court should be mindful that this serious conduct is not reflected in Kelley's guideline range.

**C.     Group 3: Tax Evasion**

**1.     Guideline Calculation**

The government agrees with Probation's guideline calculation for the tax convictions, which is as follows:

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-24

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Item | Guideline | Adjustment |
|------|-----------|------------|
| Tax offense with intended loss in excess of $250,000 | 2T1.1(a) and 2T4.1(G) | +18 |
| Defendant failed to report income from criminal activity of at least $10,000 | 2T1.1(b)(a) | +2 |
| Sophisticated means | 2T1.1(b)(2) | +2 |
| **Total** | | 22 |

### 2.   Tax Loss Calculation

As discussed in Section II.D.2, above, the government established at trial that the intended tax loss is $308,263.  This is based on Revenue Agent Paul Shipley's calculation that, if Kelley had paid tax as dues on the stolen money in the years it was stolen, his total tax liability for the period 2005 to 2020 would have been $1,890,643.  TE 2824.  However, if Kelley had succeeded in his scheme of realizing the income at an annual rate of $245,000, and had continued to take fraudulent business deductions, he would have paid only $1,582,379.  *Id.*  The difference between the figures—$308,263—is the intended tax loss.  *Id.*[5]

### 3.   Failure to Report Criminal Income of at Least $10,000

A two-point enhancement applies "if the defendant failed to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity."  USSG § 2T1.1(b)(1).  Here, Kelley failed to report more than $10,000 that he received from criminal activity—theft—during the years he received it (2005-2008).  During later

---

[5] Alternatively, the Court could calculate the loss by taking the amount of tax due that Kelley failed to pay between 2006 and 2008 ($830,873 per Exhibit 2821), and subtracting the additional tax payments Kelley made prior to his contact with law enforcement, that is, the tax he paid on the $245,000 in income he claimed for each of the years 2011 and 2012.  *Cf.* USSG 2B1.1 Application Note 3(E) (defendant entitled to credit against loss under USSG 2B1.1 for offsetting payments made before detection of the offense).  This would result in a tax loss in excess of $550,000, which would increase the tax guideline calculation by two offense levels.  However, the government agrees with Probation that the more conservative calculation of $308,263 is a reasonable approximation of loss here.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-25

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

years (2011-2015), he mischaracterized the money as current income from an ongoing reconveyance tracking business. Accordingly, this enhancement applies as well.

### 4. Sophisticated Means

Probation also correctly recommends a 2-point enhancement for sophisticated means for the tax offenses. USSG § 2T1.1(b)(2). As is true with the sophisticated means enhancement for theft, this enhancement applies when the offense includes "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate entities, or offshore financial accounts." USSG § 2T1.1Application Note 5.

Here, Kelley transferred the untaxed income through a series of bank accounts and ultimately deposited it into a Vanguard account held by a newly-created shell company (Berkeley United) owned by an offshore trust (Wellington Trust). Kelley also employed a rather sophisticated (though wholly specious) rationale for his tax scheme in which he relied on an I.R.S. private letter ruling and a patently inapplicable footnote in a securities filing by his former employer, First American Title Company. Kelley used unusually sophisticated means in furtherance of his tax fraud.

### D. Multiple-Count Adjustment

As noted above, the offense level for Group 1 is 28 points; the offense level for Group 2 is 17 points; and the offense level for Group 3 is 22 points. Because the offense level for Group 2 is 11 points below the offense level for Group 1, the perjury offenses do not result in any adjustment under USSG 3D1.4. However, the offense level for Group 3 is six points less than Group 1 and therefore counts as ½ of a Unit. With 1½ total Units, the offense level is increased by one point, to 29, resulting in a guideline range of **87-108** months.

//

//

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-26

# IV.    RATIONALE FOR SENTENCING RECOMMENDATION

The government recommends that the Court sentence Kelley to a low-end sentence of 87 months of imprisonment.  The sentence is necessary to achieve the goals set out in 18 U.S.C.§ 3553 for the reasons set forth below.

## A.    Nature and Circumstances of the Offense

### 1.    Kelley's Contempt for the Law is a Substantial Aggravating Factor.

Kelley's theft seems simple in some ways, but it was very devious.  Kelley capitalized on an obscure corner of the real estate industry that consumers did not understand.  He exploited a unique moment in time, when trustee fees were being phased out, but the industry had not yet adjusted.  Kelley then persuaded escrow companies to outsource to him the management of millions of dollars of other people's money.  He also persuaded the escrow companies not to check up his management of trustee fees.  Indeed, one of Kelley's primary selling points was that the escrow companies would not need to monitor PCD.  His marketing materials encouraged escrow companies to "leave us with the headaches,"  and proposed that "YOU: stop worrying about all those files.  WE: take it from here." TE1607i.  Then, with no one watching, Kelley stole the money in amounts that no one would notice but that, together, added up to millions of dollars.  It is easy to see why Probation characterizes this as "the perfect crime."  Recommendation at 4.

What truly distinguishes this case, however, is Kelley's dogged determination to keep his stolen money; his repeated willingness to lie, deceive, and flout legal processes; and the utter contempt for the law that his conduct reflects.  The road Kelley chose to travel had many off-ramps.  He could have acknowledged his wrongdoing, for example, by returning the money when the class actions were filed; by telling the truth when he was sued by Old Republic or when interviewed by federal agents; or by accepting responsibility in the course of this prosecution.

Instead, Kelley repeatedly decided to double down on his fraud by telling more lies.  Kelley chose to destroy his business records and then lie about it; to falsify the

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-27

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 letters to Frank Cornelius; to hide the stolen money by moving it through numerous
2 accounts to a sham trust; to tell blatant lies for eight hours in a sworn deposition (and to
3 repeat those lies in a written declaration); and to engage in plain tax fraud three years in a
4 row. Kelley then showed the same stripes in his defense at trial, claiming for example,
5 that his family tour of the national parks was a business expense (because he travelled
6 through towns with county recorders' offices); or by suddenly producing Exhibit A-529,
7 which has all the hallmarks of being forged, refusing to explain its origin, and claiming it
8 justified his theft. A guideline sentence is necessary to promote respect for the law in
9 light of Kelley's repeated and continuing display of contempt for the law.

10 **2.      The Guidelines Understate the Seriousness of the Offense Conduct.**

11      Much of Kelley's misconduct is unaccounted for in the guideline range. It is
12 noteworthy that Kelley would face the exact same range if he had done nothing more
13 than steal the money and fail to report it as income. For example, because of the
14 grouping rules, the guideline range contains no adjustment for Kelley's perjury
15 convictions, which themselves represent extremely serious misconduct. Indeed, if Kelley
16 had been convicted of a single count of perjury as a standalone offense, the perjury
17 conviction *alone* would have resulted in a guideline range of 14-21 or 24-30 months,
18 depending on adjustments.[6]

19      The guideline range similarly fails to reflect Kelley's destruction of business
20 records to avoid civil discovery or his scheme to falsify correspondence to Frank
21 Cornelius. While neither the destruction of records nor the falsified letters were the basis
22 of any specific conviction, this conduct is a proper sentencing consideration, both
23 because it is pertinent to the "nature and circumstances of the offense" under 18 U.S.C.
24 § 3553(a), and because it is "relevant conduct" under the sentencing guidelines. *See*

---

26 [6] *See* USSG 2J1.3. With no adjustments, the range would be 14-21 months. However, the government believes that
27 Kelley's false testimony, including his false testimony about PCD's business records, would merit a three-point
adjustment for interference with the administration of justice, resulting in a range of 24-30 months. USSG
28 § 2J1.3(b)(2).

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-28

USSG § 1B1.3(a) (relevant conduct includes all conduct "in the course of attempting to avoid detection or responsibility for the offense").

Finally, the guidelines fail to reflect the multi-faceted nature of the tax fraud. The tax offenses involved not only Kelley's false claim to be operating a business, but also his outrageous deductions of personal expenses. Again, as a result of the grouping rules, all of this tax-related misconduct results in an adjustment of a single point. Given that the guideline range fails to account for much of Kelley's misconduct, the government submits that nothing less than a guideline sentence is appropriate here.

## B.   The Defendant's History and Characteristics

### 1.   Kelley's Education and Experience is an Aggravating Factor

Kelley's offense is particularly willful because of his background:  as an attorney, military officer, and legislator, he should understand far better than most the seriousness of theft, fraud, and litigation misconduct.  Kelley is a member of the bars of three jurisdictions, worked in a United States Attorney's Office and at the SEC, and maintained a private litigation practice.  He prosecuted soldiers at discharge hearings for the military. Kelley served as a state legislator for five years before running for Washington State Auditor—Washington's chief fraud watchdog.

Kelley portrays himself as the ultimate rule follower.  The PSR states that Kelley "always has to read all the rules before he can play any game." PSR ¶ 59.  In this case, though, Kelley studied all the relevant rules, and put that knowledge to work to commit, and then conceal his crimes.  He used his background in the real estate industry to identify an unwatched pot of money that he could steal.  He drew on his background as a litigator when he engaged in massive discovery abuse, perjury, and the trickery of class actions lawyers with the Cornelius letter.  Kelley studied (and even taught) tax law, and then used that knowledge to engage in blatant tax fraud.  Kelley's pattern of methodically learning the rules of various systems and then exploiting his knowledge to subvert those systems makes these offenses all the more willful.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-29

1   The government also notes that, despite his outward commitment to law and order,

2   past incidents reflect dishonesty by Kelley that predates the offense.  For example, First

3   American Title Company terminated Kelley in 2000 based on accusations of theft and

4   fraud.  PSR ¶ 73.  In litigation over the termination, First American accused Kelley of

5   stealing artwork from the company.  Further, Kelley admitted, in a deposition, to living

6   rent-free in a California mansion that First American had seized in a title claim.  When

7   Kelley founded United National, his website identified "board members" such as Calvin

8   Pearson, who testified at the first trial that he was never even asked to serve on United

9   National's board.  The ten-year course of dishonesty for which Kelley has been convicted

10  is thus extreme, but apparently not aberrational for Kelley.

11        **2.    Kelley's Privileged Background Aggravates the Offense**

12        Defendants who come before this Court often turn to crime, in part, because life

13  has offered them limited options.  Their crimes may be product of poverty, abuse,

14  substance addiction, or mental deficit.  Those conditions do not excuse criminal behavior,

15  but they partially explain it, and it is appropriate to consider them as mitigating factors.

16  The other side of the coin is that defendants who do not face these types of disadvantages

17  should be viewed as relatively more culpable.  *United States v. Stefonek*, 179 F.3d 1030,

18  1038 (7th Cir. 1999) ("Criminals who have the education and training that enables people

19  to make a decent living without resorting to crime are more rather than less culpable than

20  their desperately poor and deprived brethren in crime.")

21        Troy Kelley has lived a life of privilege.  He was raised by supportive parents in a

22  "comfortable" family in the "peaceful suburban town of Rowland Heights, California."

23  PSR ¶ 53.  He was educated at the University of California, Berkeley, and obtained both

24  a law degree and an M.B.A.  His lifestyle is reflected in the phony business expenses he

25  deducted, such as dues and lessons at the Tacoma Lawn Tennis Club and spa treatments

26  at high-end hotels.  At the time he chose to commit these crimes, Kelley owned his own

27  business, and his wife earned a good salary as a professor at the University of Puget

28

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-30

1  Sound.  Kelley did not need to steal to put food on the table.  In this sense, Kelley's crime
2  is far more volitional—and malevolent—than most.

3       Defendant submits voluminous letters of support from friends, family, and
4  colleagues.  These letters assert, for example, that Kelley would "not do something he
5  knew to be wrong"—a statement directly at odds with the trial evidence and jury verdict,
6  which established a pattern of willful dishonesty.  To some extent, these letters are a
7  reflection of Kelley's ability to publicly portray himself as the consummate straight
8  shooter, while engaging in extremely dishonest conduct when no one is looking.  And,
9  while the letters may be heartfelt, they are not unusual in white collar cases, and therefore
10  do not themselves merit a downward departure.  "[E]xcellent character references are not
11  out of the ordinary for an executive who commits white-collar crime; one would be
12  surprised to see a person rise to an elevated position in business if people did not think
13  highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir.
14  2003); *see United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive
15  letters are "by no means out of the ordinary" because privileged white-collar offenders
16  "often have impressive records of civic and philanthropic achievement"); *United States v.*
17  *Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's "record of good works is neither
18  exceptional nor out of the ordinary for someone of his income and preeminence").

19       Kelley's background makes it particularly important to pay careful attention to the
20  applicable sentencing guidelines.  While the guidelines are no longer mandatory, they
21  continue to serve the critical function of insuring consistency in sentencing.  This is
22  especially important in white collar prosecutions.  Indeed, concern that "white-collar
23  offenders" received special treatment and "frequently do not receive sentences that reflect
24  the seriousness of their offenses" was a driving motivation for the Sentencing Reform
25  Act that gave rise to the Sentencing Guidelines. S. REP. NO. 98-225 (1983), *reprinted in*
26  1984 U.S.C.C.A.N. 3182, 3260.

27
28

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-31

**C.      Other Sentencing Factors**

**1.      The Need to Avoid Sentencing Disparity**

The sentence should be proportionate to other sentences.  While there is no other recent case in this district involving protracted fraud of this nature, it is noteworthy that courts have imposed significant sentences in cases involving embezzlement alone, without the eight-year cover-up present here.  For example, earlier this year, this Court sentenced a defendant to 71 months of imprisonment, following a trial, for embezzling $530,364 from a real estate agency.  *See United States* v. *Allison,* CR16-05207RBL.  In *United States v. Shutlz*, Judge Coughenour ordered a 72-month sentence where the defendant engaged in a $2.5 million false invoicing scheme.  *See* CR15-343JCC.  In *United States v. Hoss*, Judge Martinez imposed a 96-month guideline sentence, following a trial, on a hard money lender who embezzled $3.6 million in loan proceeds. *See* CR11-330RSM.

In addition, courts in this district typically order higher sentences, relative to the loss amount, when the defendant has a law enforcement background.  *E.g.*, *United States v. Allen*, CR11-0036JCC (former Granite Falls Chief of Police sentenced to 60 months after guilty plea for embezzling $625,666 while serving as fiduciary for Social Security benefits); *United States v. Manos,* CR12-5091RJB (police officer sentenced to 33 months for embezzling $159,000 from Police Officer's guild); *United States v. Schlicker*, CR15-0082JCC (Chief of police of Swinomish Tribe sentenced to 16 months after guilty plea for embezzling $33,622 from the tribe).  While Kelley was not a police officer, his roles as officer of the court, military officer, legislator, and Washington State Auditor, carry with them a similar or greater expectation that Kelley will respect the law.

An 87-month sentence for Kelley's theft of almost $3 million, combined with his protracted coverup and his defiant refusal to accept responsibility, is proportional to the cases cited above.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-32

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    ## 2.    The Need for General Deterrence

2    General deterrence is a particularly significant consideration because this case has

3    attracted widespread public attention.  A significant sentence will encourage others to

4    think twice about stealing from consumers when they think no one is watching.

5    Even more importantly, the sentence this Court imposes will send a message to the

6    community about the rule of law.  The notion of an attorney and legislator not only

7    stealing money, but worse, engaging in perjury and other litigation misconduct to hide it,

8    is deeply corrosive to the basic norms on which the administration of justice depends.

9    Our court system works only because the vast majority of citizens view the court rules—

10   and particularly the oath—as sacred.  Throughout this prosecution, Kelley has thumbed

11   his nose at this notion.  He has consistently contended, and continues to contend, that his

12   conduct is not serious.  A guideline sentence will represent a firm rejection of that

13   position.

14   ## D.    The Government's Pre-Conviction Plea Offers are not Relevant.

15   In a pleading submitted on May 17, 2018, the defense took the extraordinary

16   measure of submitting to the Court two plea offers the United States made to Kelley

17   following the mistrial.  Dkt. No. 619.  In doing so, the defense disclosed to the Court and

18   the public the terms of the government's offers.  Because the terms of the settlement

19   offers were irrelevant to the motion they were supposedly offered to support, the only

20   logical inference is that Kelley filed them in an effort to influence the Court's

21   determination of the appropriate sentence.[7]

22   The government's plea offers are not an appropriate sentencing consideration.

23   Both offers were presented after the mistrial and at a time when the defense, at least, was

24

25   _____

26   [7] Although the *timing* of the settlement offers was tangentially relevant to Kelley's argument that the Court should
     have granted a continuance, that timing was independently established by counsel's declaration in support of the
27   motion, or could have been demonstrated by filing, at most, redacted copies of the letters.  As a result, it is clear that
     attaching the settlement letters added nothing of relevance, and served no purpose other than to disclose the terms of
28   the offers.

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-33

claiming the government could not win a second trial.  Based on its assessment of then-existing litigation risk, the government offered to resolve the matter based on a guilty plea to either (a) one tax deduction charge; or (b) one false declaration charge.  While the government agreed to recommend a sentence much lower than the sentence it is recommending today, such a recommendation was based on a proposed plea to only a sliver of the criminal conduct for which Kelley has now been found guilty, and was further reduced to reflect the acceptance of responsibility by Kelley inherent in a guilty plea.  Now that a jury has convicted Kelley of eight federal felonies, including the possession of millions of dollars of stolen funds, and Kelley has not accepted responsibility in any way, the sentencing considerations are completely different.  The government's pretrial plea offers are irrelevant to the Court's sentencing considerations.

## V.        FINANCIAL PENALTIES

The government is seeking two sets of financial relief in connection with these convictions.  First, the government has moved for entry of an order of forfeiture in the form of a $1,442,302 money judgment.  Dkt. 630.  The government respectfully requests that the Court enter this money judgment at the sentencing hearing.

Second, the government intends to seek restitution on behalf of the victims.  Calculating restitution will be a complex exercise because of the number of victims involved.  On June 14, 2018, the government provided notice pursuant to 18 U.S.C. § 3663(d)(5) that the losses to the victims will not be ascertainable before the sentencing hearing.  Accordingly, the government requests that the Court schedule a restitution hearing within 90 days of the sentencing.

//

//

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-34

# VI.    CONCLUSION

The Court should sentence defendant to 87 months of imprisonment, to be followed by a three-year term of supervised release.  This sentence is necessary to reflect the seriousness of the offense, promote respect for the law, and to satisfy the other requirements of 18 U.S.C.§ 3553(a).

Dated:  June 22, 2018

Respectfully submitted,

ANNETTE L. HAYES
United States Attorney

*s/ Seth Wilkinson*
ANDREW FRIEDMAN
ARLEN STORM
SETH WILKINSON
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington  98101-1271
Telephone:  (206) 553-7970
Fax:  (206) 553-0755

**CERTIFICATE OF SERVICE**

 I hereby certify that on June 22, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s).

*Seth Wilkinson*
SETH WILKINSON
Assistant United States Attorney

UNITED STATES v. KELLEY, CR17-005198RBL
SENTENCING MEMORANDUM-35

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970